# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CARLOS GOODEN, *
*
Plaintiff, *
* Civil Action
v. * No. 4:23-cv-01987
*
THE UNIVERSITY OF HOUSTON *
SYSTEM and THE UNIVERSITY *
OF HOUSTON-DOWNTOWN, *
*
Defendant. *

ORAL DEPOSITION

OF

CARLOS GOODEN

Friday, January 26, 2024

REMOTELY REPORTED

ORAL DEPOSITION OF CARLOS GOODEN, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on Friday, January 26, 2024, from 10:05 a.m. to 5:18 p.m., before Debbie D. Cunningham, CSR in and for the State of Texas, remotely reported via Machine Shorthand, pursuant to the Federal Rules of Civil Procedure.

--ooOoo--

APPEARANCES

FOR CARLOS GOODEN:

MOORE & ASSOCIATES
Lyric Center
400 Louisiana St., Suite 1110
Houston, Texas 77002
(T) 713.222.6775
By: Rochelle Owens, Esq.
Rochelle@mooreandassociates.net

FOR THE UNIVERSITY OF HOUSTON SYSTEM AND THE UNIVERSITY OF HOUSTON-DOWNTOWN:

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(T) 512.463.2120
By: Jason T. Contreras, Esq.
Jason.Contreras@oag.texas.gov

ALSO PRESENT:

Jennifer Bloom
Philip Gutierrez

--ooOoo--

INDEX

APPEARANCES 2

EXAMINATION OF CARLOS GOODEN:

BY MR. CONTRERAS 6

CERTIFIED QUESTION BEGINS PG 182, LN 3 ENDS PG 187, LN 6

CHANGES AND SIGNATURE 277

REPORTER'S CERTIFICATION 279

--ooOoo--

EXHIBIT INDEX


| Exhibit Number | Description | Page |
|---|---|---|
| Exhibit 1 | Deposition Notice | 6 |
| Exhibit 2 | Carlos Gooden's job application materials | 14 |
| Exhibit 3 | Executive Director, Graduate Business Programs job offer | 23 |
| Exhibit 4 | Carlos Gooden UHD biopage | 32 |
| Exhibit 5 | Carlos Gooden 4/25/22 Official Complaint of Harassment, Discrimination, and Toxic Environment | 91 |
| Exhibit 6 | 5/2/22 Charles Gengler administrative leave letter | 111 |
| Exhibit 7 | 5/23/22 Mutual No-Contact Order | 125 |
| Exhibit 8 | 3/20/23 Charles Gengler resignation letter | 146 |
| Exhibit 9 | Formal Complaint Questionnaire | 149 |
| Exhibit 10 | Gooden's 4/26/22 proposal letter | 195 |
| Exhibit 11 | Plaintiff Carlos Gooden, Ph.D.'s Answers to Defendants' First Request For Admissions | 202 |
| Exhibit 12 | Plaintiff Carlos Gooden, Ph.D.'s Objections and Responses to Defendants' First Set of Interrogatories | 249 |


--ooOoo--

(Friday, January 26, 2024, 10:05 a.m.)

P R O C E E D I N G S

THE REPORTER: Today's date is Friday, January 26, 2024. This is the oral deposition of Carlos Gooden in the matter of Carlos Gooden versus the University of Houston System and University of Houston Downtown, and it is being conducted remotely via Zoom videoconferencing platform. We are on the record at 10:05 a.m. Central Standard Time.

My name is Debbie Cunningham; and my business address is 9901 Brodie Lane, Austin, Texas 78748.

Would all persons present please introduce themselves for the record, beginning with Plaintiff's Counsel?

MS. OWENS: My name is Rochelle Owens. I'm here on behalf of the Plaintiff, Dr. Carlos Gooden.

MR. CONTRERAS: My name is Jason Contreras, here on behalf of Defendants.

*

*

*

*

CARLOS GOODEN,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. CONTRERAS:

**Q. Hello. Good morning, Mr. Gooden. My name is Jason Contreras. You understand that I'm the attorney for the Defendants that you've sued in your lawsuit, right?**

A. I do.

**Q. Okay. And are you currently at the Moore & Associates law firm -- law office in downtown Houston?**

A. I am.

**Q. Okay. Thank you.**

MR. CONTRERAS: So I just sent over Exhibit 1. It's the Deposition Notice for today.

(Exhibit 1 marked.)

**Q. (BY MR. CONTRERAS) That's just a notice telling you about the deposition today that -- for your deposition. So that's all that is for Exhibit 1.**

**Just a couple of things I'd like to go over so that today's deposition goes as smoothly as possible. Okay?**

**First of all, you understand that you're under oath, even though we're not in a courtroom, right?**

A. (No audible response.)

MR. CONTRERAS: Hello. Can you hear me? Did my audio go out? Can you hear me?

THE REPORTER: I can hear you.

MR. CONTRERAS: Okay.

**Q. (BY MR. CONTRERAS) Mr. Gooden, so you understand that you're under oath, even though we're not in a courtroom, right?**

A. (No audible response.)

THE REPORTER: I'm not hearing the witness.

MR. CONTRERAS: Yeah. Melissa, is there -- maybe the audio got turned off or -- I'm sorry -- Rochelle? Sorry. Rochelle.

(No audible response.)

MR. CONTRERAS: Oh, I think they're having some internet problems or something.

THE REPORTER: Do you want me to take us off the record while we resolve this?

MR. CONTRERAS: Yeah, real

quick. That'd be good.

THE REPORTER: We're going off the record at 10:08 a.m.

(Off the record from 10:08 to 10:14 a.m.)

THE REPORTER: We're back on the record at 10:14 a.m.

MR. CONTRERAS: Okay. Great.

**Q. (BY MR. CONTRERAS) All right. Just picking up from the beginning again, good morning, Mr. Gooden. Thank you for your time today.**

**You understand that I'm the attorney for Defendants that you've brought a suit against in this lawsuit, right?**

A. Yes, I do.

**Q. Okay. Great. Just to go over a couple of things so that today's depo goes as smoothly as possible, first of all, Mr. Gooden, you understand that you're under oath even though we're not in a courtroom, right?**

A. Correct, I do.

**Q. Okay. And you also understand that if you don't tell the truth under oath, that you can be criminally prosecuted for perjury,**

**right?**

A. Correct.

**Q. So it's easier to read the transcript that we get out of the deposition, if you could please wait for me to get my full question out before you answer, that way the transcript will read smoother. Okay?**

A. Absolutely.

**Q. Also, please answer with a verbal response versus a nonverbal response, such as a nod of the head, just as an example. Okay?**

A. Noted, yes.

**Q. Okay. And if I ask you a question that you do not understand, will you let me know?**

A. I will.

**Q. Okay. Thank you.**

**And if I ask you a question and you answer it, would it be fair to assume that you understood the question?**

A. That's fair, yes.

**Q. Okay. Are you taking any kind of medication today that would impair your ability to testify truthfully today?**

A. No, I'm not.

**Q. Okay. Is there any reason why you can't give me your best and truthful testimony today?**

A. No, there are no reasons.

**Q. Okay. So just a couple of acronyms, just to make it easier, versus having to say the whole name out, you understand if I say "UHS," I'm referring to the University of Houston System, right?**

A. Yes.

**Q. And if I say "UHD," I'm referring to University of Houston-Downtown, right?**

A. Yes.

**Q. Okay. And because you've sued both of those entities, if I say "Defendants," you understand that I'm referring to both UHS and UHD, right?**

A. Yes.

**Q. Okay. And there's a name that's going to come up a lot, Charles Gengler, in the deposition.**

MR. CONTRERAS: Just for the court reporter, that's G-E-N-G-L-E-R.

**Q. (BY MR. CONTRERAS) So I'm just going to say "Gengler." And if I say "Gengler," you**

**understand that I'm referring to former Dean of the College of Business, Charles Gengler, right?**

A. Correct.

**Q. Okay. And, also, one last thing is if I say "your job" or "the job" and I'm referring to you, you understand that I'm referring to your position as Executive Director of Graduate Business Programs at UHD, correct?**

A. Correct.

**Q. Okay. So, first of all, how did you hear about the Executive Director job in the first place?**

A. I want to say either on LinkedIn or higheredjobs.com. It was a job posting announcement on a job board that I saw.

**Q. Okay. And what was the particular reason why you were interested in the job when you saw the posting?**

A. Absolutely. I was looking to get into graduate admissions. I had experience working in similar environments over MBA recruitment, as well as looking to relocate out of the Chicago area, closer to the south; and

so it really aligned with my career goals, my career skills and competencies, and just where I wanted to sort of like live long term.

**Q. Okay. And so you worked in the university/academic environment prior to coming to UHD for how long, 10, 13, 14 years?**

A. That is pretty accurate, yes.

**Q. Okay. So by the time you came to UHD, you had had significant experience working in universities in admission programs, right?**

A. Correct.

**Q. So at the time when you learned about the job, you were employed by Xavier University; is that correct?**

A. That is not correct. Can you repeat that question?

**Q. Oh, well, let me just ask you this: At the time that you applied for the Executive Director job at UHD, who was your employer?**

A. Chicago State University.

**Q. Oh, okay. Chicago State. Got it.**

**And how long had you worked for Chicago State University?**

A. At the time that I applied?

**Q. Yes.**

A. At the time that I applied, it would have been approximately a year and a month, a year and two months.

**Q. Okay. So then you applied, and you were hired for the Executive Director position. And so that involved relocating from Chicago to Houston, right?**

A. That is correct.

**Q. And when you applied for the position, you filled out a job application for the position, along with your CV and a letter of interest, right?**

A. That is correct.

MR. CONTRERAS: I'm going to go ahead and introduce Exhibit Number 2, and I'll go ahead and shoot it over on Zoom.

Would it be easier if I just e-mail -- or I just send it over chat and then I'll just screen share after I send it and then everyone will have it? I think that will be the best way.

THE REPORTER: Yes.

MR. CONTRERAS: Oh, do you need me to resend the depo notice again?

MS. OWENS: It's fine.

MR. CONTRERAS: Okay. I'm shooting over Exhibit Number 2, Mr. Gooden's job application materials.

(Exhibit 2 marked.)

MR. CONTRERAS: And let me just open it up.

**Q. (BY MR. CONTRERAS) Okay. Along with filling out the application, your CV, and your letter of interest, was there anything else that you submitted, Mr. Gooden, in support of your application for the position?**

A. I think it's important to note that the position posted originally in March and I applied at that time, in March, and then the search concluded. They cancelled the search, essentially. And I received a notification in March that said, "This position is no longer posted; however, we encourage you to seek additional opportunities at the University of Houston-Downtown."

The position then reposted about a month later, in April or May. So, technically, I applied twice. At that time, in April or May, the description for the position in the posting had changed slightly,

specifically related to, I believe, the job requirements.

So I would have at that time submitted two applications with supplemental materials. So I think that will determine what -- they will be relatively identical, but...

**Q. Okay. Let me just show you what I have marked as Exhibit 2. And whether this was your first application or your second, would you agree that this is basically the same format and information that was provided by you, correct? And this one is a total of 19 pages. So I'll just kind of scroll through it slowly for you to see.**

A. I can't read it. It looks like what would have been, but...

**Q. Okay. I'm blowing it up. Is that better?**

A. That would not have been my application for the role.

**Q. Okay.**

A. My address listed there is my Houston address, which means -- I didn't have a Houston address when I applied for the role.

**Q. Okay. Got it.**

**All right. Well -- so then this is some -- this is information that came from your personnel file, I believe; but I think I'll get to the application part of it here.**

**Can you read this screen right here, this page?**

A. Yes.

**Q. Okay. Whether it was part of your application or not, this was information that you would have provided to the University in your application materials, right?**

A. That is, yes.

**Q. Okay. Experiences, credentials, education, work experience.**

**Okay. So it has here Xavier University, University of Louisiana. You mentioned you were working for Chicago State University, and I don't see that -- there it is right there. Is that it right there, University of Chicago Booth School of Business?**

A. University of Chicago, yes.

**Q. Okay. And do you remember answering some questions in a questionnaire format when you applied?**

A. I mean, I would not remember at this time; but we can certainly review it.

**Q. Okay. Yes. Can you read this page where it says Questionnaire, Disqualification Questions?**

A. Maybe if we zoom in. I can't quite see it.

**Q. Can you see it now?**

A. Yes.

**Q. Okay. There we go.**

**So there were several questions. "If hired, are you legally authorized to work in the U.S.?" You put, "Yes." Do you see that?**

A. Correct.

**Q. Okay. Number 2 -- I don't think I need to go through all of them; but to the best of your recollection, these were questions that you answered in the application process, correct?**

A. I would assume so.

**Q. Okay. Question Number 2, I think that's about relatives, having any family members -- that answer is correct, right? Your answer was "No." That is a correct answer?**

A. That I do not have any family members, blood or marriage, serving -- that is accurate, yes.

**Q. Okay. A similar question, Number 3 -- I don't think we need to go to that one.**

**Number 4, criminal history.**

**Number 5, "Have you ever been discharged, fired, or asked to resign from a position?" And there was no answer to that one, see?**

A. Sure.

**Q. Can you see where the columns -- well, let me just --**

MR. CONTRERAS: For the record, the questionnaire is in columns; and there's three total columns. One is the answer -- or one is the answer, the second column -- I'm sorry. The first column is the question. The second column is the answer. The third column says "Results."

**Q. (BY MR. CONTRERAS) So it would be in the second box there to provide an answer. Do you see that, Mr. Gooden?**

A. I do.

**Q. Okay. So back to Question Number 5, it doesn't look like there was an answer provided to this question. So let me ask you this question: Have you ever been discharged, fired, or asked to resign from a position?**

A. No.

**Q. Okay. Any reason that you can recall why that answer, "No," wasn't provided?**

A. No.

**Q. Do you know if you had to compete with others for the Executive Director position?**

A. I believe so, yes. I mean, it was a job search process, yes.

**Q. Okay. Did it show on LinkedIn how many other applicants, if you recall seeing the -- because I know that's information that will show on a job posting?**

A. I cannot recall that far back.

**Q. Okay. And so what was the next step after you applied? Were you contacted by someone at the university, indicating their interest in you; or what do you recall happened next after you submitted your application?**

A. Correct. Well, the second time, yes,

I would have been contacted by the search chair, the hiring committee chair, to schedule a phone interview.

**Q. Okay. And who was that person?**

A. Verma Rahul [sic.]

**Q. Can you spell that just for the court reporter's benefit?**

A. Off the top of my head, no. I can look it up, possibly. He's a professor in Finance.

**Q. We can get that by the end of the deposition to make sure we get the name right.**

**Okay. So you were contacted. And was there an interview requested, or was it just like an informal phone conversation? What do you remember?**

A. There was a phone interview with the hiring committee with Verma and maybe about five individuals.

**Q. Was one of those individuals Gengler?**

A. Not for the phone interview.

**Q. Okay. Who were the individuals then on the phone interview?**

A. To the best of my knowledge, right -- this was a while ago -- it would have been

Verma Rahul [sic]; Dianca Chase; Maxine Todd. They're on the tip of my tongue, but that might be as far as I can definitively and objectively say. There were about five individuals. There might have been someone from CPS, right? But, I mean, I'm sure it's documented. The hiring committee has to submit information to Tamika Small within the university. So that information, I think, can be captured.

**Q. Sure. Got it.**

**And so what happened after the phone interview that you recall?**

A. Sure. There was about a week or two period, and then I was notified that I advanced to a second round.

**Q. Okay. And what happened in the second round?**

A. The second round consisted of a video interview with the hiring committee again; and then, after that, there was a meeting with the Dean and the Associate Dean.

**Q. Okay. And the Dean was Charles -- was Gengler, right?**

A. Correct.

**Q. And the Associate Dean was Justo**

**Manrique?**

A. That is correct.

**Q. Okay.**

MR. CONTRERAS: And just for the court reporter's benefit, the first name is Justo, J-U-S-T-O, Manrique, M-A-N-R-I-Q-U-E.

**Q. (BY MR. CONTRERAS) Justo Manrique is from Peru, right?**

A. I would not be able to speak to that.

**Q. Oh, you don't know? Okay.**

**He speaks with an accent, though, right, when you talk to him?**

A. That could be said, yes.

**Q. Okay. And so then, how did the video interview go?**

A. It was scheduled to be for 30 minutes; and it went for about 45 minutes to an hour, which I interpreted to be a good thing. We talked about a variety of different things.

**Q. Okay. Great.**

**And then was there a job offer made after that, or what was the next step?**

A. The next step that I recall, yes, about maybe two or three weeks after that, I received a job offer and call from Human

Resources -- or at the time, they were called ESO, Employment Services Operations.

**Q. Okay. So I think I have that.**

MR. CONTRERAS: So I'll just introduce that as Exhibit 3. Give me one second. I'll send it over the chat to everybody.

(Exhibit 3 marked.)

**Q. (BY MR. CONTRERAS) I'll go ahead and screen share the job offer just to go over and confirm that that's what that was.**

**Let me see if I can enlarge it. Can you read this?**

A. No.

**Q. Okay. Can you see at the top that it says UHD?**

A. I can, yes.

**Q. Okay. Is that lettering too small? Do you need me to enlarge it?**

A. I think we're fine. I think it depends on what we're looking at.

**Q. Okay. Let me see if I can just try to enlarge it one more time.**

**That was your address at the time when you received the job offer, correct,**

**in Chicago?**

A. Correct.

**Q. Okay. And you can see here that, "We are pleased to extend an offer of employment to you as Executive Director" -- and I can't get the whole page on one screen because of space limitations; but does this appear to be that job offer?**

A. It looks like something I would have received, yes.

**Q. And then it does say at the top eOffer Acceptance Form. So it was something that you received electronically, like, through an e-mail attachment, right?**

A. Correct. I think it was, like, a portal, maybe, that I had to sign back into; and there were maybe, like, a few deliverables for me to then click. So I believe I signed in with, like, my user name and password that I used to apply.

**Q. Right. Okay. Got it.**

**So you kind of had to log into UHD's portal to access this information, right?**

A. If I recall correctly, yes.

**Q. And this is a correct indication of**

**your starting salary, $103,375.08 annually?**

A. That is correct.

**Q. And is this a correct description of your job duties and responsibilities?**

A. That is --

(Simultaneous speakers.)

A. I mean, to the best of my recollection. That's a lot of information to agree to in a zoom (laughing.)

**Q. I know.**

A. But, I mean, from what I can see, yes; but I'm not sure, like, that is exactly what I received.

**Q. Okay. And, you know, I'm not trying to slip anything in or trick you at all. I'm just saying that, to the best of your recollection, the job offer included a description of your job duties and responsibilities, right?**

A. Yes.

**Q. And it says your position works directly with executive, administrative, and academic leadership of the college, right?**

A. We will go with that, sure.

**Q. I'm trying to see if I can highlight**

**it. Well, shoot. Sometimes it lets me highlight, and now it's not letting me.**

**Can you see this highlighted part where I'm highlighting it?**

A. Yes.

**Q. That's the reference that I just asked you. Can you see the sentence, "The Executive Director works directly with the executive administrative and academic leadership of the college"?**

**That's a correct statement, right?**

A. Yes.

**Q. And then it further states, "Under the Dean's direction and support the Executive Director interfaces with multiple internal partners across campus in addition to external partners and is the primary liaison and leader of all marketing projects for the college."**

**Would that be a correct statement of your job, at least in part?**

A. Generally, yes.

**Q. Okay. Would it be correct to say that the Dean of the College of Business at that time, Gengler, is a position included in**

**the description of executive administrative and academic leadership?**

A. Yes.

**Q. Okay. So it says here that your direct report is Justo Manrique. Let me find that. Where is it? It's there somewhere.**

**Now, Justo Manrique -- we mentioned him earlier -- he's the Associate Dean, right?**

A. Correct.

**Q. And is he still there?**

A. He is.

**Q. Okay. There it is. Okay. "This position reports to Justo Manrique." Do you see that?**

A. I see it now.

**Q. Okay. Are you making any claims against Justo Manrique in this lawsuit that he did or said anything in support of your claims?**

A. Not at this time.

**Q. Okay. Justo Manrique is a Hispanic male, correct?**

A. That is correct, I would assume; but that -- I would say this -- having seen this, once I reported to campus, Justo Manrique was

not, is not, nor has ever been my supervisor.

**Q. Okay. So is it to your understanding that Gengler was your direct supervisor when you began the job?**

A. Correct.

**Q. Former Dean Gengler?**

A. Correct.

**Q. Then who was Gengler's boss, or who did Gengler report to at that time?**

A. I think we would likely have to ask UHD; but my best guess would be the provost, Akif Uzman.

**Q. Okay. Akif Uzman is a White male, right?**

A. You would have to ask UHD.

**Q. You don't make the assumption based upon appearance what their nationality or race is, correct?**

A. I'm not sure.

**Q. Well, do you or don't you?**

A. I think in this case, there's an objective answer, one that could be provided through the system. Like, we have access to the information. So I'm not sure if it would be helpful or what I can do to answer that, but

I don't know.

**Q. Okay. So then you wouldn't be able to say just objectively by Akif Uzman's appearance that he's a White male?**

A. I'm not sure. I've met him two times.

**Q. Okay. So back to the job offer letter, it was sent from Tamika Small, Coordinator with Talent Acquisition. Was Tamika Small involved in any of the interviews or the meetings?**

A. No.

**Q. Was Gengler involved in the hiring decision to offer you the job position?**

A. I am not sure.

**Q. Well, to the best of your recollection, who were the individuals that were present? So you mentioned that in one of the interviews, it was yourself, Gengler, and Justo Manrique?**

A. Correct.

**Q. Was that the first interview, or was that the second one?**

A. That was during the second interview that we had.

**Q. Okay. And tell me if I got it wrong; but that second interview, was that in person or on Zoom or virtual?**

A. It was Zoom.

**Q. Okay. So prior to receiving the job offer, had you ever visited the UHD campus?**

A. I had not.

**Q. Okay. So no fear. You didn't know if you were going to actually like the campus or not. You were interested enough in the position to accept the job, right?**

A. That is correct.

**Q. And when you were hired, you were advised by Defendants of all University policies, including the right to file a discrimination complaint, correct?**

A. Yes, I would assume at orientation; and then we had to complete a bunch of trainings.

**Q. Okay. And, obviously, a lot -- I'm sorry go ahead.**

A. Oh, yeah, at that time, correct, yeah. I think they had to be completed within 30 to 60 days of employment.

**Q. Okay. And, obviously, there's -- you**

**know, it's a big place. There's a lot of policies; but they, obviously, would have included policies that would have applied to you as an employee, right?**

A. Correct.

**Q. So with Dean Gengler as your direct supervisor, what types of work-related matters did you have with him on a routine basis?**

A. In regards to...

**Q. In regards to you fulfilling your job duties as Executive Director.**

A. Mostly looking at the application functions for the MBA program, recruitment were sort of like top priority. Of course, we had a wide variety of conversations; but that was the Number 1 sort of like goal and priority.

**Q. Okay. Those were kind of the major sort of aspects of the job that you were charged with?**

A. Right.

**Q. Okay. So let me go ahead and close this one. Let me see here.**

**On your biopage on UHD's website -- let me just pull that up.**

MR. CONTRERAS: Exhibit 4 will be Mr. Gooden's UHD bio. I just sent that over to everybody.

(Exhibit 4 marked.)

**Q. (BY MR. CONTRERAS) And now I'll just screen share it real quick.**

**Can you see your biopage on the screen, Mr. Gooden?**

A. I can.

**Q. Do I need to enlarge it at all?**

A. Possibly. I mean, it depends on where we're headed in this document.

**Q. Well, let me just ask you: Did you write your bio, the information contained under the two sections -- or three sections -- Scope of Responsibilities, Educational Qualifications, and Professional Experience? Did you write that, or did somebody else write that for you -- or about you?**

A. I'm not sure. I want to say it might have been a copy and paste from the description; but that was so long ago, like, I couldn't even tell you, like, how that populated. I know everyone at the university has one, so I'm not sure if it -- I wish I

could tell you.

**Q. Okay.**

A. I can't recall that.

**Q. Okay. No problem. Just asking.**

**If you wanted to change something in it, do you know if you can contact someone and have them make a revision to the information on your biopage?**

A. I'm sure that is possible.

**Q. So, according to your bio, you have to work with the Dean of the College of Business on things, right?**

A. Correct, yes.

**Q. As well as, according to your job duties and responsibilities, working with the Dean is part and parcel of the position, right?**

A. Correct.

**Q. And as your direct supervisor, Gengler had the authority to assign you job tasks, correct?**

A. Correct.

**Q. Okay. And as your direct supervisor, Gengler had the authority to provide you guidance and instruction in the performance of your job, correct?**

A. Correct.

**Q. What about the Associate Dean, Justo Manrique, did he also have similar authority, even though he wasn't your direct report?**

A. I'm not sure. Technically, I believe his title is Associate Dean of Undergraduate Initiatives; and then you have me in sort of Graduate Business Programs. So our work structure was unique in that sense. So I'm not sure. I don't believe he ever did.

**Q. Okay. So it was primarily Gengler that was your direct report that would -- that you would report to, bottom line, right?**

A. Correct.

**Q. So we went over your job offer; and, as I mentioned earlier, your starting salary was $103,375.08. During your job, you received at least one raise, right?**

A. Correct.

**Q. More than one?**

A. No.

**Q. Okay. When did you get that raise?**

A. The University instituted a merit raise, I believe, of 2 percent across the board for staff who had been at the university for a

year and who had achieved a certain level of rating on their evals; and I want to say that was in August or September of this year -- August or September of 2023. We're in 2024 now, yeah.

**Q. Okay. Got it.**

**And so based upon that raise, what is your current salary?**

A. Somewhere around 105,000.

**Q. Okay. And your position of Executive Director is a non-faculty, staff position, correct?**

A. That is correct.

**Q. All right. During your time there on the job, have you applied for any promotions?**

A. No promotions, no.

**Q. In your job as Executive Director, how many people do you supervise?**

A. On a given average calendar, it could range anywhere from, I'll say, six to ten.

**Q. And what would be those positions that you supervise?**

A. Oh, gosh. It would be Coordinator of Graduate Services, Assistant Director of Graduate Services, Associate Director of

Graduate Business Program Services, and then Office Assistant, Administrative Assistant. We have two Graduate Assistants. And then for over a year and a half, I was also supervising Digital Communications Manager and then a host of, like, student workers.

**Q. Okay. So you have pretty substantial supervisory responsibilities, right?**

A. Oh, sure.

**Q. Okay. Who is -- was one of those persons you supervised Jamil Thorne?**

A. Correct.

**Q. Okay. But he's no longer working there, right?**

A. Correct.

**Q. Okay. And he was the Assistant Director of Graduate Studies?**

A. For most of the time we worked together, he was the Coordinator of Graduate Services. He received the Assistant Director title and then departed maybe two weeks later.

**Q. Okay. Was he already working there in the office, Graduate Business Programs; or did he come on board after you were hired?**

A. He was there before me.

**Q. Okay. Would Jamil Thorne have any knowledge about any of the claims you're making in this lawsuit?**

A. Yes.

**Q. Okay. Oh, a real quick question: Do you know why he left? Did he find a better job?**

A. Correct, he found a different job, among other things; but, yes, he did find another job (laughing.)

**Q. Okay. Did he tell you the reason why he left?**

A. Yes. We had a number of conversations, yes.

**Q. Okay. And, I guess, just in a nutshell, what were his reasons for leaving?**

A. It was very much a hostile and toxic working environment. It was before I got there. It was when I got there. And it continued to be; but, I think, to get, like, the full scope, you might have to ask Jamil.

**Q. Okay. So the allegations in your lawsuit of inappropriate comments were made by Gengler, correct?**

A. Correct.

**Q. Okay. Is there anyone else at UHS or UHD that you allege made inappropriate comments to you or about you based on your race or sexual orientation?**

A. No.

**Q. Are you alleging in this lawsuit that somebody employed by Defendants either directed or encouraged Gengler to make inappropriate comments about your race or sexual orientation?**

A. Directly encouraged?

**Q. Yes.**

A. Not directly encouraged, no.

**Q. Okay. So are you suggesting that there was an indirect -- indirectly -- that Gengler was indirectly encouraged by others at the university to make inappropriate comments that were either racist or sexist against your sexual orientation?**

A. I think that's fair, yes.

**Q. Okay. Can you explain that?**

A. I think that, you know, there have been several claims of Gengler's conduct in the workplace, several of which have gone to Human Resources; and several have gone to Title IX. And each time that they're brought up, the

University continued to allow that behavior to continue on and perpetuate it.

And despite reforms, he continued to create a hostile working environment and bullying and harassing. And so I think employees were continuing to surface things to the University; but by not properly addressing, that's how they were non-directly encouraging and continuing to promote and foster a hostile working environment.

MR. CONTRERAS: Objection, nonresponsive portion.

**Q. (BY MR. CONTRERAS) Okay. But my question to you is: Can you identify any individual by name that would have been involved in that indirect encouragement to Gengler?**

A. I would say those individuals within the Title IX office as well as in Human Resources. So whether you want me to state -- I don't know who the prior Title IX Coordinator would have been. Ivonne Montalbano, right? Arguably, Akif Uzman would have also received information related to these items that I'm referring to. Even, I mean -- yeah.

**Q. Okay. So, basically, the bottom line in a nutshell is what you were saying is that these other individuals had knowledge of prior allegations and complaints against Gengler; and by failing to act, indirectly encouraged Gengler's behavior. Is that right?**

A. Correct.

**Q. So would it be fair to say that in order for someone to make improper comments about your homosexuality, okay, that person would have to first know that you're homosexual, correct?**

A. Correct -- well, yes and no.

**Q. Okay. Well, how do you explain that?**

A. Well, one, I think when you look at sexual harassment, sometimes you don't have to be the receiver of the actual sexual harassment. Someone could be uncomfortable by observing sexual harassment; and that, too, still constitutes.

And so even a straight person, I believe, or a heterosexual person would be able to then say something; but it's also known that he was aware of my sexual orientation.

**Q. Okay. So did you tell Gengler**

**directly that you're homosexual?**

A. Two things happened. One thing that happened -- this all happened on the same day. So the answer to that question is "yes." But he had already made the assumption.

And so when we had the conversation about my sexual orientation, we were at an event; and a very uncomfortable thing had happened off campus at an event. And during that particular encounter, I then disclosed my sexual orientation; he said, "I already knew."

And I said, "Well, how did you know?"

And he goes, "There was something on your resume to let me know that you're gay," essentially.

And I'm thinking, oh, that's really interesting because the only thing that's on my resume is that I've had Safe Space Training, LGBTQ training.

And then, it was also brought to my attention that after the interview period, he went around to the office talking about the different people that had interviewed; and he

was like, "Carlos Gooden interviewed. He's Black, and he's gay." And then he, like, paused after that to wait for a reaction.

**Q. Okay. Were you present and did you personally observe Gengler do that, or was this something that you were told by others?**

A. It was something that I was told by Ikea Jernigan.

**Q. Okay. And who is Ikea Jernigan?**

A. She was an office assistant at the time in the MBA office; but now she currently works as, I want to say, an administrative assistant in the department of Supply Chain Management.

**Q. Okay. So she's still at UHD?**

A. Correct.

**Q. And because you didn't personally observe Gengler behaving in that manner, you don't have personal knowledge; you're basing that on what you were told by Ikea Jernigan, correct?**

A. Yes, for that particular claim. However, when the -- it was the Hispanic Chamber of Commerce event where the uncomfortable event happened that we ended up

processing; and that's when Dean Gengler shared with me that he knew that I was gay.

**Q. Okay. But you mentioned that you had first self-disclosed to him. What was the reason for you doing that?**

A. That I self-disclosed? We were at the Hispanic Chamber of Commerce event. Honestly, it was, like, the first Friday in October. And there was a vendor there, and she was looking to -- she was looking to basically pair me up on a blind date with a young lady. And it was, like, me, Dean Gengler, and Jamil sitting there.

And I'm like, "Oh, no, I'm fine."

She's like, "No, she's beautiful. You guys will really hit it off. Let me introduce you."

And so I'm like, "Oh, no. I'm okay."

Like, I'm literally at work the second week; and then Dean Gengler tries to then say, like, "Well, why don't we hook her up with Jamil, instead?" Right?

And so we're sitting here and

she's introducing us and so I ended up, like, leaving from behind my work stand to go and engage.

And I was then sharing, like, that was an uncomfortable sort of interaction at that time because I am not seeking a relationship with a heterosexual woman because I am gay.

**Q. Okay.**

A. His response was, like, "I know. That's why I was trying to see if we can hook her up, instead, with Jamil."

**Q. Gotcha.**

**So then it was kind of somebody tried to set you up without you really knowing anything about it; and then that kind of broached the topic of your sexual orientation, right?**

A. Correct.

**Q. Did you have any discussions with anyone else at the university about your sexual orientation other than that one particular occasion?**

A. Up until that time, no.

**Q. Okay. And so it's your position that**

**at that point it was when Gengler had knowledge of your sexual orientation and then proceeded with the harassment; is that right?**

A. No. I believe it was known prior to that particular day, which is why he reacted the way he did; but I believe he -- from what I understand, he knew. He told me that he knew when I interviewed because of materials that he saw on my application materials.

**Q. Okay. So then would it be fair to say that that was the first time you actually had kind of an open discussion about it, right?**

A. Correct.

**Q. And that was in October. So that would have been within a month or two of you starting the job?**

A. That -- yes, within two to three weeks.

**Q. Okay. Are you currently in a marriage situation with another man?**

A. I am not.

**Q. Are you currently in a relationship with another man?**

A. I am not.

**Q. So, you know, you indicated in your**

**pleadings in the lawsuit that you're an African American. You disclosed that to Defendants when you applied for the job, right? There's a voluntary disclosure questionnaire, and it's your option on whether or not you would like to disclose that. Does that sound right?**

A. That's accurate.

**Q. And so did you disclose through any other means or manner your race to the University?**

A. That is a very broad question. I'm not sure. The whole definitively thing is really throwing me off. I mean, if I can objectively answer, I would say yes; but I'm not sure. There could be a million and one ways that that comes through.

So, I mean, maybe if we can narrow that question a little bit more to a specific time that you're thinking. I'm not sure.

**Q. Sure. Okay. So you voluntarily disclosed in the job application materials that you're African American, right?**

A. Sure, correct.

**Q. Okay. What other means, if you did disclose your race in any type of written form or in any type of conversation with anyone at the university the fact that you're African American?**

A. That is a very broad question, Mr. Contreras. I'm not sure. I don't know if I can answer that question.

**Q. Okay.**

A. That is very --

(Simultaneous speakers.)

**Q. Okay. Well, what's vague about it? Because you've told me that the one manner in which you indicated your race was through the job application materials. So, to the best of your recollection, what other means or ways did you disclose your race to anyone at the university?**

A. Again, that is very broad. I mean, any form, any e-mail, any conversation, right? Like, I'm not sure.

If there's, like, a specific time you want me to, like, substantiate and validate, I can do that; but to replay, like, any form that I -- and this was also -- like,

you're talking about 2021, September, October, or even back to the application materials, which would have been March, April, May of 2021 (laughing.)

So, like, I'm not sure. I don't want to say something so narrow and then, you know, something else pops up later. I'm not sure. That's just a very vague and broad question.

**Q. Okay. Well --**

A. It's a little overwhelming, too, to think about of all those times (laughing.)

**Q. Well, of course, it is; but you understand that that's one of the grounds of discrimination you're alleging in the lawsuit is race discrimination, right?**

A. Correct.

**Q. Okay. So I know of at least one other way in which you did disclose your race was through your discrimination complaint against Gengler, right?**

A. Correct.

**Q. Okay. And another time was through your e-mail to Lauri Ruiz, discussing your race in connection with -- is it Damar Hamlin's**

**NFL game injury? Do you remember bringing that up --**

A. Correct.

**Q. -- about being Black and --**

A. Correct.

**Q. Okay. So those are two other instances in which you disclosed or addressed your status as an African American, correct?**

A. Correct.

**Q. Okay. Are there any other occasions other than those other two that I identified for you?**

A. Again, that is very broad. I mean, we can play -- I mean, not play that game -- but, I mean, there will probably be several instances of conversations like that. So I'm not sure how to respond to that, I mean.

**Q. Okay. Would another time be in one of the recordings in the conversations that you had that I believe was with a woman? And I'm going to get into more details on that; but that was another time where, you know, your status as an African American came up in conversation?**

A. Likely, yes.

**Q. Okay. Oh, and just, by the way -- we'll get to it -- but what was that woman's name? And you had three shorter ones and one really long recording; and I believe that was in a conversation with you, Gengler, and Manrique. And then there were three other recordings of a conversation that you were having with a female, and I believe it was in the workplace. Who was that female's name -- what is that female's name?**

A. Dianca Chase.

**Q. Okay. So that's another, I guess, incident in which your race came up or was a pertinent topic of the conversation, right?**

A. Uh-huh.

**Q. Okay. So I've identified three. Would it be fair to say that, to the best of your recollection, there were numerous other occasions in which your race came up or a reference was made to it?**

A. There are, yes.

**Q. Okay. So, yeah, I'm not trying to pin you down on trying to find out exactly how many; but the bottom line is that it was something that was raised either by you or**

**referred to in conversation by you, correct, as having something to do with something in the workplace, right?**

A. Correct.

**Q. Okay.**

A. I mean, even that same day we were talking about, literally, it was that same event where the vendor tried to set me up on a blind date with a young lady, it was that same exact event that President Blanchard had attended that event as well. So that's how I know it was about two or three weeks after I had started.

And I had shared with Dean Gengler that I met President Blanchard; and he goes, "Oh, did you tell him that you work for me?"

And I go, "Yeah, I mean, I told him I work -- you know, I was the latest hire in the Marilyn Davies College of Business. I told him I have one of the longest titles on campus.

And then at that point, you know, my race came up again as well when Dean Gengler said, "It looks good that I hire

Blacks." So that would have been another time that it came up.

**Q. Okay. Thank you.**

**And going back to Jamil Thorton [sic] real quick, would you be surprised to learn that -- I'm sorry. Jamil Thorne, T-H-O-R-N-E. Did I spell his last name right?**

A. Correct, yes.

**Q. Okay. So would you be surprised to learn that Jamil left UHD in part because of your leadership?**

A. That would not be a hundred percent accurate, but not a hundred percent inaccurate.

**Q. Okay. Can you --**

A. At the time that I started, if I started September 13th, my first week, as part of onboarding, I scheduled one-on-ones with my direct reports. At that time both Jamil and Dianca had expressed to me that they were on their way out. They were both in final searches for final interviews for other jobs; and so quickly it became up to me to start coming up with transition materials, like, really just getting as much information out of

them as possible.

And he was looking to leave before I even got there. In fact, Dean Gengler wrote him a letter of recommendation and a reference for the Director of Admissions job at South Texas College of Law, which would have been dated before I even started on campus. And so they were both preparing me to not -- for them to not be there by December, and so they were both very transparent with me and shared with me that they were both on their way out.

**Q. Thank you.**

**Jamil Thorne is also Black, correct?**

A. That is correct.

**Q. Okay. Did you wear a T-shirt that said Playboy in a meeting with three female staff?**

A. I am not sure.

**Q. Okay. So you're not sure or you don't recall?**

A. I don't -- I don't recall.

**Q. To your knowledge, what other employees made the same or similar -- well,**

**hold on.**

**Let me go back to that one question. Do you have a shirt that says Playboy on it? Do you own a shirt that says that?**

A. I believe so, yes.

**Q. Okay. Have you ever worn it to work?**

A. I mean, I don't know. As an undershirt, I mean, I don't know. I'm not sure. Interesting, but I'm not -- I can't definitively say "yes" or "no." I'm not sure.

**Q. Have you ever made efforts to try and portray yourself as a playboy in the workplace to anyone?**

A. No.

**Q. Okay. So, to your knowledge, what other employees made the same or similar allegations against Gengler that you have?**

A. In terms of complaints to the University or...

**Q. Yes, any type of allegations or complaints that were the same or similar to the allegations that you're making against him.**

A. Are we talking about informally or formally?

**Q. Either way, informally or formally, to your knowledge.**

A. I think formally Sedef Smith would have been one. Ben Robles would have been another. Belinda Hernandez would have been another. Ethan Waples, Jonathan Davis, Kimberly Lawson. Those would be the formal ones that I'm aware of.

**Q. Okay. And what was Ethan's -- Ripples, or what was that last name?**

A. Waples, W-A-P-L-E-S.

**Q. Got it.**

**Okay. So, to your knowledge, these four individuals have actually filed formal written complaints against Gengler?**

A. One, two, three, four -- was it five?

**Q. Oh, I'm sorry. Five.**

A. And then there would have been -- I believe there were two more at the same time that mine came out, and that information was redacted.

I'm trying to think specifically of others.

**Q. Was one of the ones that came out at the same time Noel Baldovino, correct?**

A. I suspect. I'm not sure. I don't know a hundred percent, but I believe so.

**Q. Okay. And then you said there was another one.**

**Okay. And how is it that you know that -- these five individuals that you named that had filed formal complaints against Gengler, how do you know that they actually filed those complaints?**

A. Well, one of -- when I first started, I was informed of, like, my predecessor and then sort of like why she left; and so there was that. But I never, like, had contact with her, still to this day.

But once I filed my complaint and then he was, like, placed on leave and then the interviews started happening, it became aware that I was the person who filed the complaint. And so other people started coming up to me and sharing with me sort of like their stories and how they felt sort of overlooked, not listened to, ignored, and that it wasn't addressed at that time and, you know, that they weren't -- that I wasn't alone, sort of like, in my experience.

And then I became aware of the Faculty Climate Survey as well after my complaint; and that was also very telling in terms of people notifying the University that this, indeed, was a very hostile and discriminatory working environment.

**Q. To your knowledge, prior to your complaint against Gengler, had any of those formal complaints by those other individuals resulted in a sustained finding against Gengler after an investigation?**

A. I think there are different ways of looking at that. Umm, I think there are different ways of looking at that.

**Q. Okay. So are you telling me that you don't know?**

A. I'm saying I think there are different ways of looking -- answering that question (laughing.)

**Q. Okay. Well, elaborate on that response, please.**

A. From what I understand, some complaints might have gone to HR; and they likely should have gone to Title IX for an actual investigation. And so, like, HR likely

should have taken them over to Title IX once they became aware of them; and so I don't think HR actually, you know, followed through in the same manner that a Title IX Coordinator should have or would have. But, also, if those Title IX cases were investigated similarly to mine, then whether they were substantiated or not loses validity in that they're not really following the standards. And so I'm not sure if I -- if that is important or not, whether they substantiated findings or not; but, also, for many of those, I was not here.

**Q. Correct. Those allegations or complaints would have occurred prior to September 21, when you started, right?**

A. Correct.

**Q. And so would it be correct to say that you would have no personal knowledge of those incidents or events surrounding those complaints, correct?**

A. Other than those who came directly to me. Does that count as personal knowledge?

**Q. Well, is it your testimony that you were informed by someone secondhand, without actually seeing anything happen or being a**

**witness to anything, correct?**

A. I would say I was informed directly by the complainants. Is that secondhand?

**Q. Well -- okay. So then just to be clear on the record, I'm not going to try and tell you, you know, how to testify, sir; but the bottom line is that you were -- any knowledge that you have about any prior complaint against Gengler, you learned either from the complainant about what happened of whatever the basis of their complaint was, correct?**

A. That is correct, either that or the Littler Mendelson investigation.

**Q. Okay. Of your complaint, right?**

A. Correct.

**Q. Which resulted in the disclosure of individuals who had -- who had made other allegations against Gengler; is that correct?**

A. That is correct.

**Q. To your knowledge, those prior complaints before you came to the University, is it correct or is it not correct that any of those investigations resulted in a substantiated finding against Gengler?**

A. I can't speak to that. I'm not sure.

**Q. Would you agree that a sustained finding after an investigation is significant?**

A. Yes.

**Q. Is it your position that Gengler should have already been terminated by UHD and not working there when you started your job in September 2021?**

A. I'm not sure if I can answer that.

**Q. Well, you testified that when you came on board, information was shared to you by others that other people had filed formal complaints against Gengler, correct? That was your testimony just now, right?**

A. Can you repeat that one more time?

**Q. Well, I don't want to try and alter your testimony; but you just said that you had learned about these other individuals that had filed complaints against Gengler that happened before you came on board, right?**

A. Correct, yes.

**Q. Okay. So now, as the Plaintiff in your own lawsuit against Gengler, with your own allegations against him, is it your position that Gengler should have already been**

**terminated by UHD and not working there when you started?**

A. Sure, yes.

**Q. And what is that based on?**

A. See, like, I don't know. I can't necessarily speak to that, right? I just know that those prior complaints were in place and that they were there.

**Q. Okay.**

A. And in conversations with complainants who came out after mine, they felt that their particular cases were not handled adequately; but, also, if we're talking about Title IX and conducting an investigation, substantiating findings, and then issuing sanctions, the purpose is to reform. And, clearly, those reforms did not work nor were they taken seriously.

And so I think it would have been, if not certainly, like, terminated, it would have been the role of the University to continue to sort of like monitor and to, you know, assess the climate for a hostile working environment, understanding what he's capable of. So there were no measures put in place;

and for those reasons, you know, they continued to perpetuate a hostile working environment.

So that's sort of like why I was hesitant on, like, the termination. I don't know certainly what that looks like; but I think universally what me and the complainants who also filed complaints believed that the University did not adequately respond in accordance with their own policy but standard to the Title IX.

MR. CONTRERAS: Objection, nonresponsive portion.

**Q. (BY MR. CONTRERAS) Would it be appropriate to wear a T-shirt that says Playboy in a virtual work meeting?**

A. I'm not sure. I really wish I knew kind of like what you were talking about here (laughing.) So I don't know.

**Q. Okay. Well, I mean, I'm just asking you a question; and if you know the answer, just do your best to answer. If you don't know or don't recall, just say you don't know or don't recall. Okay?**

A. I don't recall then.

**Q. So you had made reference in your**

**lawsuit about a comment by Gengler when he said, "Nice. It will probably make me look good that I hire Blacks." And you describe that as being a conversation with him after you told him that you had met President Loren Blanchard; is that correct?**

A. That is correct.

**Q. Where did this exchange between you and Gengler take place?**

A. In his office.

**Q. Was anyone else present during that conversation?**

A. No. Right before I had walked into his office, Christine Poleski was in there; and they were sort of like -- not decompressing -- but reviewing the day; it was big-event day. So I walked in; and Christine was like, "Oh, you can have him next." And so she stepped out to go to her office to get ready to leave for the day; and then I had stepped in.

**Q. Okay. And so you commented that you had met the President, and that was just how he responded with that comment?**

A. He said first, "Did you tell him that you work for me?"

And I said, "Yes." And then I shared with him just basically the conversation. I just stated, "I have the longest title on campus."

And so, yeah, then it went into, "Oh, but you told him you work for me? It looks good that I hire Blacks."

**Q. Do you recall what else was discussed in that conversation?**

A. Absolutely. Not a hundred percent, right; but, like, I do remember that the President's sexual orientation came out at that time as well and that he had shared with me that he moved here with a partner. And he sort of like made the comment that -- my order of operations may be out, but I can tell you sort of like the highlights of what I remember. He made the comment that the President and I probably go to the same bars, right? Like, that's how we got on the gay conversation.

And then he also started talking about other employees in the campus that are also -- who identify as gay and sort of like his ways of knowing.

**Q. What was your response or reaction to**

**Gengler saying that it made him look good that he hires Blacks?**

A. I was shocked. I was highly uncomfortable.

**Q. Did you communicate that to Gengler?**

A. Absolutely not, not at that time.

**Q. Okay. And why not?**

A. You know, I processed a lot. And so immediately after, I remember being in the car; and I, like, called my mom because sometimes, you know, you have to, like, take a step and process and figure out, like: Did I hear what I just heard? And then, you know, am I overreacting? Am I being, like, hypersensitive? And so I had to really, like, process what I just heard; and I was not prepared to respond and react in that moment.

**Q. Okay. Other than telling your mom, did you tell anybody else?**

A. I believe I talked to, like, maybe two of my friends. And then I want to say maybe the following week, just to really kind of understand what was happening, I probably talked to, like, two colleagues about it because it still bothered me at that time.

**Q. Okay. And who were those two colleagues?**

A. One would have been Dr. Marilyn Dement, and I talked frequently with Emily Leffler. So I'm not sure if I would have told her in that moment or not; but, certainly, it became --

**Q. And who -- oh, go ahead.**

A. Certainly it became something that I had to start figuring out was I, like, isolated in these experiences.

MR. CONTRERAS: Objection to the nonresponsive portion.

**Q. (BY MR. CONTRERAS) And who were the two friends? Were they friends from outside of Houston, or were they local?**

A. No, like, my long-time best friends.

**Q. Okay. So they wouldn't have actually been on campus that day or anything like that, right?**

A. No.

**Q. Okay. And you did not file a complaint against Gengler at that time, correct, when that statement was made?**

A. No, it was my second week on

campus -- second or third week on campus.

**Q. Okay. You also describe an incident in your lawsuit that Gengler said about your hiring that, "Now they can't say I'm racist," and that it is documented that Dean Gengler told other -- I'll just read it verbatim. "It is documented that Dean Gengler told other employees regarding Dr. Gooden's hiring, 'Now they can't say I'm racist.'"**

**How do you know about that comment?**

A. So what I learned through the Littler Mendelson investigation, that was produced through some of the interviews that they provided. So I did not know that after my interview he was going around and talking to faculty about my hiring and the decisions that, you know, sort of inspired that. They conducted an interview with several faculty, and a lot of that information came out.

**Q. Okay. Thank you.**

**And when during the investigation did you become informed of that comment? Was it through interviews through the investigators?**

A. Yeah, the first preliminary report.

**Q. Which was shared with you as the Complainant, correct?**

A. Correct.

**Q. So the actual comment was made early on in your employment at the university, but you didn't find out about it until the investigation through your complaint; is that correct?**

A. That and then another conversation where -- I'm trying to remember the specific context. It was a conversation around the Supreme Court Justice nominations with Ketanji Jackson-Brown, and that conversation sort of like floated off into a Gengler monologue on the lowering standards of Black women so that they can achieve roles and tenure.

And so during that time he was sharing with me his plan for revamping tenure; and he goes, "Yeah, when I mentioned these things, then the people up the hill" -- that's what we call it at UHD; "up the hill" is sort of what we call One Main -- "and the people in HR say I'm racist. Can you believe that?" And I literally just changed the conversation

quickly from that conversation.

So that's another time where it's, like, this conversation on him sort of like being a racist and projecting that. I'm not sure how we even got on that, but...

**Q. Okay. And when was that conversation with Gengler that you just told me about?**

A. It would have been in March.

**Q. March of 2022?**

A. March of 2022.

**Q. Oh, wait. Yes, March of 20- -- okay. I'm trying to just make sure I got the year right.**

A. I understand. Because this has been a long process.

**Q. Got it. Okay.**

**You also describe in your lawsuit that Gengler insinuated that he hired you because of race and sexual orientation to make himself look good to deflect accusations of discrimination. How do you know this?**

A. Again, it's sort of like how I was being treated and how he was sort of propping me up in the eyes of the President. And so that was very uncomfortable. So from that

first conversation of, "It makes me look good that I hire Blacks," it was sort of like: What is the motive here? You know, I come with a lot of experience, qualifications, and credentials; but in that moment it was reduced to my race. That was uncomfortable.

And then in the weeks following that particular conversation, there were times where he was looking for me to engage with the President sort of formally and informally. That was perceived and made me uncomfortable and was very inappropriate.

Again, it wasn't until the preliminary report that I learned that he had made those comments about me before I even got to campus; but I had my own personal experience around why I felt uncomfortable with his suggestions and his sort of offerings.

**Q. Okay. So the bottom line is you learned a lot about Dean Gengler's comments through the investigation, right?**

A. Well, the bottom line is I had my own personal experiences with Dean Gengler making me very uncomfortable as it related to the President in conversations of race.

**Q. And information you learned through the investigation, right?**

A. In addition to.

I mean, I filed my report in April of '2022. I did not get the report until November. So, essentially, what I was feeling and what made me uncomfortable was substantiated and validated by the work of Littler Mendelson in interviews that, like, I would not have access to or people I would not have access to.

**Q. Thank you.**

**There was another thing described in your lawsuit about you allege that in your presence and in the presence of others, Gengler suggested a Black staff member put on a monkey suit. Who was that staff member?**

A. Jamil Thorne. And for the record -- well, the answer is Jamil Thorne.

**Q. Okay. And I'm sorry. You wanted to add something?**

A. Right. It was reported to me. I was not at that particular event. However, a direct report of mine, Marilyn Dement, reported to me as something that made her uncomfortable;

and that was something that I felt should be reported as well.

**Q. Okay. To your knowledge, did Jamil Thorne file a complaint against Gengler over that comment?**

A. Jamil Thorne, not to my knowledge.

**Q. Did Jamil Thorne ever communicate to you that he was offended by Gengler's comment and felt that it was racist?**

A. He did communicate to me that it made him uncomfortable; and his follow-up was, "That's just what the Dean does. That's how he jokes. That's just who he is." But, you know, his level of offense is different, I mean.

**Q. I'm sorry. His level of what?**

A. His level of offense is different. Like, he acknowledges it as problematic and potentially racist; but he brushes it off. And this is not the only time where he shared that with me.

**Q. Because you were not present, you wouldn't be able to testify as to the context in which the monkey suit comment was made, correct?**

A. I can share with you what my direct

report shared with me; but that is the limit, yeah.

**Q. Okay.**

A. But, also, I believe they interviewed Jamil about it. I don't think it was ever disputed that he said it. He actually admitted to saying it as a joke.

**Q. What was the context it was recounted to you secondhand about the monkey suit comment?**

A. The context that was provided to me was there was an upcoming event and a gala of some sort and they were preparing to see who would attend and the dress code came up and that Dean Gengler looked at Jamil and said, "It looks like you have to put on a monkey suit."

**Q. With respect to that incident, you allege that Gengler was confronted about the comment. Because you weren't there, you wouldn't have actually heard who the person was that confronted him or if you know?**

A. I believe it would have been Dr. Marilyn Dement.

**Q. Okay. In that same conversation**

**where the comment was made or afterwards?**

A. I believe in that same conversation. And so then the Dean sort of pushed back and, you know, tried to say, "You know what? A monkey suit's a tuxedo," right, like, explaining the conversation, explaining the joke and sort of covering his tracks, which I think -- you know.

**Q. Okay. And I'm sorry. Who was that again that was a faculty member?**

A. Dr. Marilyn Dement, Associate Director of Graduate Programs.

**Q. Thank you.**

**Then in your lawsuit you recount an incident regarding campus police making an alert about an assault by a, quote, unquote, "tall Black man." How did the campus police get that alert out to you? Did you receive that via e-mail or a text?**

A. I received it by a text message and I want to say an e-mail as well, but I got it later. I was not next to my phone at the time.

**Q. Okay. So you weren't aware of the campus alert until after the fact?**

A. Correct.

**Q. And what time of the day do you recall looking -- you know, seeing the e-mail eventually and seeing what time that the actual alert went out?**

A. It was after 1:00 p.m.

**Q. Okay. In the early to mid-afternoon?**

A. Well, I just know it was between 1:00 and 2:00 p.m.

**Q. Okay. And you allege that Dean Gengler told faculty and staff that it was you because you fit the description of the suspect as a tall Black man. How do you know that?**

A. Well, first, what happened was -- well, I received a text message of him asking me my location. But then I went into my office; and there were staff in there who informed me that the Dean went in there looking for me and made the joke at that time within my office suite, Suite 401, that he had been looking for me and joking that I could have been the tall Black male assaulting a student in the One Main Building and that he was looking for me.

**Q. Okay. And who are those individuals**

**that were present when you entered the room full of people?**

A. Sure. When I first entered, it was Ikea Jernigan, Dianca Chase, Natasha Nowlin, and a new staff member in her cubicle, Amanda Trevizo. And then there would have been two other staff there, but they typically work with their doors closed and I don't recall them being there. And then when I walked into the office, Jamil Thorne had walked in behind me.

**Q. Okay. And what do you recall happening when you entered the room full of -- entered into -- did you say it was your Suite 401 office suite?**

A. Yeah. So I walked in and then -- I had already seen the Dean's message regarding my location and where I was. And I said, "No, I'm here in the building. I'm in the Digital Communications suite."

And then we had a meeting on the calendar, I want to say, for, like, 1:30. So at 1:28 I started heading over to get my materials to head over to his office for our 1:30 meeting; and when I walked into the suite, that's when I saw the alert. And I'm like, the

alert and then he's asking about my whereabouts, that's really interesting.

And at that time that's when Ikea and Dianca are saying, "Did you see the Dean? He's looking for you. The alert came out of a tall Black male and he came over here saying it did not look good that you weren't in your office and that I could have been the person.

And I was just like, "Wait. What?" And, literally, I was just, like, stunned; and so Jamil had decided to walk over to the Dean's suite with me in preparation for my meeting.

**Q. Okay. And who was that meeting with?**

A. Gengler, Dean Gengler.

**Q. Okay. And when you walked over to the meeting with Dean Gengler after all of this had just happened, did this topic come up about the campus alert and that there was some sort of indication that you were the suspect?**

A. It came up immediately. I walked in, and Dean Gengler was sitting in Manrique's -- Dr. Justo Manrique's office. And the way his desk was positioned, his chair where the Dean

was sitting is in the eyeline of the doorframe, you know, in front of his desk; and Christine Poleski was standing in the corner, sort of like having a conversation within the suite but from outside. And when I walked in, the Dean literally pointed and said, "Oh, good it wasn't you." And then they all had a good laugh about it.

And Jamil Thorne was actually behind me at that time; and I go, "What do you mean? What do you mean?"

He was like, "You fit the description. You were wearing a black jacket."

And I was like, "I told you I wasn't wearing a black jacket. I don't understand what's happening. Like, what do you mean?"

And Christine Poleski went into her office. I can't recall -- I do know that Emily Leffler and Ruby LaCour sit in that same suite, but I can't recall if they were there. I can only see the people that were there.

And then he goes, "Well, we know it wasn't Jamil because he went to lunch with me," as if Jamil would have been the only other

tall Black male that could have possibly fit the description; and then that, too, was a laugh-out-loud-joking moment.

**Q. Okay. And after that incident, did you file a complaint against Gengler?**

A. Well, I think it's important that we went into a meeting after that; and then, sort of like three more inappropriate comments happened. And then, that's when I had realized that this had sort of like escalated to something that is out of anything that I can handle on my own.

The short answer is "yes." I first talked to Ikea and Jamil about the experience, again, sort of like getting that understanding of: Did I perceive this correctly? Like, did you see this the same way that I saw this? Am I misunderstanding something here?

That was on April, I want to say, 19th. I was away at a conference -- no, the 16th. I went on a conference. So that day that happened, I then flew to Chicago on that Wednesday for a conference. I was at the conference.

So I was out of the office Wednesday, Thursday, and Friday. My first day back was Monday, so that's when I filed the complaint.

**Q. Right. According to the information, you initiated your complaint process on April 25th, right?**

A. That Monday, correct.

**Q. Okay. That was when you came back from the conference, right?**

A. That is. That was my first day back on campus.

**Q. Okay. And then you also described another incident when you were hosting a prospective student. This would have been before, in November of 2021, November 5th, I think, in which Gengler made a joke about a mandate. Can you tell me what the context of that was?**

A. Absolutely. He was a faculty member, I want to say, at Jarvis Christian University, somewhere in East Texas. Him and wife came to campus. His wife was looking for an MBA program, so we set up a special day.

They had already met with the

Dean earlier in sort of the agenda that I had created for them; but part of their visit was to visit the career center, the Career Services Center of the College of Business. So we went there, and we actually had an event later that evening. And I think he, the Dean, was coming to the Career Services Center to invite the Director of the Career Services Center to that event that was happening in, like, five hours.

And so when he walked in, of course, me and Brett were sitting there; and Brett was one of the individuals he had already sort of, like, took it upon himself to identify to me as a person who is gay. And so he then tells a joke about the man date in that moment with me and Brett sitting there in front of the prospective student and her, technically, husband, who was a professor. And it was very random, very out of context of what we were there to talk about. It did not flow. We were not having an informal conversation. We were talking about preparing students for careers.

**Q. Okay. And then what was your response or reaction to that comment by Gengler?**

A. I mean, I think I can tell you -- well, first, when he goes, "You guys want to hear a joke," Brett Hobby immediately went, "Uh-oh." And I'm like, "Oh." So then he tells the joke; but, no, there was no reaction at that time at all. I mean, I just went stoic, as I normally do, when I get shocked by one of his jokes, discriminatory remarks.

**Q. Okay. And so the joke was made; and you just proceeded with business, right?**

A. Correct.

**Q. And then we get to --**

MR. CONTRERAS: Actually, right now would be a good time for a short break. We've been on for a little while now, I think How long, an hour, hour and a half, Debbie?

THE WITNESS: I'm fine.

THE REPORTER: Yes.

MS. OWENS: Yes.

MR. CONTRERAS: Okay. I just want to take a quick five- or ten-minute break because I was going to get into kind of a big topic, and I don't want to start that right now. So just a short ten-minute break, back on at 12:00. Is that okay?

MS. OWENS: That's fine.

MR. CONTRERAS: Okay. Thanks.

Off the record.

THE REPORTER: We're going off the record at 11:50 a.m.

(Off the record at 11:50 a.m. to 12:08 p.m.)

THE REPORTER: We're back on the record at 12:08 p.m.

MR. CONTRERAS: Thank you.

**Q. (BY MR. CONTRERAS) After a short break, Mr. Gooden, let me just ask you about your complaint; and I'm referring to the formal complaint against Gengler.**

**So you allege in this lawsuit that it was, quote, unquote, "almost immediately" after you were hired that you were subjected to discrimination by Gengler based on your race and sexual orientation, correct?**

A. Correct.

**Q. Did you ever tell Gengler directly, face to face, in person, that his comments were offensive?**

A. No. I won't say ever; but for the most part, no.

**Q. Okay. So why not?**

A. I think from, like, my experiences, many of the times I was in shock, right? It would be a comment that was completely inappropriate or something that would be humiliating or a joke that was embarrassing or uncomfortable.

And, one, I know that when the initial one, the first one that I experienced happened regarding the President and "I hire Blacks," right, one of the things I had to consider was that I had just moved to Houston from Chicago across the country; and I had just sort of started this job. And this was my supervisor who has a lot of stock and say in, you know, my performance review and my livelihood.

And so any sort of opposition or objection to, you know, the comments that he was making, the discriminatory jokes he was making, could potentially damage the relationship that, you know, I was developing with him. And I was continuing to kind of get to learn a little bit, like, about him as well as the environment; and so, you know, I needed

to take time to sort of assess that.

After a while, too, I then had to assess his ability and capacity to process or understand, you know, what I was saying and, you know, how he would respond to that. And through my sort of continued engagement with him, I realized that this was not a safe space for me to bring these things to him and that it may sort of, like, add more fuel to the fire.

There were times where we would have sort of, like, conversations and not necessarily, like, agree, you know, related to, like, policy or related to things that were happening on campus. And so, you know, I would assess and see his reaction in those moments to, you know, academic disagreements or, you know, ways to process or approach a different topic; and they tended to be chaotic or irrational, not well received. And so, through my history of engaging with him, it didn't seem appropriate to engage in that manner.

**Q. Okay.**

MR. CONTRERAS: Objection to the nonresponsive portion.

**Q. (BY MR. CONTRERAS) So you mentioned**

**safe space. So why don't you define what you mean when you say "safe space"?**

A. In terms of -- well, overall, when you talk about, like, safe space in an environment, just being able to sort of show up at work in your identity to kind of, you know, be able to do your job with sort of like mental capacity without fear of, like, ridicule of humiliation or embarrassment for your identity or differential treatment.

**Q. Okay. And so "safe space" in that definition does not include physical threat of harm, correct?**

A. It could, yes.

**Q. Okay. How is that?**

A. Although most of what I experienced was definitely, like, mental and emotional, I did not include it in my definition prior because, I mean, I did not feel at that time physically threatened.

**Q. Okay. At any point during the job, did you ever feel like an actual physical threat of harm to you?**

A. I did, yes.

**Q. And when was that?**

A. After I filed the complaint in July, I was already feeling unsafe in the environment as a result of the investigation and everything that was going on and then Dean Gengler being on leave; and then there was a lockdown on campus where, arguably, any employee would likely say they did not feel physically safe.

**Q. Okay. And so what exactly was it that made you feel physically unsafe as if there was a threat to your actual physical -- you know, physical contact or physical type of harm against you? What exactly, if you could pinpoint, made you feel that way?**

A. It had become evident and clear to me that Dean Gengler was angry, obviously, at the investigation and at everything that had transpired as a result of the -- my filing of a complaint. And in July I was actually in a classroom on the third floor, one floor below my office, and I was in a meeting on a private Zoom call with my therapist and sort of obviously, like, talking about these things. And then we were all notified to shelter in place, that there had been a threat to the campus. And it was unknown, like, what the

threat to the campus was at that time.

And so it was one of those moments where I was kind of like: Why am I even in this position to not feel safe on this campus, considering the context of the complaint and the investigation?

**Q. But as you testified, there was some kind of issuance of some threat on campus; but it was nothing that you could directly attribute to Gengler, correct?**

A. That is correct.

**Q. And it's correct that Gengler never threatened you with any type of physical harm, correct?**

A. That is correct.

**Q. Okay. And the same for any other of your coworkers or anybody else that works for UHS or UHD, no one ever actually made any physical threats of violence to you; is that correct?**

A. That is correct.

**Q. Okay. Other than the one incident in which you've described that there was a possible threat to your personal safety, are there any other incidents in which you felt**

**that way?**

A. In terms of physical threat, no.

**Q. Yeah. Okay. Thank you.**

**So, to the best of your recollection, from when you started the position in September 2021, up until April 25th, 2022 -- so we're talking about eight months, I think, a little under eight months when you filed your complaint. How many times -- I'm sorry?**

A. I was going to say it was about six months, but correct.

**Q. Did I get my math wrong? Hold on. September, October, November, December, January, February, March, April. Is that not, like, at least seven months? So you started on September 1st, right?**

A. September 13th.

**Q. Okay. September 13th to April 25th. So isn't that seven months?**

A. That's fair.

**Q. Anyway, we can figure that out; but just, generally speaking, it was about seven months, you know, an extra week or two or whatever that is. But during that time period,**

**how many times did Gengler make comments that you felt were discriminatory either based on your race or sexual orientation if you can put a total number of times on it?**

A. I would have to refer to the actual formal complaint where I documented most of those; although, that is not a comprehensive account of all of them. But, you know, in my formal complaint, there may have been 30 plus that were actually, like, written and documented; but there would certainly be more. And then, of course, after that, as well, there would be additional ones to report as well.

**Q. Okay. Well, let's go to exhibit -- the next exhibit, your complaint.**

MR. CONTRERAS: I'm on Exhibit 6. Is that the right exhibit number, Debbie?

THE REPORTER: I thought we were on 5.

MR. CONTRERAS: Oh, shoot -- I'm sorry -- Exhibit 5. There we go.

Oh, I think I misplaced that exhibit. Give me one second, please. Bear with me.

Okay. Here it is. Okay. I just sent it over through Zoom to everybody.

(Exhibit 5 marked.)

**Q. (BY MR. CONTRERAS) And I'll go ahead and screen share. Let me know if you can see this, Mr. Gooden.**

A. We can see it.

**Q. Okay. Do I need to enlarge it a little bit more?**

A. Possibly, yes.

**Q. Okay. This is what initiated your complaint against Gengler, correct?**

A. Correct.

**Q. And I'm just going to scroll down to the violations here. Let's see. You cited to the negative stereotyping in April 2022. March 2022, embarrassing you on a Zoom meeting. Persistent and severe microagressions.**

**What is a microagression? Can you define that for me?**

A. I think we can probably look up a textbook definition for it.

**Q. Well, why don't you --**

A. I'm not sure I'm prepared --

(Simultaneous speakers.)

**Q. Why don't you just tell me what your understanding of what is a microagression?**

A. I'm not sure I'm prepared right now to go into a definition of a microagression, but I think that's something we can collectively look at and agree on a definition. I'm not sure.

**Q. Okay. But that's a term that you use in your complaint, right? It's right there. Do you see it?**

A. Correct, correct.

**Q. That's a term -- and you used that term in other written complaints or communications, right?**

A. Correct.

**Q. So I'm just going down the list here, 6, 7, 8, 9, 10, 11, 12, 13, 14. And these are all your descriptions of the basis of your complaint, right?**

A. Correct.

**Q. 15, 16, 17, 18, 19, 20, 21, through 26. Without getting into the details of each one -- I think that would be too time consuming -- but I'm just kind of going over the numbers here. 27 through 30, 31, 32, 33**

**through 36, 37 through 38. Is that consistent with your testimony earlier that you had identified in the thirties your specific complaints against Gengler?**

A. That is correct, that's consistent.

**Q. Okay. And so you mentioned there were other things that you have as a basis to complain against Gengler. Why didn't you include those as well in this complaint?**

A. So my approach at this time was there were -- virtually, like, I was very -- I was in a very stressful environmental. It's also a very hostile working environment. I was very stressed at the time, like, rewriting and reliving these experiences; but one of the things that I wanted to at least maintain was my working relationships with the colleagues that I had.

So there was a chance that, you know, what you put in writing and sort of like send out can end up almost anywhere; but also being aware that this may trigger some sort of investigation and so I was keeping in mind my colleagues that I have to and had to continue to work with. And so to sort of like spare

them embarrassment on some of the comments made, I did not include them.

Even when it comes to, like, President Blanchard, I did not -- I mean, I don't know, know him; but I did not go into a lot of detail in my complaint regarding President Blanchard and, like, even his sexual orientation. I think that's private information, and so I was just being cognizant of sort of those things when writing. So it's not exhaustive or comprehensive in that regard.

**Q. Okay. But you feel that you covered the main points; or the crux of your complaint against him is, according to your testimony, memorialized in your complaint, right?**

A. That is fair, correct.

**Q. And so if you could -- you know, I know you can't tell me about the total number of times -- and that's not something that I would try and hold you to, anyway -- but if you could at least tell me generally how often Gengler would make inappropriate comments or jokes to you, would it be every interaction on a weekly basis, every other week? Is there any way you can just kind of give me just some sort**

**of general timeframe of how often Gengler made improper comments or comments that you felt were improper?**

A. I would say almost every interaction and I think almost daily would be appropriate; if not, definitely weekly.

**Q. Okay. So if Gengler's behavior was so bad and occurred, as you say, quote, unquote, "almost daily," why did you wait almost eight months to file your complaint against him -- or whatever it is, almost seven or eight months?**

A. Sure. I mean, I think I shared already that, you know, I was looking to kind of make it work, right? It became clear that this is what he does and what he has done and that I had to assess his ability to be able to respond; but I just moved across the country for this particular role and was not looking to rock the boat or jeopardize that or sort of like my livelihood.

The other thing that happened was once I started experiencing these things more frequently, I went to sort of colleagues to kind of figure out, "Hey, this just

happened."

And that's where I learned a little bit more like, "Oh, this is what he does. We all know it. We just kind of deal with it."

And I'm, like, "Well, how come no one reports this?"

And they're like, "We did report it, but the University won't do anything."

So that was the culture of the Marilyn Davies College of Business that, you know, when you file something, he becomes aware of it. He becomes introduced back into the environment. He doesn't take it seriously because Title IX wasn't taking it seriously. And then you have to continue to work with him after you say something.

So my colleagues had informed me, "It's just best to kind of keep your head down and don't say anything and just deal with it the way the rest of us do."

**Q. To go back to the word microagression that I just asked you about here a little while ago, you know, just bottom line, in a nutshell, what does that term mean to you? What is your**

**understanding of the phrase "microagression"?**

A. I mean, I don't feel comfortable -- I don't know if I can do that right now; but if you want to maybe pull up some definitions, then we can maybe agree on one.

**Q. Well, can you tell me why you used that term in the first place?**

A. I know I was experiencing microagressions, right? They were present.

**Q. Okay. So, I mean, just, you know, I'm not going to hold you to the Merriam Webster, the official dictionary definition; but, I mean, just generally what's your understanding of a microagression?**

A. I can't recall off the top of my head right now. I mean, I think that's -- there's a definitive answer out there on what that means, right? And so there's a reason why it's in policy; and so if we want to agree on a definition, we can do that.

**Q. Would you say that a microagression is something less subtle than something blatant and direct and overt?**

A. That is fair, yes.

**Q. So it's more of like a nuanced sort**

**of -- it's a reference to something more nuanced or less obvious and overt, right?**

A. Correct.

**Q. So I guess with that sort of basic, general agreement on what that term means, can you place any other descriptions or labels or your understanding of what a microagression is?**

A. Sure. It could be slight. It could be indirect. Those are two other sort of like synonyms I would use.

**Q. What did it mean to you at the time you wrote that when you used the word "microagression"?**

A. Sure. I think in my formal complaint I put in there darts, if you will. You know, they were like little darts that were being sort of like thrown at me; and when I think of microagressions in my experience, they're almost like mosquito bites or paper cuts, right? Like, one mosquito isn't, you know, bad, one microagression. One mosquito bite is nothing; it just itches a little bit.

But when you continue to receive dozens and dozens of them throughout a timeframe, that tends to impact your physical,

your mental, and emotional state -- or even like little darts or paper cuts. One paper cut, right; but when you receive several paper cuts, you begin to bleed; and that then impacts your ability to show up whole mentally, emotionally, as well as physically.

So those were sort of like my definition of microagressions or how I came to understand, and that was my experience.

**Q. Okay. Do you have any training or degrees or studying in psychology as an individual qualified to use that term; or you simply use that term as a layman, with a general understanding of what you believe the phrase microagression means?**

A. Do I have any training or -- I do not have a psychology degree.

**Q. Okay. Yeah, that's fine. That's what I was asking you.**

**So on the same day you filed your complaint, you were contacted by the EOS officer Lauri Ruiz, right?**

A. Correct.

**Q. So contacting you on the same day is a very fast response time. Would you agree?**

A. It was adequate, correct.

**Q. Then the next day you had an in-person meeting with Ruiz in which you recounted more information about your complaint to her about Gengler, right?**

A. That is correct.

**Q. And in those meetings was Ms. Ruiz helpful to you and provided you information and guidance on how you could proceed with your complaint?**

A. She did, yes.

**Q. She provided you with a formal complaint form, right?**

A. Not at that time, no.

**Q. Okay. Did she provide it within the week, within a week of your contacting her office?**

A. Yes.

**Q. Okay. It was within a relatively short period of time. I'm not going to try to hold you to any specific time period; but it was a lot of information and guidance and assistance from her up front about how you could proceed with your complaint against Gengler, right? Would that be fair?**

A. Correct, that would be fair.

**Q. Is there anything that Lauri Ruiz did or did not do that you're claiming somehow supports your claims in this lawsuit?**

A. If we're talking about within that week, no, within that same week, no.

**Q. What about at any particular time throughout the whole process?**

A. I would say absolutely. There were several, I would say, grievances.

**Q. Okay. Name them.**

A. I think my first understanding of the Title IX policy was that within five days of me filing my formal complaint, the Respondent should be notified of the formal complaint and sort of informed that this is something that happened as a way to then provide some sort of protective measures while we do some sort of investigation.

The first was that did not occur within five days; and as a result of that, I continued to receive, as we established earlier, daily, weekly. So those continued to happen in the subsequent weeks after me filing my complaint and the University not notifying

Dean Gengler. So that would be the first.

**Q. Okay. And are you blaming that on Lauri Ruiz specifically, her non-action, or somebody else?**

A. I can't speak to the blame. I'm just -- I guess I'm speaking to the fact that that is the policy, and that was the expectation. That was what was presented to me, and that did not happen.

**Q. Oh, to go back to your complaint, you had mentioned that there were additional allegations. Who were those other colleagues that you talked with about those complaints that you did not include in your written complaint?**

A. In my complaint, I don't remember mentioning that there was allegations. Who are -- I'm sorry. One more time.

**Q. So we went over your first written complaint dated April 25th, 2022; and you had mentioned that there were other incidents that you did not include because you didn't want to basically name names, right?**

A. Correct.

**Q. You didn't want to disclose their**

**names, right?**

A. Right, right, right.

**Q. Okay. So now that, you know, the cat's out of the bag on that and we're here with your lawsuit and it's been going on and everybody knows you filed a lawsuit, right, could you disclose the names of those people to me at this time?**

A. One of the ones that I intentionally omitted was an observation that I -- well, I observed one was with Christine Poleski. You know, she could have, because he made an inappropriate comment that could be perceived as sexual harassment, in my presence; and so, like, I had to be cognizant about that particular incident and how that would sort of like make her feel.

**Q. Okay. Anybody else?**

A. I became aware of Kimberly Lawson and her experience.

**Q. And can you describe what that was about with Kimberly Lawson?**

A. Basically, she was the incumbent in my role before I took my position and that she had reported just misogynistic, racist comments

and just the stories that occurred with Dean Gengler being incredibly abusive. And then there's several individuals who ended up leaving the college during this timeframe as well.

**Q. Okay. Can you just give me their names?**

A. The individuals that left during this time, the first that comes to mind would be Berna McCelyra, M-C-C-E-L-Y-R-A, who would have firsthand knowledge of the abusive nature of Dean Gengler. Emily Leffler would also be privy to a lot of this information as well.

**Q. Okay. Any other names? I just want to make sure I've got the -- any other names that you can identify?**

A. Sure. Ethan Waples would be another one who reported directly to -- well, he reported directly to the Dean; but, also, he reported directly to Akif Uzman, who was the supervisor of the Dean, with a list similar to mine -- I've never seen it -- but with a list of issues of the Dean creating a hostile working environment.

And Dean Akif -- well, not Dean

at the time -- but Akif Uzman did not support the moving forward; and so, again, that's another instance of things being reported but not being taken to the proper authorities and handled.

**Q. Okay. Is that everybody that you can identify that you left out, that you omitted?**

A. Sure. I mean, we went through a comprehensive list earlier. So it would be similar to that as well, with Ben Robles, right; but in terms of individuals who have also had similar experiences, like, Brett Hobby would be one, Belinda Hernandez, Courtney Banks, Sedef Smith --

**Q. Go ahead. Go ahead.**

A. Dianca Chase, Ikea Jernigan, Natasha Nowlin would all have firsthand experiences of all of the -- Dr. Marilyn Dement. Dr. Cathy Liu has her fair share of experiences of the Dean making her uncomfortable as well.

**Q. How do you spell her last name?**

A. L-I-U.

**Q. Okay.**

A. Ceshia Love also has her fair share of experiences. Dr. Daniel Villanueva was

actually in an e-mail inappropriately receiving, I would say, creating a hostile working environment. Dean Gengler replied all to an e-mail to which the President had Akif Uzman then talk to Dean Gengler -- I was copied on the e-mail -- then had to talk to Dean Gengler about his conduct in an e-mail in a reply all. And then the reaction to that was Dean Gengler coming to my office and then complaining about him being reprimanded for his inappropriate actions.

**Q. All right. Does that cover it with all the names then?**

A. I mean, I can give a comprehensive list. The current VP of Human Resources right now, her name escapes me; but, I mean, I had a conversation with her. And she wasn't the VP of Human Resources at this time; but she basically validated and supported to me directly that this person -- that Dean Gengler is very much known as this person who does this and so that no one is surprised that these things were happening.

So the question remains: How has he been able to continue to do these

things?

MR. CONTRERAS: Objection, nonresponsive portion.

**Q. (BY MR. CONTRERAS) So then, essentially, it was conversations that you had with these other people about Gengler's reputation, right? Would that be a fair characterization?**

A. Yes.

**Q. Okay. But as far as what these other individuals were telling you, you had no personal knowledge about what they were recounting to you; is that correct?**

A. I don't -- and please forgive me. I guess I don't understand the definition of "personal knowledge," right, so I'm not sure of the context.

**Q. When I say "personal knowledge," I mean something that you actually heard or saw that you would be able to testify to. Okay?**

A. As, like, a firsthand, I observed it directly?

**Q. Yes. Firsthand something you personally observed that you have personal knowledge of. That's what I mean.**

**And so to go back to my question, all these individuals were recounting their own experiences with Gengler to you; and you were learning it secondhand without personal knowledge, correct?**

A. That is correct, other than the one that I stated with Christine Poleski and those stated in my formal complaint.

**Q. Okay. Got it.**

**And so, once again, just to be fair, to make sure that we have a description right, you had conversations with a lot of other people in the workplace that spoke to Gengler's reputation for making improper comments or jokes at work, right?**

A. Yes.

MR. CONTRERAS: Okay. I'm just going the cover one more topic and then we'll break for lunch, or do you guys want to break right now? I think right now is a good time to break for lunch. So how about --

MS. OWENS: Okay. That's fine.

MR. CONTRERAS: How about 1:15-ish back on?

MS. OWENS: Okay.

MR. CONTRERAS: Okay. We'll take a short lunch.

Off the record.

THE REPORTER: We're going off the record at 12:43 p.m.

(Off the record from 12:43 to 1:22 p.m.)

THE REPORTER: We're back on the record at 1:22 p.m.

MR. CONTRERAS: Thank you.

**Q. (BY MR. CONTRERAS) We're back after a short lunch here.**

**So, Mr. Gooden, Gengler was put on administrative leave -- oh, shoot. I forgot to ask you real quick: What did you do to prepare for today's deposition?**

A. I guess, I mean, I read over the documents in my original formal complaint.

**Q. And I don't want to ask you what you talked about with your attorneys; but did you, in fact, also meet with your attorneys or communicate with them?**

A. I did.

**Q. Okay. Anything else?**

A. No.

**Q. Okay. Thank you.**

**So Gengler was, in fact, placed on administrative leave after you filed your complaint against him, right?**

A. Eventually, yes.

**Q. So do you remember that on May 19th they were going to give Gengler the notice of admin leave; but you told Ms. Ruiz that there was a seminar that day at the College of Business, so notice was held off until the following Monday, on May 23rd, 2022?**

A. So, in my head, I want to say it was May 18th.

**Q. Oh, okay. Well, let me just --**

A. I got a phone call on Thursday, whatever that Thursday was.

**Q. Let me just bring up the next exhibit. This might help clarify --**

A. Yeah.

**Q. -- the dates a little bit.**

A. Yeah, you're right.

**Q. Okay. Yeah, I'll just bring it up here real quick.**

MR. CONTRERAS: Exhibit 6, Gengler admin leave letter.

(Exhibit 6 marked.)

**Q. (BY MR. CONTRERAS) Can you read that, or is that too small?**

A. One second.

MR. CONTRERAS: I'll be back in two seconds. Hold on.

MS. OWENS: Okay.

**Q. (BY MR. CONTRERAS) Okay. So Exhibit Number 6, I'll represent to you this is a notice that was given to Gengler on the admin leave on May 23rd. So that would have been about four weeks after you initiated communications regarding your complaint, right?**

A. Correct.

**Q. And once Gengler was placed on leave and he was gone, who became your direct report?**

A. We had an admin Acting Dean, Dr. Jonathan Davis.

**Q. Okay. And is he still currently your direct report?**

A. Correct.

**Q. Okay. And what's your opinion of Jonathan Davis as an Acting Dean?**

A. We work together very well.

**Q. Okay. No issues like Gengler at all?**

A. No.

**Q. So on May 23rd, 2022, Gengler was placed on administrative leave; and he never came back to the workplace, correct?**

A. That is not correct.

**Q. Okay. What -- explain why that's not correct.**

A. I mean, if we define the workplace as the campus, you know, he was on campus -- he was reported as being on campus at one time during this leave.

But, also, I had reported our workplace shifts, right? And so we do a lot of off-campus and outreach events. I had reported that the Dean had showed up -- as part of our playbook, he showed up at an event where we recruit; and he had caused some complications at that time at that event. But he showed up in his official capacity as a Dean and began recruiting for the college.

**Q. When was that?**

A. August of 2022.

**Q. Okay. Well, let's see. So that was during the time that the administrative leave was in place; is that correct?**

A. Correct.

**Q. Did you see him on that occasion when he was on campus?**

A. No, it was reported to me.

**Q. And what was the -- was it a recruiting event?**

A. So this particular time it was a recruiting event at the Asian Chamber of Commerce.

**Q. Okay. So --**

A. I had --

(Simultaneous speakers.)

**Q. I'm sorry. Go ahead.**

A. I had a staff member attend on behalf of the UHD MBA as a representative. We had one, and then the undergrad sent one person as well.

**Q. Okay. So it was not on the UHD campus; it was at a different location?**

A. Correct.

**Q. And where was that, again? You said the Asian...**

A. It was the Asian Chamber of Commerce event.

**Q. And it's your testimony that Gengler**

**appeared and was acting in his role as Dean in recruitment efforts?**

A. Correct.

**Q. And who was the individual you said that reported that, again?**

A. Sadia Ravate, R-A-V-A-T-E.

**Q. Is it your position that that particular incident in August of 2022 violated the terms of this administrative leave placing Gengler on admin leave?**

A. Yes.

**Q. Okay. Anything else? Any other what you're claiming are improper appearances by Gengler in any UHD school-related functions?**

A. In June of 2022 I had reported to Lauri Ruiz that he had made an unorthodox contact with my administrative assistant who sits next to me to discuss this, what we're looking at here. That was just a few weeks after, and he provided contact information and phone number they exchanged in order to discuss it.

**Q. And what was the name of your admin assistant?**

A. Robin Read.

**Q. Okay. And what exactly happened then? So he had communication with Robin Read and wanted to discuss with Robin Read what exactly?**

A. It was via LinkedIn and it was through sort of like a chat and the outcome of that message was, "Here's my number" -- Dean Gengler telling my administrative assistant, "Here is my number. Give me a call, and I'll tell you all about it," or something to that effect.

**Q. Okay. And was this information that was relayed to you through Robin? Robin Read informed you of all this?**

A. Correct, she reported it to me -- I'm sorry.

(Simultaneous speakers.)

**Q. No, no. Go ahead. That's what I was going to ask you. Go ahead.**

A. Oh. Yeah, I was going to say she reported it to me; and then I reported it to Lauri Ruiz.

**Q. Okay. And what's your understanding of what happened with your report on that?**

A. I don't know.

**Q. Did Robin Read actually show you the written chat between her and Gengler?**

A. I don't recall.

**Q. Okay.**

MR. CONTRERAS: Hold on. Give me one second.

**Q. (BY MR. CONTRERAS) Is Robin Read still employed at UHD?**

A. She retired last week -- two weeks ago.

**Q. And was she an individual that was under your direct supervision?**

A. Correct.

**Q. And how long did she work for you?**

A. The entire time that I was there. She was there before me, and then -- so September 2021 until January 2024.

**Q. Okay. You're aware that Gengler serves on the board for the Asian Chamber of Commerce, right?**

A. Correct.

**Q. Okay. So would it be fair to say that maybe you -- the information that you received was incorrect and that he was simply appearing as a board member of the Chamber of**

**Commerce that he, obviously, has involvement in?**

A. How did he become the board? He became the board through contributions of the Marilyn Davies College of Business.

**Q. Do you know that for a fact?**

A. Yes. We were significant sponsors annually to the Asian Chamber of Commerce as well as our gala, which is why we were at that particular event as a sponsor. His title on their website throughout this investigation continued to say, "Dean of Marilyn Davies College of Business," to the point where I actually had to inform them in May of this year that they -- so a year after what we're talking about here, I then had to write to the Asian Chamber of Commerce to inform them to take it down because they remained having his title associated with his board membership.

Additionally --

**Q. Okay. So --**

A. Oh, go ahead.

(Simultaneous speakers.)

**Q. I'm sorry.**

**So at that time, though, when**

**this incident occurred in August 2022, he was still officially the Dean. He was simply on interim leave, correct?**

A. Correct.

**Q. So he was still an employee of UHD. Obviously, being on administrative leave is significant; but the bottom line is that he was still, in fact, a current employee of UHD as Dean in August 2022, correct?**

A. I believe if we pull up that letter, he was not to be acting in any capacity as Dean. And the reason it was reported to me was my staff member said that he was leading people to our MBA table to talk about MBA recruitment. And so that then made my staff member uncomfortable.

But, also, she's an hourly employee and so it became another issue when he suggested that her and Liz Tran, another staff member for the Marilyn Davies College of Business, stay later than their assigned reported time to attend a happy hour that he would then give them tickets. Well, as an hourly employee, that causes implications and complications.

So they were conflicted and uncomfortable because if they had stayed longer, what would that do? I'm their supervisor. He can't approve; but he was still showing up with that title, power, and authority of Dean. And it put them in this very uncomfortable position when he should not have even been having contact with them.

**Q. Okay. Did that have any impact on your job as Executive Director?**

A. I mean, yes, absolutely. It's something that I then had to address with my staff member. It's something that I then had to report to Lauri Ruiz, but also talking about how we navigate hours and time for the week for staff who have to clock in and clock out.

**Q. Okay. But as far as any direct contact with you, you've already admitted that since the mutual no-contact order was issued, Gengler never contacted you directly, correct?**

A. Correct, not directly, no.

**Q. Okay. Or indirectly, right?**

A. I mean, I think the ones that I reported would certainly fit my definition of indirectly.

**Q. Are you referring to him contacting Robin Read on LinkedIn?**

A. Correct and engaging with my staff at an off-campus event regarding recruitment.

**Q. Who were the staff that were present on that day when Gengler appeared at the Asian Chamber of Commerce?**

A. Sadia Ravate and Liz Tran.

**Q. And they actually saw Gengler there and interacted with him and spoke with him?**

A. Correct, yes.

**Q. Okay. Are there any other incidents in which you believe Gengler had indirect contact when he wasn't supposed to?**

A. No. I mean, we later, like, walked past each other at another event at the Hispanic Chamber of Commerce event in, it would have been October of 2022, September of 2022. We walked past each other at an event, but we just walked past each other. But he was also at the Hispanic Chamber of Commerce event.

**Q. Okay. And did the University have any business at those events, or was it just an event that you were attending because you were a member of the same chamber?**

A. Similarly, the University is a major donor. So we had two tables at this luncheon. The President as well as the Vice -- I want to say Vice Provost Deborah Bordelon might have been there. Marilyn Davis was at that table, along with the Vice President of Advancement would have been there. And then we had a table as the Marilyn Davies College of Business as well.

So there would have been several of our -- Dean, Associate Dean, Assistant Dean, as well as a host of students; and then my team, we were there to set up a vendor table.

**Q. Okay. Have you now told me about all of the indirect contacts that Gengler had with you?**

A. I mean, I don't know if this counts as an indirect; but, you know, I received an anonymous report to HR that was filed that HR then had to contact me regarding an anon- -- a, quote, unquote, "anonymous complaint" to me. And the complaint that was recited to me matched word for word Gengler's response in his writing that he had provided to the investigating lawyers.

**Q. And when you say "investigating lawyers," are you referring to Darren Gibson and Aaron McNamara?**

A. Correct. He had provided a written response to my formal complaint to them, and I received a copy. And then I received an anonymous complaint through HR about me and to me, and it matched word for word what was presented in his written response.

**Q. And how did you respond or react to that anonymous complaint?**

A. I think I spoke with Chatiqua Matthews, who serves as the Director; and it was, basically, I am aware of what the policy is as it relates to this particular topic. This is not true nor is it valid; but, also, it's a part of an ongoing investigation. I've already provided supporting materials validating that this is not true to those individuals, but I am aware that this is the policy. And I'm going to make sure that I'm not violating it.

**Q. And what was that complaint about, though?**

A. It was related to consulting or,

like, other paid work, like, professional positions outside of the university.

**Q. Okay. So it didn't necessarily relate to matters within your job duties and role at the university, right?**

A. No.

**Q. No, that's not correct; or that is correct?**

A. No, I'm saying it did not relate directly to my job.

**Q. Okay. Anything else in addition, or does that cover any other type of indirect contacts that you're claiming Gengler had while he was on administrative leave?**

A. It very narrowly fits it; but after the first preliminary report was issued, Dean Gengler then started contacting those who interviewed and who had already sort of validated their responses to the investigation and then asked to change what they reported and then, you know, said the whole thing is lies, of course; but he began sort of like intimidating those who participated in the interview process to change their statements.

**Q. And did you make that known, or did**

**you file a complaint or inform anyone at the university about these actions?**

A. Yes, Lauri Ruiz.

**Q. Okay. And is that in writing anywhere in any document that you produced in the case?**

A. Yes, it would have been a part of my e-mail communication to Lauri in January of 2023. We also jumped on a Zoom call where it was Lauri, as well as she had a witness present. It was a new Title IX person, Coordinator Officer within her office, who was in the background and joined the meeting as well. And I continued to underscore and emphasize how I'm continuing to operate in a hostile environment, and these were the reasons why. I continued to deal with his outfall that related to the investigation. So it would have been written as well as verbally on the call in January of 2023.

**Q. Okay. And, to your knowledge, what occurred as a result of those additional contacts with Lauri about Gengler?**

A. They were dismissed. It was part of a request for me to seek additional protective

measures as a result of what I had been experiencing and the prolonged investigation, and the response came back that I would not receive any protective measures.

**Q. And did you feel that that was somehow -- did that have any adverse impact on your job itself as Executive Director, or were these simply concerns that you raised to make the EOS office aware of these actions that Gengler was taking while he was on administrative leave?**

A. I would say the former. These were certainly absolutely adverse actions that I was receiving as it relates to my overall emotional, mental health, safety, and capacity with in the workplace.

MR. CONTRERAS: Okay. The next exhibit is the Mutual No-Contact Order, and I'll go ahead and shoot that over. It's Exhibit Number 7.

(Exhibit 7 marked.)

**Q. (BY MR. CONTRERAS) All right. This is the Mutual No-Contact Order. Do I need to enlarge it for you?**

A. Please, yes.

**Q. And as you can see, the order is basically that yourself and Gengler are not to have any contact between you two. "Scope of the order: In person, via telephone or electronic means, via third parties, through any other medium." Did you comply with this order?**

A. I did.

**Q. And then if you go to the second page, it references "Nonverbal contact used to threaten or intimidate may also constitute a violation of this order, such as: Body language, proximity, or other physical cues to communicate" and that it was in effect pending the investigation of the formal complaint, your formal complaint. And the enforcement of the policies and reporting violations.**

**So is it your position that what we just went over and what you just recounted to me was you reporting possible violations by Gengler of the Mutual No-Contact Order?**

A. Correct.

**Q. Okay. And it's your understanding, though, that -- or it's your testimony here that despite you reporting these violations of**

**the Mutual No-Contact Order, no action was taken by the University? Is that your testimony?**

A. Correct. I think there's additional later -- I'm sorry. Go ahead.

**Q. I'm sorry. What was that?**

A. Are you sure?

I was going to say that I think there's an additional layer to this as well that I continued to report.

**Q. Okay. What is that?**

A. But I can save it for the end if you want to continue with your next question.

**Q. Well, no, since we're on that point, go ahead and tell me. What is the additional layer that you're telling me about?**

A. Sure, sure.

Part of my request for additional measures in January was, you know, those were the specific -- the specific times. What also was occurring that I became aware of was he continued to contact individuals within the Marilyn Davies College of Business and spreading false truths about me in terms of, like, my motivations for filing this complaint,

that I am lying about everything that I filed, and that I do this at every university, right?

And so those things became part of the narrative within the working environment that made it very uncomfortable for me to be at work, to work with my colleagues in committee work, to work with my colleagues to accomplish the job that I needed to do to be successful. And so it became very difficult to maintain working relationships in the environmental, all of which I also reported to Lauri Ruiz.

And so there were a lot of darts, I would say, of character defamation, assassination, gaslighting that occurred throughout this time period that I very much made Lauri Ruiz aware of. While some individuals came to me, others were documented in written declarations under penalty of perjury through Gengler's lawyer and further validated and affirmed that my experiences of what I was receiving was true.

**Q. And who were those people within the college that he contacted?**

A. Robustly, I can't give you, like, you know, name for name; but the ones that were

most impactful to me were I know that he maintained conversations with Dr. Liu, the Chair of the Department of Accounting, which is a critical program that I work with.

I know that he had conversations with Dr. Candace TenBrink, professor in Management. We used to do a lot of recruitment and outreach together. We no longer engage --

**Q. What was that last name?**

A. TenBrink, T-E-N-B-R-I-N-K.

**Q. Okay.**

A. And she was one of the individuals who was contacted by Dean Gengler, who he tried to coerce into changing her statement.

Another one would have been -- I lost my train of thought -- oh, Marilyn Davies. Marilyn Davies wrote an actual written declaration under penalty of perjury; and in it, it actually talks about, you know, my motivations for wanting to file a report because I didn't get comp time for my birthday, I guess, is what he's telling people. And so Marilyn Davies wrote something similar to that.

Darren Wolf also wrote something attesting to things that just completely are

not true about my employment history and my motivations for doing this.

And so those things began spreading throughout the college, and so I have to then walk into meetings being perceived as this person that he painted me as, without any vindication, validation, substantiation when it's just not true.

**Q. Did Dr. Liu personally tell you that Gengler contacted him [sic] about you?**

A. No.

**Q. Then how do you know that?**

A. Through a mutual colleague.

**Q. Okay. So you heard secondhand?**

A. I suppose; but, I mean, I think all of this can be validated in, like, a -- you know, it can be validated.

MR. CONTRERAS: Objection, nonresponsive portion.

**Q. (BY MR. CONTRERAS) So you were not privy, you did not hear or observe the conversations or communications that Gengler had with Dr. Liu; this is everything that you heard secondhand about Dr. Liu's communications with Gengler, correct?**

A. Correct.

**Q. The same thing with Dr. Candace TenBrink?**

A. She came to me directly with the info- -- no, actually, I can say yes because as she was standing in my office telling me about him contacting her, he received a phone -- she received a phone call and she literally held up the phone and it said, "Charles Gengler." So he actually contacted her while she was sitting in my office telling me about these things.

**Q. Did you actually hear their conversation firsthand?**

A. No.

**Q. Okay. So you don't know what they actually talked about because you didn't hear that conversation, correct?**

A. I know what they talked about because that's what Candace TenBrink told me.

**Q. Okay. But you didn't actually hear their conversation, right?**

A. No.

**Q. And just to make sure that I'm clear, what exactly did Dr. Candace TenBrink tell you about her conversation with Gengler?**

A. That, obviously, the preliminary report had been issued at this time. So it would have been November of 2022 and that he was furious and that he wanted her to change her statement, that the investigators changed their words around; clearly, she didn't say these things. And so I believe her response was that she did not want to engage in any more conversations about this, the investigation or him, and that she kind of wanted to move on. And then her phone rang with him calling her.

**Q. Okay. And then did you walk out of the room and she took the call, or what do you remember happening?**

A. We were in my office. So she didn't answer the phone call, but we were in my office. We talked a little bit more, and then she had to run to class. I believe she had a class at 6:00; and this was, like, at 5:55.

**Q. And what was your allegation regarding Gengler's communications to Marilyn Davies?**

A. I think that is documented, right? Marilyn Davies specifically wrote a declaration. Again, I don't know the legalese

terms; but it was under penalty of perjury and it was some sort of, like, witness statement. And, you know, it was basically saying that I made these things up and that I lied because I did not get what I wanted. And that is very much his sort of understanding of the series of events and so...

**Q. Okay. And do you have any personal knowledge that Gengler influenced her or told her what to say in a written statement, or is that just something that you just heard secondhand?**

A. That was something that was submitted to me in a written declaration through Gengler and his attorney.

**Q. And when was that communicated to you, or when was that provided to you?**

A. It was provided to me January or February of 2023, but it was written and dated around November or December of 2023. And so the importance --

MS. OWENS: 2022.

A. Of 2022. Excuse me. December of 2022, and then it was presented to me in February of 2023. And the importance of that

is I continued to share with Lauri Ruiz in my request for additional protective measures, like, what this environment is happening around me in terms of him character assassanating me on false truths. And the response that I got was, "I don't think that that's happening."

And then we later received these declarations that they basically put in writing to everyone that this is happening, but I knew that it was happening.

**Q. But you're not suing Gengler in this lawsuit; you're suing the University, right?**

A. Correct.

**Q. You're not suing Gengler for any kind of defamation claim, are you? You don't have another lawsuit against him for that?**

A. Not at this time.

**Q. Okay. Is that something that you're considering?**

A. I don't know.

**Q. Explain to me how the University would have any responsibility for Gengler, you know, through his own volitional acts engaging in these contacts with other individuals with the College of Business or discussing with them**

**your complaint against him or the outcome.**

A. That was a lot. One more time, please.

**Q. Explain to me how the University would be able to have any control whatsoever over Gengler, as you say, making these indirect contacts to you after he was placed on administrative leave.**

A. Right. I think there could be a conversation in terms of what is appropriate and inappropriate; but, also, I think this was a byproduct of a prolonged investigation. I never imagined, to be honest, that I would be sitting right here in front of you today.

But I think when this investigation continued to linger on for this long, that was one of the byproducts and unintended consequences is that instead of just going ahead and validating as substantiated, this went on for a year with no sort of understanding. And so I think there are a variety of different things, but the one solution that I did ask and come up for -- come up with, "Well, if you can't control him and you can't control that, control me and give me

protective measures." And that is something that could have been done.

MR. CONTRERAS: Objection, nonresponsive portion of the response.

**Q. (BY MR. CONTRERAS) What other protective measures are you claiming in this lawsuit could have been taken by the University to protect you? At this point he had been -- Gengler had been given administrative leave and was specifically instructed by the University on the terms on the scope of the order what the order meant, nonverbal contact. What other protective measures are you telling me in this lawsuit could have been taken against Gengler at that point?**

A. One, conclude the investigation is all I really wanted, right? Putting in a timely response to the actual investigation; and then, secondly, I requested administrative leave. That was the crux of the January -- I believe I submitted that either December 31st or January 1st that my mental health had eroded as a result of this. "The environment is toxic and continues to be toxic; and if we can't control him, so take me out." That was my

request was put me on administrative leave until the conclusion of the investigation.

**Q. Did these, as you say, indirect contacts by Gengler result in your termination from your job?**

A. No, but it impacted my --

**Q. Did the -- go ahead.**

A. No, but it did impact my mental health as well as my ability to show up whole at the my job.

**Q. Explain what you mean by showing up whole on your job.**

A. I mean, I continued to face a lot of, I would say, mental anguish and mental suffering as a result of the prolonged investigations, as a result of the continued actions of the Dean, as well as having to navigate that working environment with my colleagues.

**Q. Didn't you threaten the University with going to the press if you were not given administrative leave?**

A. I did not. I think we're conflating two sort of -- two or three different conversations, and I would not say "threaten"

would be the appropriate term.

**Q. Did you raise the issue with the University that you would go to the press if you were not given administrative leave?**

A. It did come up in conversation, yes.

**Q. Okay. And that's something that you brought up is saying, "You know, I'm not getting what I want. So, you know, I'm going to go tell the press. I'm going to the press about this." Was it something along those lines?**

A. I think words mean things, Mr. Contreras; but, no, that is not how we approached that conversation, so no.

**Q. Okay. Well, then, explain to me how you approached that conversation.**

A. I believe it was, I want to say, around May, end of April or early May; and I was informed that Dean Gengler had already been -- his last day would be May 31st and that the investigation would conclude as a result. And I appealed in saying, like, "Wait. I mean, there's still, you know, loose ends to tie up as a result of a one-year investigation."

Lauri Ruiz was in the Marilyn

Davies College of Business and she was promoting Title IX awareness on the first floor and I believe I had just like walked by and sort of like just asked to talk about what we can do. And I had proposed ways of us even actually, like, working on this collaboratively.

We had an upcoming Marilyn Davies College of Business college-wide meeting and I shared with her, again, how this continues to be a hostile working environment; but, together, we can come up with solutions, you know. I said, "You know, what if we collaboratively present to faculty and staff?" I said, "I have been trying to navigate within the bounds and the parameters of this policy as well as this investigation." And it was concerning to me that by doing that, no action had really been taken.

And so after a year of doing that I said, "I have to start figuring out how to start being the driver of this car for my own experience and to make myself whole." I had been looking to the University to do it. I had been looking to other people to do it; but

following their lead, it got me sort of like nowhere.

At the end of the day, I really just wanted my name to be cleared in this process as a result of a year-long investigation; and so I said, "I'm going to start exploring ways to start doing that and I don't know what that looks like; but one of those could potentially be going to the press."

**Q. Would another way, as you say, of your name being cleared is you wanting to see Gengler terminated from the university, right?**

A. I think that's what I listed in my formal complaint; but as this continued on, there continued to be cumulative effects of a prolonged investigation. So those requests began changing because I was being assassin- -- my character was being assassinated in the workplace; thus, creating a hostile working environment.

MR. CONTRERAS: Objection, nonresponsive portion.

**Q. (BY MR. CONTRERAS) Is it fair for Gengler to defend himself in the investigation, including talking to witnesses? I mean, let's**

**put it this way: You talked to people about the basis of your complaint against Gengler. You talked to coworkers, right?**

A. Yes.

**Q. Okay. So how was it not fair that Gengler wouldn't be able to do the same thing in order for him to defend himself from your complaint?**

A. The things that I talked about were substantiated through a third-party, neutral factfinding investigator hired by the University. The material that he was touting and sharing with individuals were, unequivocally, a hundred percent false; but also was the attempt at making my job harder. And that's exactly what it did.

**Q. When you told Lauri Ruiz that you were independently going rogue, what did you mean by that?**

A. It meant I continued to go to lawyers and I continued to go to the University to request protective measures in hopes of fixing this; and that was not helping, me partnering with people. So I independently had to figure out for myself how to restore my name so that I

could be comfortable in sharing my story, essentially; but that is what I meant. I was no longer going to depend on other people to sort of fix this for me.

**Q. And do you feel at this time, as you sit here today, now, your name has been cleared; and you've been vindicated?**

A. No, I think as evidenced by the fact that we are here, which, again, is nothing I ever thought I would be in this chair in this position (laughing.)

**Q. I'm going to show you the next exhibit, Number 8.**

**But before I do that, you raised your request to take paid administrative leave. Did Lauri Ruiz not explain to you during that whole process that the policy did not contemplate administrative leave with pay for complainants? Was that not communicated to you?**

A. Not at that time, no.

**Q. Okay. Well, being told that now, do you have any reason to dispute that?**

A. I've seen different models and I've seen -- applied and so I don't know if I'm in

a position to dispute it or not. I do know it is within the authority of the University of Houston System and University of Houston-Downtown to provide it. I mean, it is a measure; but I don't know if I can dispute that or not.

**Q. Isn't it generally accepted that the person that's placed on administrative leave pending an investigation is the respondent, right --**

A. I'm not a lawyer.

**Q. -- generally speaking?**

A. I'm not a lawyer.

**Q. Okay. Well, within the university context, within these types of policies that you discussed with Lauri Ruiz, who provided you guidance and information and instruction on the process, the complaint process, isn't it generally true that the individual that is placed on administrative leave is not the complainant, but the respondent, who, in this situation, was Gengler, correct?**

A. Again, I'm not a lawyer in higher education; but I think one of the reasons we're here is they deviated from what is generally

and what truthfully happens several times in an attempt to protect themselves as well as Dean Gengler. I put forth one request to protect me, and that was denied. So that's what I do know.

**Q. And what specific request are you saying was denied to put in place, that Gengler be terminated?**

A. Well, that or conclude the investigation in a timely manner, as wells my request for paid administrative leave; but, also, when it became known there was a second preliminary report, I then pushed back and said, "That is not the policy, to do a second preliminary report." So, again, deviating from what is documented and generally held true within these circumstances, the University did not follow those guidelines.

And so I guess if what you're suggesting is true and generally accepted, why not make an accommodation for me in this particular case?

**Q. And if you had been -- if you had gotten what you wanted, your administrative leave for -- was it the spring of 2023 that you**

**were requesting that, right?**

A. January 2023, correct.

**Q. Okay. If that leave had been granted and you were -- had gotten paid administrative leave, what would you have done during that time period, sit at home and relax or do other pursuits, I mean, if you were on paid administrative leave from the university?**

A. My priority at that time was my mental and emotional health and safety.

MR. CONTRERAS: Objection, nonresponsive.

**Q. (BY MR. CONTRERAS) What would you have done if your request for paid administrative leave had been granted during that time period?**

A. I would have focused on improving my emotional and mental health while also removing myself from the very environment that caused it to erode in the first place.

**Q. Okay. Anything else?**

A. In regards to...

**Q. Things you would have done, you know, on any given day during the time that you were on paid administrative leave from the**

**university if it had been granted.**

A. No, I couldn't think beyond that. I mean, the impetus for that request was we had just came off of holiday break and I had shared with Lauri Ruiz that I did not enjoy time with my family. I did not enjoy time over the holidays, Christmas and New Years, because I was not presentable at that time to be around people. It was a very dark time for me because I continued to just play over the investigation the entire time. So, again, my request for that time was a time to focus and prioritize my mental health.

**Q. Okay.**

MR. CONTRERAS: Exhibit Number 8 is going to be Gengler's resignation letter.

(Exhibit 8 marked.)

**Q. (BY MR. CONTRERAS) Have you ever seen his resignation letter?**

A. I have not.

**Q. Well, I'll go ahead and show it to you. So then, this will be the first time that you have ever seen it?**

A. Correct.

**Q. Okay. Well, you do know for a fact**

**that he's, obviously, no longer at the university and that he did resign, right?**

A. I do know he's no longer at the university. I do not know the circumstances under which his resignation was tendered.

**Q. Okay. I'll go ahead and show -- share screen. Can you read this?**

A. I...

**Q. Do I need to make it larger?**

A. Yes, please.

**Q. Do you see that it says, "Memo to Deborah Bordelon from Charles Gengler"?**

A. Correct, yes.

**Q. Okay. And so that would have been March 30th -- I'm sorry -- March 20th, 2023; and it says resignation, right?**

A. Yes.

**Q. Can you read that first sentence -- or those first two sentences?**

A. Yes.

**Q. Go ahead.**

A. Up until -- well, it stops. So I can see, "This is to notify you that I am resigning from my employment at University of Houston as of May 31st, 2023. I am stepping down as Dean

of the Marilyn Davies College of Business effective immediately. I am deeply concerned that in February of 2023 faculty/staff attended an AACSB conference and told representatives from a school I was interviewing with that I was no longer Dean and was resigning from the University. This was brought up when I visited their campus for a final interview which ruined my chances of finding employment there after a nine-month interview process. This seems to be contrary to our agreements. Please ensure this behavior is not repeated, and I will try to find another opportunity."

**Q. Okay. So you have no knowledge about what he's referencing here other than the fact that you know that he's no longer employed there and that he left the university effective May 31st 2023, correct?**

A. Correct.

**Q. Okay. And as you mentioned, it was your complaint and the subsequent investigation that resulted in Gengler's departure from the university; is that correct, if you know?**

A. I cannot confirm. I would not have information related to that.

**Q. Okay.**

MR. CONTRERAS: Exhibit 9 I'm going to send over Zoom real quick, Gooden's Formal Questionnaire.

(Exhibit 9 marked.)

**Q. (BY MR. CONTRERAS) And I'll go ahead and bring it up on the screen.**

**You indicated in the formal questionnaire the resolution that you wanted was that Gengler be terminated, right?**

A. Correct.

**Q. That was your notation right there on this page?**

A. Correct.

**Q. Do you see the resolution that you're seeking? Okay.**

A. Correct.

**Q. Yeah. And then the rest of it was through your attachments, right? You had attached a letter or your actual written complaint, right?**

A. Yes.

**Q. Okay. So I guess my follow-up question is: So whether Gengler was terminated or he resigned, the end result is the same;**

**he's no longer working at UHD, right?**

A. So I would say those are two questions. Can we break those up?

**Q. No, it's actually one question. It's whether he was terminated or whether he resigned for whatever reason, it's the same end result; that being that he's not longer at the university, correct?**

A. No.

**Q. No? Why is that not correct?**

A. So I think asking me what I want on a formal questionnaire in April of 2023 versus asking me in January of 2024, you know, it doesn't consider the context of what happened throughout that year. One thing that I think I got out of Dean Gengler's resignation is that we were both needing, calling, requesting, pressuring the University to close this investigation. It apparently seemed to impacting him as well as me. That might be the only thing we agree on here is that we needed the University to wrap this up, and they did not.

So one of the things that I shared with Lauri Ruiz is by following that

logic that you just presented, it assumes that we're following the same blueprint. We have far navigated outside of the bounds of what was to be expected in the Title IX investigation. As such, those byproducts and those loose ends needed to be addressed. One of those, as we saw from Dean Gengler, was his interviewing capacities; and then, for me, it was my character. None of these things would have happened had we resolved this in a timely manner.

MR. CONTRERAS: Objection to the nonresponsive portion.

**Q. (BY MR. CONTRERAS) Does your institutional knowledge of universities include conducting Title IX investigations?**

A. I would say, at a novice level, I began to investigate Title IX investigations similar to mine.

MR. CONTRERAS: Objection, nonresponsive.

**Q. (BY MR. CONTRERAS) Do you have any academic training, credentials, certifications, in Title IX investigations, yes or no?**

A. I have a Ph.D. in Educational

Administration.

MR. CONTRERAS: Objection, nonresponsive.

**Q. (BY MR. CONTRERAS) I didn't ask you about Educational Administration. I asked you about Title IX investigations. Are you an expert in the area of Title IX investigations?**

A. How do you define "expert"?

**Q. Well, have you ever conducted a Title IX investigation in your career?**

A. No.

**Q. Okay. And the first real experience or interaction you had with a Title IX investigation was your own based upon your complaint against Gengler, correct, as the Complainant, right?**

A. That is correct.

**Q. Okay. So then you're not qualified to render an opinion regarding how the Title IX investigation was conducted, correct?**

A. I don't think that any of us can determine who is qualified to render the appropriate way to approach a Title IX investigation. I believe my training in terms of being among the top 2 percent of individuals

with a Ph.D. in this topic of Educational Administration qualifies me to speak to and to adequately research how this should go; but, also, my complaints are rooted in the fact that our own policy that was documented and provided to me was not followed. So I believe that, alone, as a Complainant, would make me qualified to determine whether something was followed adequately or not.

**Q. Okay. And that's your opinion -- or whatever you want to call it -- opinion or conclusion as a Plaintiff in this lawsuit in connection with your own complaint against Gengler, right?**

A. And as a nationally, globally recognized scholar in the field of Educational Administration, correct.

**Q. But not in the field of conducting Title IX complaints --**

A. Which fall under --

**Q. -- investigations, correct?**

A. -- Educational Administration.

Correct, but it falls under Educational Administration.

**Q. So whether -- so with Gengler gone**

**from UHD effective May 31st, 2023, that eliminated, once and for all, the hostile work environment that you claimed Gengler caused, right?**

A. No.

**Q. And why not?**

A. As stated earlier, he had -- the damage was already done by the prolonged investigation. I continued to have to work in an environment with individuals who believed that I have lied and that I am a liar and that I'm some militant, angry Black man who goes around intimidating people when I don't get my way.

Marilyn Davies, again, has been on the record, both in written responses as well as in the press, as damaging my character as a result of what the University of Houston has done. And so, no, I have to still continue to work; and I'm expected to attend events with Marilyn Davies. I'm still expected to attend events with my colleagues who have been fed a lot of false truths.

We know -- those of us who have seen this report behind closed doors know

that I am telling the truth. Never once through this investigation, Title IX or even this one, has anyone actually disputed that my experience was not real or rooted in severe microagressions and pervasive harassment; but that is not what is known throughout the environment.

And so that is why I continue to have to make myself feel so small when I go into working events. I'm not allowed to show up as my full authentic self and be myself in events and meetings, walking down the hall. I have severed all of working relationships within the working environment. That makes it incredibly uncomfortable going into the office.

I have no sense of community. This has been incredibly isolating having to navigate this on my own, but I don't know how to pivot out other than through this process.

**Q. You mentioned --**

MR. CONTRERAS: Objection to the nonresponsive portion.

**Q. (BY MR. CONTRERAS) You mentioned that you're nationally known. What do you believe you're nationally known for or**

**nationally recognized for?**

A. I would say the Ph.D. credentials stand on its own.

**Q. And what are those? What are those credentials?**

A. Can you clarify the question? I'm not sure I understand.

MR. CONTRERAS: Court reporter, can you please read back the last question and answer?

(The requested material was read as follows:

"QUESTION: You mentioned that you're nationally known. What do you believe you're nationally known for or nationally recognized for?

"ANSWER: I would say the Ph.D. credentials stand on its own.

"QUESTION: And what are those? What are those credentials?

"ANSWER: Can you clarify the question? I'm not sure I understand.")

**Q. (BY MR. CONTRERAS) Okay. So just the fact that you have a Ph.D. alone is indicative of your credentials? Is that your**

**testimony?**

A. Correct, in the context of the question that was phrased, yes.

**Q. Okay. What does it mean that the Ph.D. credential stands on its own? Can you just elaborate on that?**

A. Well, I would say anyone with a Ph.D. is sort of known nationally. The rigorous scholarly process we go through academically as well as contributing new knowledge to the field in which we hold represents a great commitment to be breadth abroad of several different factors within our field but also that we contributed significantly in our own meaningful way to the field in which our Ph.D. represents.

**Q. Did your Ph.D. dissertation topic involve conducting Title IX investigations?**

A. In the spring of, like, 2016 I took a policy class in higher education at the graduate level from the University of New Orleans.

MR. CONTRERAS: Objection, nonresponsive.

**Q. (BY MR. CONTRERAS) I don't think you understood my question.**

**Did your Ph.D. dissertation topic relate to Title IX investigations?**

A. No.

**Q. What was your Ph.D. dissertation topic?**

A. Absolutely. I looked at admissions policies at urban public universities.

**Q. And what was the fundamental conclusion or finding of your dissertation?**

A. It's twofold. One, I was looking at the impact of race when admission standards are changed within urban public universities. One of the things my findings -- my Chapter 5 really looked at was the notion of signalling, what do colleges and universities signal to not only their constituents but external stakeholders by the policies that they implement, how does that connect to their organizational values; but what do they signal to external stakeholders by implementing and following those policies, which I would argue is very similarly tied to why we're here today.

MR. CONTRERAS: Objection, nonresponsive portion.

**Q. (BY MR. CONTRERAS) So I kind of**

**touched upon this earlier; but the bottom line is, as of May 31st, 2023 -- so, you know, it's been a good year and a half now -- well, let's see -- yeah, a year and five months, something like that, that Gengler has been gone from the College of Business. He's clearly no longer Dean. He's not a faculty member teaching there at the university in any capacity whatsoever. He's gone, right?**

A. Correct, yes.

**Q. Okay. So the bottom line is that since he's been gone, he hasn't been there to harass you, as you claim he had harassed previously, correct?**

A. That is not true, no.

**Q. How is that not true?**

A. So while I don't have direct, you know, items to write down in regards to him speaking directly to me, again, the byproduct of this entire prolonged investigation and lack of addressing the investigation has led to this continuing to be a hostile working environment. So I think it --

**Q. Okay.**

A. Sorry. Go ahead.

**Q. Well, I was going to say, you said hostile work environment; but if Gengler's gone, then the response question is: Caused by who at this point?**

A. Gengler and the University of Houston.

**Q. And, once again, is that in relation to your testimony earlier about the indirect communications that he's had with other members in the College of Business?**

A. No. I would say that would be a part of it, but not directly.

**Q. Okay. Then what other testimony can you tell me about any direct involvement by Gengler after his resignation May 31st, 2023?**

A. No, that wasn't -- so the question that you asked was: Was it in relation to specifically the indirect that I had faced. And I would say that indirect communication is a part of what continues to contribute to the hostile working environment, not necessarily him having direct communication with me after May 31st, 2023.

**Q. And as we sit here today at this point, is it your testimony that any and all**

**indirect communications by Gengler in an attempt to somehow harass you indirectly is no longer occurring?**

A. The last that I have received in terms of that would be in August of 2023. A really good friend of his had an article written, again, about me that assassinated my character and spouted a lot of un- -- false truths about me that then is out there and, of course, circulated around the college about me being a liar and not telling the truth about my experiences and filing a basically unfounded Title IX.

And then in that, too, each time these things come out -- you know, they use the word "unsubstantiated." But we know that that's not true. These were substantiated, right? So the longer that this investigation -- well, it's closed now; but, you know, without concluding, the world, my colleagues continue to think that these are unvalidated and unsubstantiated. And that's not true. They were.

**Q. Who was Gengler's friend that had -- was it a news article, what type of publication**

**was it?**

A. If you look up The College Fix, he went viral in 2019 during the Brett Kavanaugh testimonies; and basically his comment at that time -- he's a professor at CUNY, which was the previous employment of Charles Gengler. And he went viral by saying, "If you haven't committed some sort of sexual assault or rape in high school or college, then you're not a male. It's a rite of passage. That's why Brett Kavanaugh should be given a pass to be on the Supreme Court Justice."

So I mention that because I can't remember his name off the top of my head; but if you look at that person, that's his name. He runs a blog, and then his name is also cited in The College Fix. And he very much outed himself as a great colleague and friend of Dean Gengler in that particular publication.

**Q. Was your name --**

A. Megan Peppiat [sic] is the author. I think it was, like, P-E-P-P-I-A-T.

And that same individual sent me an e-mail this past summer telling me that he

was writing an article and he requested my resume. I sent it immediately to my lawyers because it made me uncomfortable. Yet another example of causing stress for me in the workplace. It came to my work e-mail.

**Q. Did you turn that over to your lawyers for the lawsuit?**

A. I don't know if it went for the lawsuit. I know that I notified them that I had received this communication and I would not be engaging.

**Q. And that was not a communication that was sent from anybody at the university, right? It was sent by somebody outside the university, correct?**

A. Dean Gengler's friend, correct.

**Q. Is Dean Gengler's friend an employee of the Defendants?**

A. I believe them to continue to be colleagues, work colleagues. They worked together.

MR. CONTRERAS: Objection --

A. So I don't know the capacity, but they were both employed at CUNY.

MR. CONTRERAS: Objection,

nonresponsive.

**Q. (BY MR. CONTRERAS) So Gengler's friend is not an employee -- is not employed by Defendants; he works at CUNY, right?**

A. Correct, yes. I misunderstood the question. I apologize.

**Q. Okay. That's okay.**

MR. CONTRERAS: Can we just take a quick five-minute break, bathroom break, real quick?

MS. OWENS: Sure.

MR. CONTRERAS: Thank you.

Off the record.

THE REPORTER: We're going off the record at in 2:34 p.m.

(Off the record from 2:34 to 2:45 p.m.)

THE REPORTER: We're back on the record at 2:45 p.m.

**Q. (BY MR. CONTRERAS) So, Dr. Gooden, there are a couple of things that I want to ask you about. You had made some recordings of you talking to others at work, right?**

A. Yes.

**Q. Okay. I have a total of four. Is**

**that it, or are there more?**

A. That is it.

**Q. Okay. Did you make those recordings with your cellphone, like, you would just turn it on and put it in your pocket; or how did you do that? How did you make them?**

A. Correct, I used my cellphone.

**Q. Okay. Did you tell those other persons whose voices were captured on the recordings that you were recording the conversation?**

A. The Gengler and Manrique, no; but the Dianca Chase one, yes.

**Q. Okay. And the hour long, 3-minute-and-40-second one, that was the meeting that you had with Gengler and Manrique, right?**

A. That is correct.

**Q. And, you know, obviously, I'm not going to play that whole thing and sit here and listen to it; but when did you make that recording?**

A. I believe the date on it is May 18th, 2023; and I might have to...

**Q. Okay. So that would have been after Gengler had announced that he was stepping down**

**as Dean but was still employed through the rest of that month?**

A. I'm sorry. You have to forgive me. It's been so long. You're right. It's May 18th, 2022.

**Q. Okay.**

A. The investigation took one year.

**Q. Okay. So that was the following month after you started the investigation that you made the recording, right?**

A. Correct.

**Q. Okay. Why did you record that meeting?**

A. One, because I had already been informed by Lauri Ruiz that the University had secured an attorney, essentially, Littler Mendelson; and that had me very spooked and scared (laughing.) And so I then sought legal counsel.

Although they were to be a neutral factfinder, I was still somewhat unclear of how to make sure I was protected throughout this investigation, knowing that they were hired by the actual University. And so I met with a lawyer; and through legal

counsel, I was informed of the laws on recording in the state of Texas, what's allowed and what's not allowed. So that was, like, Number 1.

Number 2 was I was having an uncomfortable conversation regarding something that I felt was very simple and was clearly we were not on the same page; and so I wanted to make sure that we both sort of, like, had an understanding coming out of that meeting what was going to take place and what we agreed upon for the topic of the meeting.

But, third, knowing that I had already filed a complaint, I knew that there was a chance that he was going to say something or do something additional to become another item to add. So as another way to sort of substantiate that I had been facing a hostile working environment, I chose to record.

**Q. Okay. And in that recording you were referencing your request for comp time, right, compensatory time?**

A. Yes.

**Q. And there was a back-and-forth discussion about that, an extended discussion.**

**Would that be fair to say?**

A. Correct.

**Q. And that's really kind of the main thing, right, unless there was something else because I listened to it; and that was pretty much what, really, the entire meeting was all about. Would that be a correct characterization?**

A. While that was the purpose of the meeting, that's not everything that was discussed.

**Q. Right. I mean, there were other things; but that was the main topic, right?**

A. That was the purpose of the meeting.

**Q. Okay. And, basically, you walked out of the meeting not getting what you wanted, this request for comp time, right?**

A. I can't fully recall. Honestly, I can't fully recall the details of it. I believe that he ended up resolving with a half of a day on Friday and maybe, like, half of a day on Tuesday, I believe, was the final conclusion.

**Q. Right. Okay. But what you were really asking for was to be able to use kind of**

**an hour-per-hour comp time proposal, that you had discussed with them what you would like to do, right?**

A. I get the spirit of your question and please know I'm not trying to be difficult; but, like, the term "hour per hour," for me, I think, is where we continue to have a disconnect, right? Like, that was not the spirit of my request; but I believe that that is how it was received. And so I believe that's what caused a lot of the disconnect.

**Q. Okay. So then just for purposes of getting it in the record then, what exactly were you going to Gengler and Manrique and that you proposed to them that was captured in that recording?**

A. Sure. So on May 18th, that day I had sent an e-mail; and I had listed all of the nights and weekends, which was every weekend in May, that I had worked. And I know it accumulated maybe, like, I don't know, 24 to 30 hours or something like that. And so in that e-mail, I said, "Hey, here are the hours that I did work. I'm asking for maybe 16."

So when I hear "hour for hour,"

I'm thinking, "I worked 30 hours; I want these 30 hours back." And that's just not what I was asking for. Instead, I was kind of saying, like, "Hey, here are all the things that I did to accumulate that 24 to 30. May I have half of that," was my request.

**Q. Okay. And it ended, like you said, you were allowed to take off of half of Friday and half of Tuesday the following week, right, as comp time?**

A. Correct.

**Q. Okay. And is it -- would it be correct that in that captured recording, Gengler made no references to your race, right?**

A. No.

**Q. And Gengler also did not make any comments about your sexual orientation, correct?**

A. No.

**Q. Is that correct or not correct?**

A. That is correct.

**Q. Okay. It's correct that Gengler did not make any comments or jokes about your race or your sexual orientation, correct?**

A. There were jokes made but not about

those things, yes.

**Q. Okay. What were the jokes that were made?**

A. I'm sure you heard. It was within the first, you know, moments of us being in the office -- in the conference room. He joked to Dr. Manrique about turning the electricity on in my chair.

**Q. Anything else?**

A. And then turning it into an electric chair.

**Q. Okay. Anything else?**

A. In terms of the jokes or takeaways from that conversation?

**Q. In terms of any kind of jokes or comments that you thought was improper.**

A. Not in terms of jokes, no.

**Q. Okay. Any other jokes or comments?**

**And did you interpret -- were you offended by this electric chair joke, that you were sitting in a chair with electricity?**

A. A hundred percent, yes.

**Q. What do you recall was actually said? Was it the word, "the hot seat"? Is that the word that was used?**

A. It was, "Turn the electricity on."

So, you know, we had a scheduled meeting. They were in Dr. Manrique's office. So I went to Dr. Manrique's office first and asked if we were going to meet in here; and they said, "No, let's go to the conference room."

So that's when we walk into the conference room. And I think I made a comment of, "I'm a creature of habit" -- something like that -- "but I feel like I sit in the same chair every time I come into this room."

And then that's when he goes to Dr. Manrique and tells him, "We should turn the electricity on in that chair."

And so, like, I ignore it, don't say anything; Dr. Manrique didn't say anything. And so he repeated it again. I don't react again.

So then he goes, "You say you sit in the same chair. I was telling Manrique we should turn the electricity on in that chair." And I finally acknowledge it so that we can just, like, move on and let it go; but...

**Q. Okay. Did you interpret that to be an improper comment or unprofessional comment?**

A. Absolutely, yes.

**Q. Okay. And anything else stated by Gengler in that recording that you interpreted to be improper or inappropriate?**

A. We can unpack the ways. So I think, you know, one, that continues to illustrate that I continued to face this type of bullying and harassment. It also happened nearly a month after the event that caused me to file my Title IX report. He should not have even been in a position to engage with me like that, right? And so that by not addressing this in a timely manner, I then was subjected to further -- and that's just one of several examples that I have during that timeframe.

The other thing is I think we learn of differential treatment on that particular call as well. You know, the reason it sounded very unorthodox for people to request this is I learned in that conversation and on that recording that other people had been flexing. Had they worked late, they would come in a little bit later in the morning.

That option was never presented to me; but that is something, I guess, that they shared amongst themselves or that they were doing and self-regulating themselves. That option was never presented to me.

So I was working through nights and weekends and continuing to do that, and so that policy was never shared with me. And that's one of the things I tried to underscore was like: That's why we have policies.

**Q. Okay. Aren't you an exempt employee?**

A. I am.

**Q. Okay. So then how would that apply to you, those policies?**

A. I think what -- we have a university and institutional policy that states that any staff member can request of their supervisor to lean on a flex time or a comp time policy. So although there is the broader, I guess, FLSA policy, we had an institutional policy by which members of the community and the university use, whether they're exempt or not.

**Q. Okay.**

A. And so in my first request, he said that he was not allowed to. So that showed to

me that he wasn't even aware of the policy. I then followed up in an e-mail providing him with the policy.

**Q. And what happened after that?**

A. It was ignored. And so I then shared with him that, "We have other staff who are requesting. How should I proceed?" It was only until -- it was only then, when I had mentioned other employees wanting to have comp time, that he scheduled a meeting on my calendar for later that afternoon. When it was the topic of me and my comp time, it was not a pressing matter. It was ignored. It was not a conversation; but when I put other people on the table with the same conversation, then it became a pressing matter.

**Q. Okay. And is there anything else that you would like to unpack at this time about that recording that came out?**

A. The other things that we hear was just the amount of work that was added to me outside of my job description also became a topic. And so I think it's important to know that when we talk about the issues that I have within the current work environment, that

Marilyn Davies literally put in writing and is in the Houston Chronicle and Inside Higher Education saying that I'm doing false allegations because I didn't get my request for comp time and that I didn't get a promotion, these conversations are clearly indicating they occurred on May 18th. I filed my report April 25th.

He believes and continues to believe and is telling people that I asked for comp time and I didn't get it for my birthday because that was May 18th, and the University put him on notice May 23rd. So he thinks that happened right after. My report was filed four or five weeks before this, six weeks before my birthday. And therein continues to lie the problem: So who gets to substantiate my claims and clear my name with my colleagues?

**Q. What additional work are you saying was added that was outside of your job description after that meeting?**

A. No, it was things that had led up to that meeting. So there were three sort of like ad hoc roles that I continued to operate in. One was as a Digital Communications

Manager. I received that in -- by October of -- gosh -- 2022. He had added that to my plate, and it was a substantial role. And he admitted that it's not part of my job description, but it was a part of my skill set and I was the only person in the college with that skill set.

And then by January I had become the Chair of the Business Alumni Conference somehow, and that falls far outside the scope of my responsibilities.

And then in March of 2022 our program faculty department -- excuse me -- our Program Faculty Director, Kevin Barksdale, fell ill -- he later died from his complications in June of 2022 -- but he took sick in March of 2022. And there was no one to operate in his capacity, so I began doing those roles as well.

**Q. And do you attribute any of those ad hoc roles as somehow being motivated by discriminatory animus by Gengler against you?**

A. I would say yes. It's just a whole lack of respect and lack of boundaries for me as an individual; and, also, we can't point to any situations that I'm aware of where other

individuals were subjected to this type of treatment.

MR. CONTRERAS: Objection, nonresponsive portion.

**Q. (BY MR. CONTRERAS) When you say yes to my question of these additional job roles were due to discrimination, how do you make that connection?**

A. Again, it's, I would say, an overall disregard and lack for me as an individual and as a professional. Therefore, my boundaries continued to be pushed, tested, and broken down; and so he knew that he could put those things on me. But, also, like, they weren't assigned to any other people who did not possess my identities.

**Q. That you're Black and that you're homosexual?**

A. Correct. And this is highly regarded in the literature as something that happens all the time primarily to minorities and women being assigned non-promotable tasks in the workplace because they are perceived as being available.

MR. CONTRERAS: Objection,

nonresponsive portion.

**Q. (BY MR. CONTRERAS) Are you aware that at a public university, there are often employees who cover the duties of vacant positions or take on other duties as assigned?**

A. Absolutely.

**Q. And isn't it true that in your very job description that we went over, Exhibit 3, includes taking on job duties as assigned, correct?**

A. Correct, I think. Correct.

**Q. Okay. What are your boundaries, Mr. Gooden, when you say "boundaries"?**

A. That is a very broad question. Can you rephrase?

**Q. Well, in your answer you said not respecting your boundaries. Wasn't that your testimony just now?**

A. Oh, yes. I would say there was no --

**Q. Okay. Please explain.**

(Simultaneous speakers.)

A. Absolutely. In terms of, like, my boundaries, there was no respect for my time. There was no respect for my personal space. There was no respect for my identity. There

was no respect for my, I would say, like, mental and emotional safety. There was no respect for even just things that I would put on my calendar; or I already said geography or environmentally, right? Like, he would violate those boundaries all the time as well.

**Q. When you say "personal space," define what you mean by that.**

A. As it related to just like me being in my office and his ways of engaging with me and approaching me.

**Q. Okay. Let's talk about the other three recordings. Is it correct that it was the same conversation captured in three separate recordings with Bianca Chase [sic]?**

A. That is correct.

**Q. I'm sorry. Dianca. How do you spell her first name, with a "D" or a "B"?**

A. "D," Dianca Chase, "D," as in dog, "I," igloo, -A-N-C-A.

**Q. Got it.**

**So in that conversation -- I have here that there were three different recordings. One was 15 minutes and 14 seconds, and that's Plaintiff's Bates Label Number 1175.**

The second one, Plaintiff's Gooden Bates Label 1176, was 9 minutes and 52 seconds. And the third one, Gooden Bates Label 1177, 4 minutes and 10 min- -- I'm sorry -- 4 minutes and 10 seconds. Does that sound about correct on the times of each of those recordings?

A. That sounds about correct.

Q. Okay. And you did not tell Dianca Chase that you were recording her, right?

A. That is not correct. I did.

Q. Okay. You did tell her.

And did you tell her, "I'd like to record this," and then you started the recording? And when you told her that, she, obviously, said yes; or else you wouldn't have made the recording, right?

A. That is correct.

Q. Okay. Did you actually capture on the recording you asking her if it's okay if you can record and her saying yes, or was that outside of the recording?

A. I can't recall.

Q. Okay. Because I didn't hear it, and I would assume that it would have been in the first recording the first thing that you said.

**Would that make sense?**

A. It does make sense.

**Q. Okay. But with respect to Gengler and Manrique, if someone was going to record a conversation that you were having with them, wouldn't you want to know that you're being recorded; or wouldn't you like to be asked to give consent to being recorded?**

A. I think it would depend on the context. I'm not sure I can answer that.

**Q. Okay. So then you would be okay with somebody just recording a conversation with you without your knowledge?**

A. I think it would depend on the circumstances and the context.

**Q. Okay. Well, if Gengler was a complainant in the complaint and you were the respondent -- let's put it in that context -- and if Gengler recorded a conversation without telling you, would you appreciate that; or would you -- would that be okay?**

A. I believe Texas is a one-party state, so as long as one party is aware that the recording is happening, then that makes it legal. So I'm not sure, I mean, what we're

leaning towards here or how that is helpful; but that's a very narrow question to ask, right, like in context (laughing.) So I'm not sure how to respond.

**Q. Well, first, you said it depended on that context. So I put it in context -- well, first, I asked you, you know, the question; and you said you can't answer it without context. Then I give you context; and you can't answer, either.**

**And, also, I'm not asking you about, you know, what's legal and not legal. I'm just saying: Bottom line, within the context of if Gengler had filed a complaint against you and you were the respondent and he had approached you and recorded a conversation without your knowledge, would you appreciate that; or would you not appreciate that, bottom line?**

A. I don't know how to answer that question, Mr. Contreras.

**Q. Well, I gave you one particular context because you said you needed context, right?**

A. Correct.

**Q. Is that right?**

**And I put it in one particular instance of context and now you don't want to answer my question; is that correct?**

A. It's a hypothetical.

MS. OWENS: Objection, form. Argumentative.

**Q. (BY MR. CONTRERAS) Why is it that you can't answer that question?**

A. I believe it's a hypothetical question, so I'm not sure. Like, I'm not the respondent nor was there a complaint filed against me. And so, you know, you're asking me to conceptualize something that I did not -- I haven't had to mentally, like, walk through that process and whether I appreciate it or not.

I mean, like, the first thing that comes to mind, you know, without allowing me to really process, is, you know, if there were a complaint against me alleging that I was harassing an employee and then I was being recorded, likely, there would be nothing on that recording of value, right?

And so quite the opposite, I did

file a complaint. We did have the Respondent, and they further proved that I was being subjected to a hostile working environment. So I don't know. It's a lot of things to have to, like, wrap my mind around in such a small timeframe regarding something so narrow; and so it makes it difficult for me to, like, respond.

Again, like, I'm not trying to be difficult here; but that was a lot to try and process (laughing.)

**Q. Okay. Well, what about just in the context that we're in? You're the Complainant. Gengler was the Respondent. And what if Gengler had approached you and had a conversation with you and recorded it without telling you? Would you appreciate that, or would you not appreciate that?**

A. I'm not sure I can answer that question, Mr. Contreras.

**Q. Okay. Well, now I'm putting it in the exact context of this whole case of you're the Complainant in the complaint you made; and Gengler is the Respondent. Okay? And, like I said, what if the roles were reversed here and he did to you what you had done to him, made a**

**recording without his knowledge; would you appreciate that or not?**

A. I'm not sure. I don't know.

**Q. Why are you not sure?**

A. Because it's a lot to unpack. It could potentially be helpful, right? Like, if someone is claiming, like, I'm bullying or harassing and we're in this environment and there's a recording and I don't have anything, that's one thing. But, like, if you record it, it substantiates and validates what is happening.

But, also, the purpose of the meeting was to talk about comp time; and we had already not sort of like understood or agreed on the policy. And so the other purpose of the recording was so that we could understand what our takeaways were from the meeting; but, again, like, I don't think it is as narrow as we're trying to frame it here. And so, like, I don't feel like I can confidently under oath, like, respond to what you're asking me here because there's a lot of moving parts.

MR. CONTRERAS: Objection, nonresponsive.

I'll note for the record that Plaintiff Gooden is simply being evasive and refusing to answer the question, and I'd like to certify the question for possible motions with the Court to force the Plaintiff to answer this question.

**Q. (BY MR. CONTRERAS) I'll move on because we'll go back and forth, Mr. Gooden; and I know you're just going to keep giving me these, you know, longwinded explanations as to why you won't answer the question. But I put that question in the exact context of the lawsuit that we're in. There's no hypotheticals here. There's no: Well, what if it was this?**

**No, this is: You're the Complainant, okay? Gengler was the Respondent in your complaint. What if he did exactly what you did to him with a recording without his consent or knowledge? Would you appreciate that, yes or no?**

MS. OWENS: Objection to the extent it calls for speculation. He's answered the question that he does not know how to answer the question considering there's some

moving parts.

If there's another question that you'd like to ask of Dr. Gooden, you're certainly welcome to do so.

MR. CONTRERAS: The Plaintiff did not answer the question. He refuses to by some type of explanations as to why he cannot, but that's still being evasive.

But let's just move on, okay?

**Q. (BY MR. CONTRERAS) Let's go to other three recordings. In your conversation with Dianca Chase, in a nutshell, can you tell me why you recorded that conversation and what was discussed?**

A. Absolutely. So that was -- she had already sort of announced that she was sort of transitioning; and one of the things that came to my mind was, like, she would not be here with the university -- well, she's at the University of Houston System; but she would not be at UHD. And so she was also one of the firsthand witnesses of a lot of what I experienced but, primarily, the safety alert regarding the tall Black male.

And so I had an opportunity to

already sort of like talk to Ikea Jernigan about it, as well as Jamil Thorne; and they both agreed that it was inappropriate that he was joking and that it, too, was very stereotyped and partially racist.

And so I had not talked to Dianca about it and I did not have an opportunity to -- or won't have an opportunity to talk to her about it because her last day was coming up. And so we worked our event together. It was at the East End Chamber of Commerce. There was a luncheon held that day and so we were staffing a table and we began to have a conversation. And knowing that she was leaving, I was, like, "Well, is it okay if I get your perspective on those events and, you know, everything that's happening before you leave?"

And she said yes. She goes, "I'm fearless," and that I can record her.

**Q. And she was another individual that you spoke to in the workplace that had, I guess, explained that Gengler has a reputation for making improper comments or jokes, right?**

A. Correct.

**Q. Is there anything specific that you recall in that conversation that she said about Gengler that was inappropriate or that he did that was inappropriate or improper?**

A. There are a wealth of things in the recording.

**Q. Okay. Why don't you just summarize them for me?**

A. Well, I mean, I think, primarily, one of the things that was shared was how her performance evaluation was actually, like, five minutes of her actual evaluation; but the remainder of it was him bragging that White people didn't start slavery, that Black people started slavery and how White people are blamed for it. And that had nothing to do with her actual performance evaluation, and I think it then circled into a conversation about privilege.

And there was, like, another conversation about porn and making jokes about porn to Jamil in front of staff, asking Jamil if he was watching porn on his work computer.

And then there was another conversation regarding him having inappropriate

sexual contact with students on a couch that used to be in his office, among others, as well as recanting the events that happened around the safety alert and, actually, the -- how the individuals in my office felt highly offended by that comment that he made to them specifically.

**Q. Okay. And so these comments that Gengler made that Dianca recounted to you were not things that you heard personally, right? She's telling you secondhand what he said, correct?**

A. Correct.

**Q. Okay. And so why is it that you had three different recordings of the conversation versus just one long recording with her of the entire conversation?**

A. I can't recall specifically. I do know that, you know, we were at an event; and maybe I thought the conversation had ended. I don't know.

I do know we were at an event, and we were working a table. And when they went in to lunch, we went around the corner into a hallway; and sometimes there were people

around. And we were having a pretty, I would say, like, confidential conversation around some really personal and inappropriate things; but it was our experience in the workplace.

And so I do know people were walking by and then, like, standing in line at times. And so I'm not sure, but I believe we relocated at some time so that we could talk more. But I don't know the specifics.

**Q. Okay. Thank you.**

**And when was that, and what event was it?**

A. I know that it was May of 2022 and it was the East End Chamber of Commerce and it was, like, their educational symposium. I believe the Dean, Charlie Schwartz, had attended as well and he kind of like walked by and we were kind of like -- we had to stop talking because he was the colleague on campus; but he attended that event as well.

**Q. Okay. And did you have a table up for doing recruiting for the university? Was it, like, promoting recruitment?**

A. That is correct.

**Q. Okay. Recruitment was really heavy**

**emphasis for you in your job, right, or is a heavy emphasis?**

A. Correct.

**Q. Have you recorded -- made any recordings of you and your subordinates at work?**

A. No.

**Q. Who else have you recorded?**

A. Dianca would be the one.

**Q. Okay. Anybody else?**

A. As it relates to this, no. I mean, like, Zoom meetings, for purposes of, like, agenda keeping, right? Like, for work, we would have Zoom meetings and things like that.

**Q. But, no. I'm talking about conversations that you would capture on your phone, like you did with these recordings. Anybody else at work that you've recorded or just these four that we went over?**

A. Just the ones we went over.

**Q. Okay. Is Jonathan Davis still the Acting Dean?**

A. That is correct.

**Q. Okay. And what is your work relationship with Jonathan Davis?**

A. I mean, strong, well. We're working. Anything -- I'm sorry. I was going to say anything after working under Gengler would be a breath of fresh air.

MR. CONTRERAS: Objection to the nonresponsive portion.

**Q. (BY MR. CONTRERAS) And so you have a good working relationship with Jonathan Davis; and there's certainly no concerns or issues of the same nature or character that you had with Gengler, correct?**

A. That is correct.

**Q. Do you feel that since you've made your complaint against Gengler that you've been retaliated against in any way by the University?**

A. In the traditional sense, no.

**Q. State to me how you believe that the alleged harassment that you're making in this case by Gengler affected your job performance.**

A. I mean, I continue to reiterate the fact that, you know, I filed my complaint; and the lack of its conclusion puts me out here, both internally at work, whether in a committee meeting, but publicly, broadly with people that

I have to engage with and work with I am listed and noted as a liar and someone who launches unsubstantiated, defamatory claims against individuals. And we know that that's not accurate, and so that continues to impact how I maneuver within the environment overall.

**Q. So you're saying that there's this -- okay.**

**So is that everything? Is that your full answer to my question?**

A. I believe so, yes.

**Q. Okay.**

MR. CONTRERAS: Exhibit Number 9 is going to be Gooden's proposal letter.

THE REPORTER: I think we already had 9.

MR. CONTRERAS: Oh, we already had 9?

THE REPORTER: I think we're on 10.

MR. CONTRERAS: Oh, shoot. Okay.

All right. Exhibit 10, proposal letter.

(Exhibit 10 marked.)

**Q. (BY MR. CONTRERAS) And give me one second to just pull it up.**

**Can you read that, Dr. Gooden?**

A. Correct. I can, yeah.

**Q. Okay. So, as you can see here, this is a letter that you wrote to Gengler dated April 26th, 2022, correct?**

A. Correct.

**Q. And so that would have been one day after you initiated your formal complaint against him, right?**

A. Correct.

**Q. And the subject you put here is "Proposal to Create the Official Digital Communication Office & Structure." Was that something that you came up with, or had that been assigned by you and this is your work product? How did this letter come about?**

A. The letter itself came about -- again, I had been working in Digital Communications since October of 2021; and then, what happened, the person -- we had a digital communications specialist or manager. That person resigned in February. So I occupied the full-time role in addition to

my current role in addition to the alumni office.

And so what ended up happening was we held interviews throughout April to fill that role; and so what I was looking to do was if I was going to continue to supervise this particular person, then, I wanted to make sure that me, as well was my administrative assistants and office assistants, they were also supporting the work of that particular office that was supposed to report to the Dean's suite; and so it came over to me. And so the purpose of this was: We need to establish this as an actual office so that we can make sure that we have the structure to support it as well as the resources to move forward.

**Q. Okay. And what was the result of your proposal? Did Gengler approve it?**

A. Well, I sent it May 3rd; and then as of May 18th, you can see we hadn't talked about it. And so, still, if you listen to that May 18th recording, you can hear that no conclusion had come out of it. I was still awaiting response from -- it's dated

April 26th. I sent it May 3rd, but we hadn't discussed it until May 18th.

**Q. Okay. And so by that point, are you basically saying that there was no decision made in response to your proposal? There was essentially no response?**

A. There was no response.

**Q. Okay. And did you continue to assume this additional role of Digital Communications after you sent this letter?**

A. Correct, so --

**Q. Go ahead.**

A. No, no, please.

**Q. No, no. Go ahead.**

(Simultaneous speakers.)

(Laughter.)

**Q. I thought I was going to give you the floor. Go ahead.**

A. Yeah. What I'm thinking about is we had talked about what that would look like; and I believe May 18th we started getting at a better resolve -- the thing was we were hiring a new Digital Communications Manager that started June 1. And two things that I wanted to get was, one, if he were to be put on some

type of leave, I wanted to get it in writing what this looked like from him, right, and get something in writing because he had created these informal structures that existed outside of policy and outside of the university and I had no way of sort of like covering me in terms of what I am doing, what I'm supposed to be doing.

And so when he gave me the directive to supervise all of these offices, that wasn't in an e-mail. No one went to HR, right? And so my concern was I had all these unrealistic expectations placed on me and so I wanted to clarify what that looked like moving forward.

And so, then, the other thing that we decided at the end of, like, May 18th was that he was to then have the digital communications person report directly to him. So after that, I then started to try and follow up to get him to put that in writing so that we can go to our business person that can make the change happen before our Digital Communications Manager started; but he dragged his feet on that as well. And then, eventually, he got put

on leave.

MR. CONTRERAS: Objection, nonresponsive portion.

**Q. (BY MR. CONTRERAS) What was the extra monthly stipend that you were asking for? Did you get that?**

A. It hadn't been clarified. I didn't know. I later learned that there's a policy that talked about additional compensation. Through my conversations with HR, I learned about that policy; but I didn't know what that was.

**Q. Okay.**

A. I just knew I was committing a significant amount of time to that particular role and it was outside of the scope of what I was hired for.

MR. CONTRERAS: Object to the nonresponsive portion.

**Q. (BY MR. CONTRERAS) But in that role was it revealed that you had a URL that was an entirely different UHD microsite?**

A. I don't understand.

**Q. In this additional role, was it revealed that you had a URL to an entirely**

**different UHD microsite?**

A. What do you mean? I had a URL?

**Q. Yes.**

A. Like, for Digital Communications?

**Q. Yes.**

A. At UHD?

**Q. Yes.**

A. I'm not -- I don't think I understand. I know we had a microsite that we were working on to get digital leads for the MBA program.

We ended up creating a Digital Communications website; but that would have been, like -- that was a 2023 thing that we did, if that's what you're referring to. Like an office landing page?

**Q. Yes.**

A. Yeah. No, I believe that was created this past year. We created that in 2023, if I understand the same correct website.

**Q. Okay. And so, once again, the monthly stipend issue -- request or the pay increases that you had requested for those in support of those additional responsibilities were never responded to or acted upon?**

A. Correct, at this time. Within this timeframe that we're speaking of, that is correct.

**Q. Okay.**

MR. CONTRERAS: The next exhibit, Exhibit 11 -- we're on 11, right?

THE REPORTER: Yes.

(Exhibit 11 marked.)

**Q. (BY MR. CONTRERAS) I'm showing you some answers in the lawsuit. The Parties sent requests for information and answers and such, and this is your response to Request For Admissions that the Defendants sent you, through your attorneys, to answer. And I just want to direct you to Request For Admission Number 3 -- come on already; it's not letting me -- there we go.**

**Okay. Request For Admission Number 3, "Admit that Defendants never demoted you." And your answer to that was, "Deny." So can you just answer my question: Why did you deny that?**

A. It's a gray area. So I think this was looking for, like, a yes, no, admit, deny. But what I did share was I did eventually get

the structure for the digital communications role, and we did formalize that in writing. And it took a long time, but I did eventually get compensation for that. And then I got pulled from that, I want to say, in June of -- gosh -- 2023? June of 2023. So I'm no longer operating in that role, and so it was just more context behind it.

**Q. Okay. As we just now discussed. Okay.**

**Now to this Request For Admission Number 3, we asked you to admit that Defendants never demoted you; and your answer is, "Deny." Do you see that?**

A. I do.

**Q. So my question to you is: Why did you deny that Request For Admission?**

A. Again, I think it fell into this gray -- I think it leads to a conversation where we are able to provide more context. It's not as simple as, like, admit or deny. I think that that offering of the Digital Communications Manager is important, so I did not know -- I didn't want to say "admit" because that's not a hundred percent true.

**Q. Okay. So you feel that you were demoted because your request for money and structure wasn't approved?**

A. Excuse me? One more time.

**Q. You feel that you were somehow demoted because your proposal for money and structure wasn't approved; is that right?**

A. No. I think that's one of the problems with a one-year investigation. What we just looked at was 2022. What I just referred to was 2023. These are like two completely different things.

**Q. Okay. Well, let me just ask you this: What does it mean, in your mind, the word "demote"?**

A. I think what I'm considering here is I was in that role, and I'm no longer in that role. I was receiving that stipend, and I'm no longer receiving that stipend. Those job responsibilities were taken away.

**Q. Okay. Which you're interpreting as a demotion?**

A. I'm saying it's not a full -- I can't admit to it.

**Q. Okay. Well, that was a role that was**

**outside the scope of your regular job duties, correct?**

A. Correct.

**Q. Digital Communications, right?**

A. Correct.

**Q. So then if it was a role that was, as you say, taken away from you; but it wasn't in your scope of regular job duties, can you just please explain on the record how was it that you conclude that that's a demotion?**

A. What I'm saying is I don't know if putting "admit" there would have been a hundred percent accurate.

**Q. Okay. Let's go to RFA Number 4. "Admit that Defendants never took disciplinary action against you for any reason." And your answer was you denied that. So can you explain the reason why you denied that Request For Admission Number 4?**

A. What continues to concern me is marks on performance reviews, supervisor feedback that I receive as a result of remaining in the environment; and so those continue to concern, the feedback that I get from the University regarding those elements.

**Q. Which you're interpreting as disciplinary action, what you just described; is that correct?**

A. Correct, I make connections to those things.

**Q. Okay. It's true that you've never received a written reprimand from work, right?**

A. That is correct.

**Q. It's also true that you've never received a formal disciplinary action for anything at work, correct?**

A. Correct.

**Q. Is it also true that no one's ever filed a complaint against you for any kind of job performance related issues?**

A. I would say that's not correct.

**Q. Okay. Why is that not correct?**

A. I mean, again, annually at UHD we hold these -- what do they call that -- like, supervisor assessments; and so the way that these things come out is direct reports can, you know, basically get feedback. And so I then meet with my supervisor and I get feedback on what is put into that tool; and, you know, one of the uncomfortable conversations I have

to have at that time is, "Hey, I'm still navigating a lot of these things and dealing with a lot of these things" if there's a request for me to be more, you know, engaging and to be more present and to be more involved.

I do my job, right, and I do it very, very well; but, unfortunately, I just -- I haven't been the person that goes to lunch with the team, right? I don't have the emotional capacity to be able to do those things. So I get negative feedback through those types of tools; and they, I would say, ultimately are being connected to my overall performance in the role.

**Q. And is that something that you associate with disciplinary action?**

A. I mean, it's an uncomfortable conversation. It's one -- if anytime HR has to tell your boss to have a conversation with me, you know, that's not positive; and that's not the first time that something like that has happened. There was at least two, three conversations that have come to me regarding me being in the workplace that surfaced that the genesis for them were this particular

Carlos Gooden - 1/26/2024



investigation.

**Q. And what about prior to that time, prior to the investigation?**

A. It would have only been six months, so no.

**Q. Okay. Have you ever played professional football?**

A. No.

**Q. Okay. So why did you raise the Damar Hamlin NFL game injury to Ms. Ruiz as having something to do with your complaint against Gengler?**

A. Absolutely. I would say, one, it was a show systemically of what the system and what organizations typically want and what really should be happening in the spirit of humanity. And so, for me as a person, again, I was in a place of, like, high anxiety, high depression as a result of being within an organization that failed to protect me.

A man died on the field and the officials -- the owners, the managers, wanted to continue for the advertisers, for the ticket sales, for the concession stands, without any sort of regard for the fact that a man had

died. And so the game did not continue.

And we saw some of the strongest individuals, warriors, right, athletes, most of them being the most physically fit Black males that we've ever seen being strong; but, in that moment, they weren't.

And, you know, I drew a lot of connections and parallels, right, like to me being in this working environment. And I was literally screaming and asking someone for help dealing with my anxiety and depression; and I continued to feel that, as the organization and the system, U of H represented the NFL owners saying, "No, we need our advertising. We need our concession stands. We don't care that a has man died here. We don't care that the mental health and mental safety of the NFL players is what really should be the important thing here. We want to keep it business as usual."

And so I was the all Black male on the field, essentially, trying to work; but I could not show up whole. I was hurting emotionally and mentally; and I was asking Lauri Ruiz to be the coach, to call the game

here and let me heal. And so I saw those connections, and that was how I could draw that.

But, also, like, I was -- again, that was a very low point in time in my life; but, arguably, that, too, was a display of what my mental state was at that time as a result of everything we're talking about right now.

**Q. Well, but he actually didn't die. He was just out for -- what was it -- like, ten minutes; and then he was revived, right?**

A. Really, I don't know if you want to say that. You might want to go back off the record on that one (laughing.)

**Q. Am I wrong on that?**

A. His heart stopped; but, like, after everything I just said, that's what you got out of this, "he didn't die, though"? I believe his heart stopped medically for an amount of time to where if your heart is stopped, then he has been regarded in the press as having died.

**Q. Is Damar Hamlin alive as of this day, yes or no?**

A. He is.

**Q. Okay. So then he didn't die, did he?**

A. He died on the field in the moment.

**Q. Is he still alive as of this day, yes or no?**

A. I would Google that, Mr. Contreras; and we can see if we have the answer to that question.

**Q. Is Damar Hamlin still alive, yes or no?**

A. He has been revived, yes.

**Q. Okay. And so when you say "died," that's not correct, is it?**

A. I believe we can pull the reports that were on the field at the time that will report that he died; but, I mean, I think you're focusing narrowly. You asked me why I sent the e-mail. Those were the parallels that I drew. It was less about, like, him dying than the responses of the organization to protect individuals on the field and make the right call and do the right thing. So I don't know if we're focusing on the right thing here, but that was the spirit of the e-mail that moved me.

**Q. Okay. Then at that incident, in your opinion or in your mind, when that game injury**

**was sustained by Damar Hamlin, what is it that you're saying should have been the proper course of action by the NFL or by the football team?**

A. I think the overall narrative following that was the coaches got it right, and the management of the NFL got it wrong. They wanted to hurry and get him off the field and resume business as usual without understanding the emotional and mental state of the players who had just lost and experienced something incredibly traumatic. And so the owners were then criticized for wanting the game to continue, but that human element was missing. And so similarly to me, I --

**Q. Go ahead.**

A. No, I was going to say: And similarly to me, I had been expressing, you know, that my mental capacities were eroding. I was experiencing anxiety and depression; and I was asking: Until we conclude this investigation, can you please take me off the field, essentially, was my request.

And I was saying -- well, the other part of this, too, I think, talks about

the structure of the organization. I would take these things to Lauri Ruiz; but Lauri Ruiz, as the Title IX Coordinator, had no authority or any, I would say, influence or power to make the decision. She would then take some time to float it up to the University of Houston System.

There was no person respond- -- no decisionmaker on the campus to deal with my particular case. Everything had to be floated up through the bureaucratic channels to get things done, similarly to that incident, right? The coaches decided to make a decision independent of the management; and, arguably, it was the right thing to do.

**Q. Okay. But your request for FMLA and ADA accommodation requests were not ignored. Lauri Rodriguez [sic] did, in fact, refer you to those processes, correct?**

A. But that was not my request. She did. She gave me a list of resources, many of which weren't applicable at the time because I hadn't been at the university long enough to accumulate time to be able to use FMLA at that time. And so I circled back and clarified that

my requests here were actually for paid administrative leave, which was the same treatment that Dean Gengler had received.

**Q. Yes, but your positions were fundamentally different. You were a complainant, and he was a respondent that was placed on administrative leave in the position of a respondent. So yourself and Gengler were in two completely different contrasting positions, correct?**

A. That is correct.

**Q. So you're the founder of a company named Be the Good, right?**

A. Correct.

**Q. What is that company, and what does it do?**

A. It's basically -- well, if it were actually, like, up and running, it's a small business development consulting company that I'm looking to launch and get off the ground.

**Q. Okay. So is it not launched yet, or it's still in the works?**

A. I would say it's still in the works. Mostly anything that I've done now has been for, like, family. So I don't have, like,

clients, per se; but it's up and out there. And it's been fun to have it there, but I haven't had the time to actually engage with it.

**Q. Okay. But the website looks like you can make appointments at this time, right? If somebody out there is interested, they can contact you through your company and make an appointment, right?**

A. No, they can't.

**Q. They can't? So are you not accepting possible business solicitations or people that are interested in the services of your company?**

A. No. I mean, I don't have the time to do it at all right now, so no.

**Q. Do you have a physical space currently for the company, or is it all just pretty much online with you and your associates?**

A. I mean, I don't even have associates. It's me. It's -- I mean, if you want to, think of it as a hobby. It's something that I created; but, like, no, I don't have a physical space. I don't have clients. I don't have contracts. I don't have marketing. I don't

have those things.

**Q. Okay. Is it ultimately your goal to get that up and running as an ongoing concern for profit?**

A. I would say I was in the position where I didn't understand where my employment would lead. I didn't know if, as a result of filing this complaint, if I would still be employed. So I started putting things in place so that I could have a backup plan in the event that I needed it, and I started going through training for that.

Right now I do have documents with the university that I do have other paid outside commitments with the University of Southern California, and read applications. So I've been working with them since September, reading applications for their doctoral program; and that consumes my time.

I don't have the capacity to do that, but I wanted to make sure that I had that as a fallback in case I needed to.

**Q. Okay. Didn't a prior version of your website include names and pictures of associates?**

A. It did, yes.

**Q. But the current version does not?**

A. I don't recall. I couldn't even tell you the last time I even went to that website, but I don't know what's up there or not --

**Q. Okay.**

A. -- right now.

**Q. Have you submitted an outside employment form to UHD regarding Be the Good?**

A. I did submit one -- this is when I really thought I had a client. It may have been, like, June 2023. I was looking to do social media -- well, I submitted the form, and it was just so that I could be able to broadcast it. And then it came back saying, like, "You need specific clients," like, right?

And so I put it out there like, "Hey, I want to do business development, digital marketing."

And they didn't sign it and push it through because they said, "You need a specific contract with a specific..."

And I was like, "Oh, I don't have those things."

I wanted to at least be able to

try to get some out. I thought I had a client coming on board in this past summer, I want to say; but that did not pan out. We continued to have conversations; but it never actually, like, translated to anything.

And then that's when I became an admissions, like, seasonal reserve for Southern California; and so that takes up my part time.

**Q. Okay. Did you submit a form for the application review gig? Is that a paid position?**

A. That is, yes; and, yes, I did.

**Q. Okay. And how much does that pay, I guess, per month if you can do just an estimate?**

A. $200 a month, maybe 250 on a good month. It hasn't been anything significant.

**Q. Okay. And is it just like a couple of hours a week or something like that?**

A. Correct. It's contractual; and I believe it ends March, April, which is all stated in my paperwork to the Provost.

MR. CONTRERAS: Can we just take a short break, just a five- or ten-minute break? And then we'll go back on; and,

hopefully, I'll be close to finishing?

MS. OWENS: Okay. Sure.

MR. CONTRERAS: Okay. Thank you.

THE REPORTER: We're going off the record at 3:51 p.m.

(Off the record from 3:51 p.m. to 4:01 p.m.)

THE REPORTER: We're back on the record at 4:01 p.m.

**Q. (BY MR. CONTRERAS) Dr. Gooden, the job offer letter that we -- that I introduced as Exhibit 3, that offer letter was from UHD, right?**

A. Yes.

**Q. It didn't say UH System on it, did it?**

A. I'm not sure. I don't...

**Q. Okay. Let me just pull it up again.**

**Okay. This is Exhibit 3, Plaintiff's job offer letter. Do I need to enlarge that? There we go.**

**Do you see that offer acceptance form?**

A. I do.

**Q. UHD, right? The job offer is not from the University of Houston, right?**

A. I mean, if you look at Bullet Point 1, it says University of Houston System. I don't know what that says; but, I mean --

**Q. I'm sorry. Where is that?**

A. If you scroll up -- I can only see the Bullet Point 1, that one; and I see University of Houston System there. I'm not sure of the context that it's in, but...

**Q. Here we go. Let's just go over that real quick. "To ensure mutual understanding, I would like to reiterate the nature of the position below: This position is a full-time, benefits-eligible, staff position. You will serve a twelve-month probationary period as specified in the University of Houston System Administrative Memorandum," right? That's what that says.**

A. Right.

**Q. The reference to the system, it's referencing to a memorandum, not as UH System as a separate employer, correct?**

A. I don't know. I think you asked me if this letter mentions University of Houston

System, and it does.

**Q. Okay. Other than that reference, is there anything else in here that would indicate that University of Houston System is your employer?**

A. In this letter?

**Q. Yes.**

A. Oh, I mean, I'm not sure. I haven't seen this, probably, since the moment I signed it. So I haven't bonded with it. I mean, I guess in the bottom right-hand corner -- I don't know -- is that something you-all put on as a labeling?

**Q. Yes, that's just a label indicating the Defendants because you sued both the system and UHD, so we just made that for numbering purposes. See that?**

A. Okay. Gotcha.

I mean, we could probably do a Control F and see anywhere else it's mentioned. So, like, I don't -- without the document right in front of me and parsing through it, I'm not sure I can answer the question.

**Q. Okay. All right. Well, I mean, just for practical purposes, does the job offer**

**appear to come from UHD?**

A. And the University of Houston System, the policies that guide UHD.

**Q. Right, based upon a reference UH System Administrative Memorandum 02.A.18, correct?**

A. Right.

**Q. Okay. All right. We'll leave that as that then. That's fine.**

**Okay. Your office for the job is located on the UHD campus, right?**

A. Correct.

**Q. You don't have an office at UHS?**

A. No.

**Q. Okay. You don't regularly perform any work-related job duties at UH System, correct?**

A. I mean, as an employee of UHD, I'm an employee of UHS.

MR. CONTRERAS: Objection, nonresponsive.

**Q. (BY MR. CONTRERAS) Do you regularly perform any work-related job duties at UHS?**

A. Yes, they sign my paychecks. I mean, I work for -- that's who my employer is.

**Q. Well, do you go there to the UH System offices and do any kind of work?**

A. Oh, no.

**Q. Okay. Other than your testimony that UHS signs your checks, do you have any other indicia of employment by UHS?**

A. I mean, they're my employer.

**Q. Are you saying that your employer is both UHS and UHD?**

A. Correct. UHD is a subsidiary of UHS, right? Like, they are a part, a component, of the system.

I think I'm a little confused, right? I mean, I thought we know that, right? Am I missing something?

**Q. Well, I can't answer your questions for you. I can only ask you questions and you answer.**

A. Oh.

**Q. But let's just leave it as that. I mean, if that's your testimony that your employer was both UHS and UHD, that's your testimony. Okay? So we'll just leave it at that.**

**But I think you did mention --**

**was there at least one fact witness that you mentioned that works at the system versus UHD?**

A. I'm sorry. One more time.

**Q. Is there any witness in this case -- with knowledge relevant to this case that works at UHS that you're aware of?**

A. Oh, Dianca Chase has now left UHD to work at Main.

**Q. Okay. But at the time, she worked at UHD, right, when all this happened?**

A. Correct.

**Q. Okay. Thank you.**

**And so all of these comments by Gengler that you're raising in the lawsuit, they were made verbally, right?**

A. Right.

**Q. Okay. So there was nothing that Gengler actually put in writing in an e-mail or any other type of document in which he made any type of discriminatory remarks based upon your race or sexual orientation, correct?**

A. If we include his responses to the investigation, the responses. I mean, although I made my initial complaints about the events that happened, his responses many times in

writing to the lawyers were often double-downing, but also racist, discriminatory, bullying, and harassing, which could be completely new cases but also continued to re-traumatize.

MR. CONTRERAS: Objection, nonresponsive portion.

**Q. (BY MR. CONTRERAS) So what racist or improper comment based upon your sexual orientation did he put in any documents relating to the investigation? Tell me specifically -- as you sit here today, tell me specifically: What words did he put in writing that were racist or disparaging of your sexual orientation?**

A. I would have to refer to his responses that were written down. It was very much full of examples.

I think I'm also starting to wane here. I'm starting to get tired. So to ask me, like, specific materials from the document; but I know that they were there. I mean, he doubled-down on jokes that he had told. He continued to try to explain why they aren't racist, and then the lawyers would come

in and tell him why they are racist; or he would say that I told the joke wrong and then rephrase it and reframe it to tell it the right way and it would still be racist or misogynistic.

**Q. Okay. So, I mean, as we sit here today, though, you can't quote anything that Gengler wrote in his response to your complaint, right?**

A. Okay. So if we want to do that, we can. I mean, we have the documents; and we can go through them. But in one of his responses, he claimed that he never told a joke about his wife and he claimed that the joke isn't actually written: I've had a lot of money and I've spent a lot of them on booze, women, and -- booze, women, and, like, travelling or something; and only two of them were worth -- booze, women, and my wife; and only two of them were worth it.

And he goes, "The joke doesn't actually go like that; the joke actually goes like this" and he continues to tell the joke. And it's actually more harassing and more awful than what I had actually written because I

didn't recall it specifically the way that he said it.

Another time where he did that was the joke of the two men who were on a date, where he, in front of me and Brett Hobby, who identifies homosexual, I told the joke one way; and in response, he doubles back and corrects me and says, "The joke is actually said like this: Why should a waitress obey two men who are on a date? Because it's a man date."

Apparently, I didn't say it specifically that way, right? And so then he continued to do it that way.

Another way that we can go through this is the time where we talked about the Ketanji Jackson-Brown case; and I said -- and I reported that it made me feel uncomfortable saying -- "He doesn't understand why we would limit this to 6 percent of the population, but whatever."

He then goes back and says, "I didn't say it that way. Dr. Gooden misunderstands me." And the way he recounts saying it is equally racist, but he put it in writing.

I think the issue here is he actually had time to sit down and write those things. And my other thing is, like -- I think I'm going on a tangent.

I don't care that he is racist. I should never have known these things or been aware of his views in the first place. So I don't necessarily care about his identity or his identity politics or his culture wars. None of those should have ever been in the workplace.

But if you want us to kind of go through one by one a document that you have access to for me to tell you what is racist in that document, I'm not sure that's the best use of any of our time; but we can certainly do it.

I lived this experience, Mr. Contreras; and it's real. And one thing that has not happened on your side is no one's disputing the fact that he didn't do or say these things. So we have a wealth of time that we can use talking about the ways that UHS did not address the concerns; or we can go back to what he did and what he didn't say and act like they didn't happen. But no one at UHS has ever

said that they didn't happen. We know that they did.

MR. CONTRERAS: Objection to the nonresponsive extended tirade.

**Q. (BY MR. CONTRERAS) But --**

A. Tirade, that's what we're doing?

**Q. Sir, sir, you just yourself described that you're being longwinded here. I just asked you a question; and you're giving me a very long, extensive, narrative answer. And that's not what I asked.**

A. For the record, you asked for every single example that he put in a written response that was actually identified as racist; and there are several of them. And you asked do I have any. And I said "yes," and I started to go through what you asked for.

MR. CONTRERAS: Objection, nonresponsive portion.

Object to Plaintiff's sidebar comment.

**Q. (BY MR. CONTRERAS) Mr. Gooden, why don't we just do this, okay? My question to you about anything in writing that you interpreted as being disparaging towards your**

**race or sexual orientation, you're saying are contained in Gengler's written response to your complaint, correct?**

A. That is correct.

**Q. Okay. Is there anything else, any other category of documents or anything written by Gengler outside of that context that was improper or disparaging towards you to your race or sexual orientation?**

A. There may exist documents, but I don't have full knowledge of everything that would be out there regarding my race or sexual orientation in writing.

**Q. Okay. So when you say "there may exist," you're just speculating, right, because you don't know one hundred percent for sure about that, correct?**

A. That is accurate. There may be.

**Q. Yes, you're speculating that there may be; but you don't know for sure one hundred percent, correct?**

A. Correct.

**Q. Okay. What about anything in writing by anybody else at UHD or UHS in which they said they had a problem with you because you're**

**homosexual? Is there -- do you have any knowledge of that?**

A. I do not have any knowledge.

**Q. Okay. Are you aware of anything in writing, once again, such as an e-mail, in which anyone else other than Gengler at UHD or UHS said that they had a problem with you because you're Black?**

A. I mean, other than the written declarations that I had that mentioned, "Isn't it interesting that Carlos, who is Black, is calling Dean Gengler a racist, who hired him, which was Marilyn Davies, right?

And so when I go back to those articles and I read those thing or read those written declarations that were submitted by my colleagues and individuals that I work with, those are the only times where they write to support his character as a non-racist. And my identity is brought up both in that as Black and gay, as well as connected to me and the President in writing. So those, I think, are very relevant and would fit the category you're referring to.

**Q. So then, the declaration, affidavits,**

**statements that you're referring to by Gengler supporters, as you've described, referring to you as either Black or an African American and identifying your sexual orientation, which you, yourself, admit, is improper. Is that what you're saying?**

A. I believe so, yes.

**Q. Okay.**

A. I guess in the spirit of what you asked me before, if I don't fully understand the question, to ask, I don't fully understand that question.

**Q. Okay. So, well, my question to you was: Once again, are you aware of anything in writing in which anyone else other than Gengler at UHD or UHS made improper or disparaging comments about you based on your sexual orientation?**

A. Yes.

**Q. Okay. And it's those written statements, correct?**

A. That is the limit of what is in writing that I'm aware of, yes.

**Q. Okay. Anything else?**

A. At UHS, no.

**Q. Okay. Did you personally hear anyone other than Gengler, anyone else at UHS or UHD, say that they had a problem with you because you're homosexual?**

A. No.

**Q. Okay. What about the same question but because you're Black?**

A. No.

**Q. The same question about hearing -- other than Gengler, the same question about anyone -- hearing anyone else make an improper comment about you because you're Black?**

A. No.

**Q. Anything in writing by anyone at UHS or UHD instructing or encouraging Gengler to harass you because you're homosexual?**

A. Anything -- I'm sorry. One more time, please.

**Q. Are you aware of anything in writing in which anybody at UHS or UHD instructed or encouraged Gengler to harass you because you're homosexual?**

A. No.

**Q. The same question but to harass you because you're Black?**

A. No.

**Q. If you had an e-mail or other document in which somebody at either UHS or UHD made an improper comment about your sexual orientation, would you have turned that over to your lawyer?**

A. Yes.

**Q. Okay. The same question about your race. If you had anything like that about an improper comment about your race in writing, would you have turned that over to your lawyer?**

A. Yes.

**Q. Okay. I'm getting close here. I'm going to try and do my best on wrapping up soon, hopefully, by 5:00.**

**But let me ask you this, Dr. Gooden: When did you first start seeing a therapist or counselor?**

A. April of -- related to the case, it would be April 2022.

**Q. Okay. What about in your life?**

A. In my life?

**Q. Yes.**

A. You want, like, years?

**Q. Yes. When did you first start seeing**

**a therapist or counselor in your life?**

A. I think the first time might have been 2016.

**Q. Okay. And any particular traumatic experience or thing that caused that?**

A. It's kind of personal; but it was a relationship, a breakup.

**Q. So you would have been, what, approximately in your early thirties?**

A. I think that's fair to say, yes.

**Q. Around there?**

A. Yeah.

**Q. And since that time, since 2016, have you regularly visited a counselor or therapist for any, you know, mental health issues or the need to receive therapy for whatever is going on in your life?**

A. Sure. I think I did that in 2016, and I engaged for a while. And then I want to say the next time I used a therapist was during the stay-at-home order, COVID, so maybe like October 2020.

**Q. Okay.**

A. That sounds about right. And that was just navigating the isolation and stay-at-

home order. And then April 2022.

**Q. Okay. So, basically, three different times in your life over three different things?**

A. Sure.

**Q. Okay. If you could, identify all physical and mental injuries or conditions that you claim you incurred as a result of the allegations you're making in this lawsuit.**

A. If I can?

**Q. Yes.**

A. Well, I think a lot of it was, obviously, like, mental anguish. My mental health had eroded. I had developed a severe anxiety which then led to depression as a result of this.

**Q. Okay. Are those a full description of all the, I guess, ailments or things, mental anguish, severe anxiety, and depression?**

A. That's accurate, yes.

**Q. Okay. And when did these conditions start -- oh, oh, I'm sorry. I'm sorry.**

**Let me go back really quick. On these three different times when you had seen therapists in 2016, during COVID in 2020, and most recently in connection with your case, was**

**it with all the same therapist; or was it with different therapists?**

A. Different. I moved. I lived in different places each time.

**Q. Okay. The therapist that you see in connection with the injuries you're claiming in this case are in Houston?**

A. Ideally, yes. I met them in Houston; but we meet, like, Teladoc, like, VirtualHealth. So I believe they would have to be in Texas according to, like, their licensure; but I don't know if they're actually in Houston.

**Q. Okay. So you've never actually been to their -- like an in-person office visit; it's all, like, in the way that we're communicating right now on Zoom?**

A. For my talk therapist, yes. My talk therapist would be virtually. So I recently just started seeing a new one with the new year, like, December; but the one with Anne Hicks would have been virtually. And then my psychiatrists I do have to see in person every so often, so I have met in person with them.

**Q. Okay. And is that Bright Stone?**

A. That is correct. They're in Houston.

**Q. Okay. So you're currently seeing two different counselors?**

A. I would say I stopped seeing one therapist, and now I'm talking to a new one. I sort of transferred. And then my psychiatrists have remained the same.

**Q. Okay. And, generally, or just at least a timeframe, when did you start experiencing these conditions?**

A. Well, I started seeing -- in April of 2022, I started to talk to them about what I was experiencing in the workplace; and I had to kind of figure out -- just kind of get a third-party sort of like objective view of, like, what was happening. And what we realized is that at the time of April, I had been sort of like chipped away at, right? Those microaggressions, those paper cuts, those mosquito bites had been occurring.

And so at the time when I decided to file and I said enough was enough; I couldn't take it anymore. That was my result that I came to after being in sort of like therapy and getting that objective that this is

bad. Like, I've been minimizing this, actually; but this is really, actually, like, really bad and that I would be valid in bringing it -- coming forward.

**Q. Okay. And was that the psychiatrist in April of 2022, or was that with Anne Hicks?**

A. That was with Anne Hicks.

**Q. Okay. But she's not a psychiatrist, right? Is she a counselor?**

A. I believe so. I'm not sure.

**Q. Okay. And are these conditions ongoing up to this day now, or have they subsided? Have you improved? What's the current status?**

A. They continue, although, I'm not -- I'm still navigating my anxiety. I'm no longer in depression at this time, but I'm still dealing with anxiety in the workplace.

**Q. And when did you overcome the depression?**

A. The thing about depression is you don't know you're in it when you're in it. It's only in hindsight. And so I would say things started getting better for me around, like, May 2023; but I also ended up -- the term

had ended. I had vacation put in place, and then I put in for FMLA.

**Q. Okay. Could you just explain to me: What types of symptoms, health symptoms, did you experience with your mental anguish, severe anxiety, and depression?**

A. Yeah, absolutely. One of the things that I really realized was my indications was I was just like highly irritable, right? I had, like, a very short attention span as well. It was very difficult for me to focus with anxiety. I could feel, like, heart palpitations. I began breaking out in hives because of anxiety and stress; and so, like, I had to take some days off work. I had to get, like, an allergy test. They were, like, "You don't have allergies. Like, you just need to sit down somewhere." So that was in the summer of 2022.

My personal hygiene began to fail. There would be days where I just wouldn't shower at all. My friends came over, did the dishes for me, took out the trash, and would start cooking for me. I was not taking care of myself at all. I wasn't grooming,

right? I wasn't doing my laundry. My hair wasn't brushed. Like, my friends literally came to, like, intervene.

And it got to the point where, you know, when I asked for the administrative leave, that was my holiday break, right? I would typically go home and be with my family, but I was like, "I cannot present myself this way." I had gained weight. My actual, like, skin was in bad condition. And so I was, like, "I cannot let my family see me like this," nor would I have the actual mental capacity or the social meter to engage; and that's just not who I was before this experience at all.

And so it took some time to be able to, like, navigate those things.

**Q. Okay. So have those symptoms improved since that time in the summer of 2022?**

A. I would say with the help of FMLA, yes, my depression has not necessarily been an issue. Again, at the time that I requested protective measures, they very much were. I also had the benefit of accommodations for anxiety in the workplace; but, certainly, when I do -- I don't always have those. But when I

do go in, you know, it's very overstimulating for me to have to deal with in the workplace.

**Q. With Gengler gone, correct?**

A. Correct.

**Q. Okay. So even with Gengler gone, who has been gone since May of 2023, you still do not feel secure in the workplace?**

A. That is correct. I walk -- yeah, that is correct.

**Q. And why is that?**

A. I think we sort of talked about it. You know, we -- I'm continuing to engage with people who, as a result of this investigation and this lack of closing, still believe that I am a liar. I walk into the Marilyn Davies College of Business. She donated $10 million. I wear her name on my Polo. And she literally says I put out these unsubstantiated -- but we know they are substantiated; the university chose a different route instead of substantiated. So they resolved it for themselves and for him, and I continue to work in this environment with my colleagues who believe that I am a liar.

**Q. Has anyone ever actually told you**

**face to face, "Dr. Gooden, we don't believe you were truthful and honest; and we, in fact, think you're lying about this whole thing against Gengler"? Has anyone ever told you that?**

A. I can't recall off the top of my head, like, specifically, you know, like date and time.

**Q. Okay. So but has that happened? You know, you may not be able to narrow it down to yesterday at 2:45 p.m.; but has anybody ever directly to your face in a conversation in person told you they did not believe any of your allegations against Gengler in your complaint and that they think that you're a liar?**

A. I would say I'm not sure if I can answer that, but directly --

**Q. Why not?**

A. -- that's a lot to ask, right? And, also, the way that I'm receiving this information, it's not necessarily that direct; but because they're not direct doesn't mean they're less valid or untrue.

**Q. So then are you basically suggesting**

**that, without it being directly communicated to you, somebody thinks that you were untruthful, that's the feelings that you get when you see other people or interact with other people is they give off an impression that they do not think that you are an honest man?**

A. That's one part of it. Yes, I believe that is absolutely accurate.

I mean, the other part of it, too, is, you know, I've been painted by Gengler as this, again, like, angry, militant, you know, Black Panther, Black man who goes around yelling, swearing, and cussing at people and intimidating people and I could physically take them. And so he spread those things.

And similar to, like, your line of questioning, that's the same sort of approach that Lauri Ruiz took. "Well, I don't think that that's happening," right?

And so when I say that I have, like, a lived experience and this is what I'm experiencing in the workplace and someone tells you they don't think that it's happening because it doesn't fit sort of like this narrow definition of how you use it, that, to me, is

gaslighting.

And so when that happened then and we're sort of trying to, like, narrowly define my experience now, what happened a month later is that those affidavits came out that confirmed for sure that I knew what I was experiencing in the workplace. I lost a lot of working relationships as a result of that.

Until this day I still don't speak to a lot of people who were a part of this investigation, not even a hello walking down the hallway; or you walk down the hall and then, all of a sudden, a group of people disperse and run to different rooms and the conversation starts. I'm not a part of the lunch invitations, right? Like, I've been extremely, like, isolated.

Even if I'm in a meeting and I feel that I need to disagree with my colleagues, I have to make myself so small when I go into those conversations because the baseline conversation for this is that I am someone who will report or who will make up things in order to sort of like prove my point.

So those are the types of things

that I'm continuing to experience.

MR. CONTRERAS: Objection to the nonresponsive portion.

**Q. (BY MR. CONTRERAS) With regard to any health issues or mental -- I guess mental anguish, severe anxiety, or depression, prior to your employment, did you have any pre-existing conditions that you contend were aggravated as a result of the allegations you're making in the lawsuit?**

A. In regards to anxiety and depression?

**Q. Yes, anxiety or depression.**

A. Correct, I would say I have had it before. Yes.

**Q. Okay. So my question is then: Were any of these pre-existing conditions aggravated as a result of allegations you're making in the lawsuit?**

A. Aggravated by any -- I would say, I mean, I ended up having anxiety; but they were all very different reasons why. So were they aggravated? I guess I would say yes.

**Q. Okay. How?**

A. How were they aggravated? I mean, again, I would consider it to be, like,

harassed and bullied every single day, right? And then, when I actually spoke up and said something, I was continued to be put in front of my harasser every single day for another month.

Then, when he was put on leave, I then continued to report how I felt sort of unsafe in the environment each month while dealing with character assassination, which I also reported to the University; and that never stopped as well, while continuing to be expected to perform my functions, which I have done in my role to the best of my ability and while continuing to navigate, you know, responses requested from Littler Mendelson. That was its own sort of like part-time job, but also having to produce those deliverables that took a significant amount of time.

Even the information that you asked me to submit, that was me reliving this all over again. So that re-triggers all over again.

**Q. When were you first diagnosed with anxiety and depression?**

A. I would say the first time would have

been 2016 was when I first sort of like learned about anxiety.

**Q. Okay. And this most recent stint to psychiatrists, did they actually -- I mean, are they able to make a diagnosis; or do they just do counseling to try and find out what the root of the cause is and address that and to help your mental health condition?**

A. The therapist or the psychiatrist?

**Q. Both.**

A. I guess I'm not sure I understand the question fully. I know the therapist, we would talk; and, oftentimes, like, we couldn't really get too deep into it because we were dealing with the latest thing that week and so just like kind of catching up on the latest thing that week because there was never any sort of, like, peace, calm, or resolve. That tended to be a lot of what we talked about and, like, navigating that; but we couldn't quite get deep, deep because every week, there was, like, something to be able to have to, like, bring up.

**Q. Okay. And so the psychiatrist is more focused on medication management and**

**providing you with the medication to improve your condition, while the therapist is there to talk things through and address issues, correct, in a nutshell?**

A. Correct.

**Q. So in your written discovery answers, you identify Miranda Sanchez and Chandra Smith with Bright Stone Psychiatry and Anne Hicks as -- I guess that would be your therapist with Doctor On Demand by Included Health?**

A. Correct.

MR. CONTRERAS: And let me just -- are we on Exhibit 11 or 12?

THE REPORTER: I believe 12.

MR. CONTRERAS: Exhibit 12 will be Plaintiff's Interrogatory Answers.

(Exhibit 12 marked.)

MS. OWENS: Before we go any further, Court Reporter, how long has Dr. Gooden been on the record testifying? Can you give me that?

THE REPORTER: Yes. It looks like five hours and seven minutes.

MS. OWENS: Okay. Thank you.

MR. CONTRERAS: I'm trying to

wrap up and go through this as fast as I can to, hopefully, be done by 5:00, Rochelle. I'm getting close, though. Okay?

MS. OWENS: Okay.

**Q. (BY MR. CONTRERAS) So here's your Interrogatory Answers, and it just might help to show it to you rather than talk about it so you can see the information. Here we go. Let me just...**

**So, once again, as I mentioned earlier, you know, the parties submitted information back and forth about the claim and other information about the lawsuit. And so can you read that, or do I need to blow it up a little bit?**

A. Can you zoom in?

**Q. Yeah. Can you read that?**

A. Yes.

**Q. Okay. Interrogatory Number 12 -- oh, it bumps right over with just one move of the mouse there -- but in Interrogatory 12, you identify your healthcare providers, as I mentioned, with Bright Stone and then Anne Hicks with Doctor On Demand.**

**And so you go and see Hicks in**

**person, right, because she's the therapist?**

A. No, that's the tele- -- that's virtually.

**Q. Okay. And you see the psychiatrists in person, right?**

A. Oh, sometimes we do virtually; but the regulation states I have to go in every so often for an in-person.

**Q. Okay. So how does that work with Miranda Sanchez and Chandra Smith? They're both psychiatrists, right?**

A. Correct.

**Q. And when you visit them, do you visit both of them so it's all three of you; or is it just one or the other, depending upon scheduling or availability?**

A. One or the other.

**Q. Oh, I mean -- okay. So when you go to Bright Stone, do you visit with both Miranda Sanchez and Chandra Smith at the same time; or do you visit with them separately, depending --**

A. One -- sorry. I was going to let you finish. I thought you were done.

**Q. Oh, no, I'm done. Go ahead.**

A. Oh, no, it's usually one-on-ones.

**Q. Does that just depend upon who's available in their scheduling or is there one you have a preference to or how does that work?**

A. They assign.

**Q. Okay. And so who do you see more, Miranda Sanchez or Chandra Smith?**

A. I'm not sure.

**Q. Okay. Maybe half and half equally?**

A. I'm not sure.

**Q. Okay. When's the last time you've been to Bright Stone or had a visit?**

A. Every three months I have to engage. So I'm going to say maybe September would have been -- huh-uh. It would have been October, October I would have had to engage.

**Q. Okay. And do you indicate to them your current status, your current wellbeing, and how you're doing and how you're feeling?**

A. Absolutely.

**Q. Okay. The same thing with Anne Hicks?**

A. Correct.

**Q. Okay. And would it be correct to say that you've been seeing the psychiatrists at Bright Stone since April 2022 up to the present**

**every three months?**

A. No. I've been seeing -- Bright Stone Psychiatry started in July of 2022.

**Q. Okay.**

A. That's when I started seeking additional help; but Anne Hicks would be, yes, April 2022.

**Q. Okay. And how often? Was that the one for every three months, or how often do you see Anne Hicks?**

A. No. Anne Hicks, that was sporadically. So it could be -- I think at one point we were meeting weekly because we had so much material and ground to cover. I feel confident saying that that was for a good year or so.

Right around the time of my FMLA, I decided to take a break; and it was no longer healthy for me to continue to engage with conversations in the workplace because I needed to disconnect. I needed to disconnect.

**Q. Okay. So Bright Stone prescribes you the Vyvanse medication; is that right?**

A. That is correct.

**Q. Okay. And the one picture that you**

**produced was a picture of your pill bottle that was dated December 24th, 2023. Was that the first time you started taking the medication?**

A. No.

**Q. Oh, okay.**

A. I mean, through this, yes; but, like, that was a refill.

**Q. Okay. So then, I guess, you've take Vyvanse --**

MR. CONTRERAS: Oh, and for the record, it's V-Y-V-A-N-S-E.

**Q. (BY MR. CONTRERAS) Did I get that right?**

A. Correct.

**Q. Okay. And so you had taken this medication previously in your life, stopped, and then started taking it again in connection with the allegations in the lawsuit?**

A. That is correct.

**Q. Okay. When did you start taking Vyvanse in connection with your claims in the lawsuit?**

A. So it originally started off as Adderall, and it would have been July 2022. And so that was when I first started expressing

concerns over my physical safety. And so I then started seeing psychiatry help to help me with sort of like my responses and reactions, and so that is when I did Adderall. And then there became an Adderall shortage in the country, and it became very difficult for me to get that. And so I then switched to Vyvanse, which is an alternative.

And, I mean, the psychiatrist wanted to put me on antidepressants several times and advocated for it and I did not want to go that route. I was a major advocate for something that would reduce my stimulation, particularly at work. And so she agreed that I should take it for the days that I work and then take a break on the weekends from it. So that was my sort of like medical management plan.

**Q. Okay. Thank you.**

**And so you've been taking Vyvanse -- well, you said you started with Adderall in July 2022; and then when did that switch over to Vyvanse?**

A. I cannot recall that. There was a time -- there was a time where a really big

shortage had happened and I had gone to try and get a refill and I couldn't and so I couldn't tell you exactly when that was.

**Q. Okay. But you are currently taking Vyvanse presently?**

A. Correct.

**Q. And is that as needed or is it prescribed that you take, like, one a day; or how does that work?**

A. It's typically one a day for the days that I work, Monday through Friday.

**Q. Okay. And Vyvanse, that's for your anxiety, right?**

A. Yes, it helps with anxiety.

**Q. Okay. Because I thought it was for attention -- ADHD in adults, but that's kind of another way of saying it's treatment for anxiety?**

A. Yes. The way that it helps me is it helps reduce stimulation and reaction and responses to stimulation. And so, for me, when I go into the working environment and I'm sensing, you know, like, anxiety, it helps me just get a moment to reduce it a little bit and be able to kind of of like go into my office and

decompress so I can get the work done. So we do use it for my anxiety.

**Q. Okay. Have you been prescribed any other medication other than -- I think you said the Adderall and then it switched to Vyvanse. Any other medications?**

A. I mean, none relevant to this.

**Q. Okay. So you take other medications; but they are not related to your claims in your lawsuit, right?**

A. Correct.

**Q. Okay. And do you have appointments in the future with any of these healthcare providers?**

A. I just had one with my new therapist -- what's today, Friday? So I maybe met with her Tuesday or Wednesday in preparation for this; and then my upcoming one with Bright Stone should be coming up next month, in February.

**Q. Okay. And is there any way you can tell me how much longer in the foreseeable future you plan on seeing these healthcare providers for things that you associate with your allegations and claims in the lawsuit?**

A. I'm not sure. I don't know. I don't know if I can answer that.

**Q. Would it be correct to say, though, that since Gengler is not there anymore, the environment is not as hostile as it was at the time when he was present?**

A. I'm not sure how to answer that.

**Q. Well --**

A. Not as hostile? So it is hostile, but not as hostile? Is that what we're resting on?

**Q. Well, I mean, the guy that you testified to was making discriminatory comments and jokes is no longer in the workplace, right? And you testified earlier that he was the only one that was doing that. So would it be fair to say that with him absent now from the workplace, gone -- he's not coming back, clearly; and you can probably rest assured on that -- does that ease any anxiety or tension that you have?**

A. I would say it does ease, yes. Thank you for that. I just want to note that it is still hostile, but I would agree that it is not as hostile.

**Q. Okay. Who is hostile towards you in the workplace? Because, you know, once again, Gengler's gone; so who is the person that's now making improper comments based upon your race or sexual orientation?**

A. I'm not sure of my right to respond, but that's redundant. We've, I think, circled and answered that question about five different ways.

MR. CONTRERAS: Objection --

A. And the last time it led me into what you classified as a tirade. So I'm not sure, like, how else to respond in answer to that question (laughing.)

**Q. (BY MR. CONTRERAS) Well, since Gengler's departure, has there been anybody else in the workplace that has made any improper jokes or comments or -- of course, including in writing -- that is demeaning or disparaging towards your race or sexual orientation?**

A. As it relates to the case, I very much isolate myself at work now because I'm not uncomfortable -- I'm not comfortable engaging with individuals at work.

MR. CONTRERAS: Objection, nonresponsive.

**Q. (BY MR. CONTRERAS) Since Gengler's -- and I just need you to listen to my question so we can move on. But my question is: Since Gengler's departure, has anybody else in the workplace made any comments to you or jokes or inappropriate remarks that disparage your race or sexual orientation?**

A. Yes. We've answered that question, though.

**Q. I don't think we have. Who --**

MS. OWENS: Objection, asked and answered.

**Q. (BY MR. CONTRERAS) Who is that person or persons?**

A. My attorney...

MS. OWENS: He's described Ms. Davies, who has been quoted in articles, indicating that Dr. Gooden is a liar. He's testified to that previously today, and she went through on knowing -- stating that Mr. -- or Dr. Gooden, who's an African American man, isn't it suspicious that the reason why he complained is because he wanted comp time. And

I believe she got the timing wrong, which is why she would make such a accusation or an allegation.

But Dr. Gooden has testified to this about four times. I've been keeping a tally on the last time I recall. So he's testified to this about four times.

MR. CONTRERAS: Okay. Well, let's just leave it at that then.

**Q. (BY MR. CONTRERAS) If that's the testimony that you're giving in response to my answer [sic] I'm going to leave it at that. But just to summarize in a nutshell, you are interpreting those representations as being disparaging towards you based upon your race and sexual orientation; is that correct?**

A. That is correct.

**Q. Okay. And so for these visits, do you use your health insurance through work?**

A. I do.

**Q. Okay. Do you have any other insurance that you use to cover these visits to these healthcare providers, or is it all through your work health insurance?**

A. All through work.

**Q. Okay. And so for visits with Bright Stone Psychiatry, how much is the cost for you out of pocket per visit?**

A. It is my co-pay, which might be 30 or $40 -- I'm not sure -- and then, of course, the cost of the prescription.

**Q. Right, and I saw that. It was $45 a bottle?**

A. I believe you more than me. I didn't look at that. I just kind of swipe and go, but...

**Q. Okay. Does that sound about right, $45 out of pocket for a bottle of Vyvanse?**

A. Correct, that sounds about right.

**Q. Okay. And how much per visit with Anne Hicks?**

A. That goes through my insurance. I do not have a co-pay.

**Q. Okay. So you only actually have to pay out of pocket for Bright Stone Psychiatry, right?**

A. Correct.

**Q. Okay. So from the time you started seeing healthcare providers at Bright Stone up to the present, is there any number of visits**

**you can assign to that?**

A. No, I can't. I'm not sure.

**Q. Okay. The records would reflect the number of visits, right?**

A. I'm sorry. Was that to me?

**Q. Yes. To you that your medical records would reflect the number of visits to Bright Stone Psychiatry?**

A. Yes, yes. Sorry.

**Q. Okay. And is there any way you can you tell me the total cost out of pocket as of today for your visits to Bright Stone, any particular monetary amount or estimate?**

A. I didn't do any sort of -- I'm not sure. I wasn't prepared for that question.

**Q. Okay. What about -- I'm sorry?**

A. I wasn't prepared for that so I didn't kind of like go through my calendar, you know.

**Q. Yeah. Okay. What about for the medication? Is there any way you can tell me how many bottles you've paid for of the Vyvanse medication?**

A. No. I'm sorry. I don't -- I can't -- I wouldn't have that information on

me.

**Q. Okay. So in your job at UHD, at any time have you ever performed any of your work while physically present outside of state?**

A. Possibly, yes.

**Q. Okay. And when was the last time you did that?**

A. What is today? This is a question -- I mean, I can't recall.

**Q. Do you remember how many times that's been?**

A. Huh-uh.

**Q. Currently, what is your work schedule? Do you have, like, a hybrid work schedule where you work a couple of days a week from home and then a couple of days a week on campus?**

A. I tend to be more hybrid, yes.

**Q. Okay. So currently, on average, during any given week -- well, let's just say last week, how many days would you have worked on campus; and how many days would you have teleworked?**

A. I'm not sure. I'll have to look at my calendar; but maybe -- oh, last week?

That's a unique week because it was Martin Luther King; and then we had a freeze, right? So I think we all -- I'd have to look at my calendar.

**Q. Okay. Well, how about: Just currently during the average week, how many days do you work on campus; and how many days do you telework, work from home?**

A. It could be some -- it varies week to week. Some days [sic] it could be three out, two in; two in, three out; four in, one out; five. It just depends on what's happening that particular week.

**Q. Okay. Would it be fair to say that when you're teleworking, you feel less anxiety because you're not physically present on campus?**

A. That is correct.

**Q. Okay. So in your lawsuit one of the things you're asking for is monetary damages. You understand that, right?**

A. Yes.

**Q. What is the total amount of damages you're seeking for mental anguish and emotional distress in this lawsuit?**

A. I would say what the law says and allows.

**Q. Okay. So you're unable to give me even an estimate of how much you're seeking in monetary damages for mental anguish, pain and suffering?**

A. I would lean on what the law says in terms of that. I'm not sure how to respond other than that.

**Q. Since you've maintained your job and maintained your salary this whole time and even received raises, you're not requesting any backpay damages, correct?**

A. I would say whatever the law allows.

**Q. Okay. Do you know -- can you tell me of any other types or forms of monetary damages you're seeking?**

A. I would have to say whatever the law allows. I'm not sure. This is...

**Q. That's fine.**

**How did you find -- and I don't want to ask you about any communications with your attorneys, but I just want to ask you: How did you come to find Moore & Associates to represent you in this lawsuit?**

A. I think I did a Google search, and they had popped up. I had engaged, I think, with maybe, like, two or three attorneys; and then their office is right up the street from my office. I can actually see my office from theirs. And so it made it very easy for communication, in-person meetings on lunch and things like that, to be able to go back and forth between their building and my building because we're both downtown.

**Q. Okay. And as we sit here today, have you put down any monies or, like, a retainer fee at all; or has it all been by contingency representation?**

A. I believe so. That's very legally and technical. So I'm not sure, but I believe the answer is yes.

**Q. Okay. So I guess just to put it in, you know, standard American, have you paid your attorneys any money?**

A. No.

**Q. Okay. Is it your understanding that they only collect if you win your case?**

A. That is my understanding.

**Q. Okay.**

MR. CONTRERAS: Can we just take a quick two-minute break? Then back on the record; and I should be very, very close to finishing. Just a two-minute break.

THE WITNESS: I would appreciate that.

MS. OWENS: Yeah.

MR. CONTRERAS: Thank you.

THE REPORTER: We're off the record at 5:02 p.m.

(Off the record from 5:02 to 5:08 p.m.)

THE REPORTER: We're back on the record at 5:08 p.m.

MR. CONTRERAS: Sorry. My camera went out, Guys.

MS. OWENS: It's okay.

MR. CONTRERAS: You can hear me okay, though, right?

MS. OWENS: Yes.

MR. CONTRERAS: Okay. Great.

**Q. (BY MR. CONTRERAS) Let me ask you just a couple of questions; and I think we'll be done very, very quickly here.**

**Dr. Gooden, what has been your**

**contact with the media and press in relation to your allegations in the lawsuit?**

A. Yes, I did share some information with the media and press.

**Q. Okay. And, first of all, what information did you share?**

A. I mean, I shared with them that there was an investigation going on and some of the things that's happening with it.

**Q. Okay. Anything else?**

A. I guess no.

**Q. Okay. And with which, I guess, news media companies or organizations did you -- which press companies did you share that information with?**

A. I mean, I engaged with a few and declined others. I'm trying to remember. I know for sure Inside Higher Ed and The Chronicle. I did not engage with The College Fix. There was a news channel who wanted to do an interview. And I believe GLAD and maybe one other sort of like national organization -- maybe one or two other organizations.

**Q. Okay. And did you provide documents to these organizations; or was it just, like,**

**through an e-mail where you would communicate to them what's going on?**

A. A little bit of both. To validate that an investigation was happening, I did.

**Q. Okay. And what -- which documents did you provide and to who?**

A. I mean, I can't recall specifically. I do know that I did share some information with the Inside, Ryan O'Quinn -- or maybe Ryan Quinn -- some information; but I can't recall what specifically. If I shared anything with The Chronicle, I can't recall. I do know that I shared information with Inside Higher Ed.

**Q. Okay. What information did you share with Inside Higher Ed as far as documents?**

A. Yeah, again, I can't recall, like, the specifics of it. I believe they needed evidence that what I was saying was true; and so, like, I do remember sending some attachments to them.

**Q. Okay. But you don't recall what those attachments were?**

A. Not specifically, no. This was a while ago.

**Q. Okay. And with all of this press and**

**media, were you the one that initiated contact with them?**

A. Most of them, not all of them.

**Q. Okay. Which news media or press contacted you and wanted information?**

A. The College Fix, and I was -- was it ABC? I can't quite remember the actual news station, but I happened to be out somewhere with a correspondent and we were just having a conversation and it came up there. And they were like, "We want to interview you." So I don't think anyone actually, like, approached anyone. It was just kind of like a natural conversation that evolved.

**Q. Okay. But with others, you did initiate contact; you affirmatively contacted them through an e-mail or maybe a phone call?**

A. Correct.

**Q. Okay. Did you cc your attorney on those communications?**

A. I don't know.

**Q. For example, if you had reached out to the press or media and sent an e-mail, to cc your attorney on the e-mail, is that what you're saying you don't know?**

A. No, I don't know. I know that I communicated with them regarding it; but I don't know if I actually, like, put their e-mail in the "cc." Like, I don't know that.

**Q. Okay. Did you provide the preliminary report to any media?**

A. Again, I provided some -- I don't know if I did or didn't. I don't know. I'm not sure.

**Q. All right. Well, that did result in at least a few articles being published about your lawsuit or just one, or more?**

A. One more time.

**Q. Your communications with the media resulted in at least one news article about your lawsuit, right?**

A. At least one, correct, yes.

**Q. Okay. And do you recall the name of that media outlet or that newspaper?**

A. So, I mean, the two are The Houston Chronicle and Inside Higher Ed.

**Q. Okay. And Inside Higher Ed is kind of more of a scholarly publication for academics, right, not necessarily for the general public?**

A. I don't know if it's more scholarly. I think they just focus on issues related to higher education. Well, higher ed, like, that's their industry; but I don't know if they're more scholarly.

**Q. Okay. But, obviously, it's more focused on individuals in higher ed, right?**

A. Correct.

**Q. Okay.**

A. Yes.

**Q. And did you send any documents to any media via e-mail; or was it, like, you just sent paper copies in an envelope?**

A. It would have been via e-mail.

**Q. Okay. But, once again, as we sit here today, you don't recall what specific documents you sent them?**

A. I do not, not off the top of my head definitively.

**Q. Okay. Did anybody at the university encourage you to initiate contact with the media to get your lawsuit out there to the public, or was it something --**

A. No.

**Q. -- that it was your own idea?**

A. It was my idea.

**Q. Okay. Did you produce any of the news articles in discovery?**

A. I would have to ask my attorney.

**Q. Okay. If I do a search online, would I be able to -- if I looked up Carlos Gooden, do you think something would come up on Google about your lawsuit?**

A. Yes.

**Q. Okay. All right. And you said that you were -- you've got at least one interview by a reporter about your lawsuit?**

A. Correct.

**Q. Okay. Just once?**

A. Right. I did not engage.

**Q. Okay. And who was that interview with? Do you remember the name of the reporter?**

A. I do not. And I honestly don't even know if it was, like, ABC or Fox. Man, that was a while ago; but it was that. Huh-uh.

**Q. Okay. Let's see.**

**Have you understood all of my questions today?**

A. Not all of them, but I think we made

it through (laughing.)

**Q. Yes. I mean, you've understood my questions except for the ones that you indicated that you did not understand, right?**

A. Sure.

**Q. Have you answered all of my questions truthfully and to the best of your ability?**

A. Yes.

**Q. Are there any answers to any of my questions that you would like to change at this time?**

A. No.

**Q. Okay. Thank you.**

MR. CONTRERAS: Pass the witness.

MS. OWENS: We'll reserve our questions until the time of trial.

Thank you.

THE REPORTER: Ms. Owens, would you like to purchase a copy of the transcript?

MS. OWENS: No. I would like a read and sign.

THE REPORTER: Okay. This concludes --

MS. OWENS: And with respect --

THE REPORTER: I'm sorry.

MS. OWENS: Excuse me.

And with respect to the exhibits, can you make sure you notate the Bates numbers in the exhibits?

THE REPORTER: I will pass that request along to my office. I don't handle the production of the transcript.

MS. OWENS: Thank you.

THE REPORTER: This concludes the position at 5:18 p.m.

(Deposition concluded at 5:18 p.m.)

--ooOoo--

CHANGES AND SIGNATURE

WITNESS NAME: DATE OF DEPOSITION:

CARLOS GOODEN January 26, 2024

PAGE/LINE CHANGE REASON

I, CARLOS GOODEN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted herein.

_______________________________

CARLOS GOODEN

THE STATE OF __________ )

Before me, _______________________, on this day personally appeared CARLOS GOODEN, known to me (or proved to me under oath or through ______________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this _____ day of _________________, _________.

_______________________________

NOTARY PUBLIC IN AND FOR

THE STATE OF __________________

My Commission Expires:_________

REPORTER'S CERTIFICATION

I, DEBBIE D. CUNNINGHAM, CSR, hereby certify that the witness was duly sworn and that this transcript is a true record of the testimony given by the witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefore.

Subscribed and sworn to by me this day, February 1, 2024.

Debbie D. Cunningham, CSR
Expiration: 6/30/25
INTEGRITY LEGAL SUPPORT SOLUTIONS
9901 Brodie Ln, Ste. 160-400
Austin, Texas 78748
www.integritylegal.support
512-320-8690; FIRM # 528